1  Paul Q. Goyette, Esq. SBN 137250
   Richard P. Fisher, Esq. SBN 161540
2  GOYETTE & ASSOCIATES, INC.
   A Professional Law Corporation
3  2366 Gold Meadow Way, Suite 200
   Gold River, CA 95670
4  Tel: (916) 851-1900
   Fax: (916) 851-1995
5  Email:  richard@goyette-assoc.com

6  Attorneys for Defendants, Townsley,
   Largent, Zufall, and Jacoby

7
                    UNITED STATES DISTRICT COURT
8
                  EASTERN DISTRICT OF CALIFORNIA
9

10 S M-B,  a minor, by and Through his        LEAD CASE NO.: 2:14-CV-00767-MCE-AC
   Guardian Ad Litem DAWN BIANCO,
11 individually and as successor in interest   (Consolidated Case: 2:14-CV-01736-TLN-CMK)
   to the estate of STEVEN MOTLEY,
12                                             **DEFENDANTS TOWNSLEY, LARGENT,
                Plaintiff,                     ZUFALL, AND JACOBY'S  SUPPLEMENTAL
13 v.                                          DESIGNATION OF EXPERT WITNESSES
                                               PURSUANT TO F.R.C.P. 26(A)(2)**
14 CITY OF REDDING, a municipal
   corporation; ROBERT F. PAOLETTI,
15 JARED HEBERT, WES TOWNSLEY,
   BRANDON LARGENT, BECKY
16 ZUFALL, CHRIS JACOBY;
   and DOES 1-25, inclusive,
17
                Defendants.
18  _____

19 L.M. by and through her guardian ad
   litem ASHLEY MCCAIN, individually
20 and as successor in interest to the Estate
   of STEVEN MOTLEY; CAROL
21 ADAMS, individually,

22              Plaintiff,

23 v.

24 CITY OF REDDING, CHIEF ROBERT
   F. PAOLETTI, OFFICER JARED
25 HEBERT, OFFICER WES TOWNSLEY,
   OFFICER BRANDON LARGENT,
26 OFFICER BECKY ZUFALL,
   CORPORAL CHRIS JACOBY; and
27 DOES 1-10, inclusive,

28              Defendants.

                                             - 1 -
_____
**DEFENDANTS TOWNSLEY, LARGENT, ZUFALL, AND JACOBY'S SUPPL. DESIG. OF EXPERT
WITNESSES (Pursuant to F.R.C.P. 26(A)(2))**

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:**

Defendants, TOWNSLEY, LARGENT, ZUFALL, AND JACOBY (hereinafter "Defendants") hereby disclose the following expert witness who may be called to testify at the time of the trial pursuant to Federal Rule of Civil Procedure ("F.R.Civ.P.") 26(a)(2).

**I.      RETAINED EXPERTS:**

1.      Jeffrey A. Martin

DSI Consulting, LLC

727 Industrial Road, Suite 102

San Carlos, CA 94070

Mr. Martin is a Police Practice expert and will be prepared to testify and offer opinions and expertise on the actions of Officers Townsley, Largent, Zufall, and Jacoby.  Mr. Martin will also provide rebuttal opinions of Plaintiff's designated police practice expert(s).  A copy of Mr. Martin's report is attached hereto as **Exhibit A**.  Also included is Mr. Martin's Curriculum Vitae and fee schedule, which includes his publications, trial/deposition testimony, and a list of the information he considered in forming his opinions.

Defendants reserve the right to call any expert disclosed by any other party in this litigation as their expert at the time of trial.

Defendants also reserve the right to call any and all rebuttal witnesses, which are appropriate under F.R.Civ.P. 26.

Dated: July 8, 2016.                           GOYETTE & ASSOCIATES, INC.
                                                A Professional Law Corporation


                                                _____/s/  Richard P. Fisher_____
                                                Richard P. Fisher, Esq.
                                                Attorneys for Defendants, Townsley, Largent,
                                                Zufall, and Jacoby

DEFENDANTS TOWNSLEY, LARGENT, ZUFALL, AND JACOBY'S SUPPL. DESIG. OF EXPERT
WITNESSES (Pursuant to F.R.C.P. 26(A)(2))

EXHIBIT "A"

# L.M. by and through her guardian ad litem v. City of Redding, et al.,

### United States District Court (Eastern District of California)
### No.: 2:14-CV-00767 MCE-AC

### Interim Report of Expert Witness Jeffrey A. Martin
#### Pursuant to Rule 26(a)(2)(B)

## IDENTIFICATION AND QUALIFICATIONS OF EXPERT WITNESS

My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose, California Police Department. I currently divide my time between providing consulting and expert witness services and teaching. I am a former labor relations attorney representing public safety personnel in administrative matters. I also worked as an author of "Daily Training Bulletins" for Lexipol, LLC, regarding various practices including the use of force, search and seizure, and other police practices.

I was promoted to sergeant in 1995 and have worked in the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the Training Coordinator, the Airport Division, and as a supervisor in the Training Division. As a patrol supervisor, I investigated and documented several uses of force by officers, whether as a matter of routine or due to citizen complaints.

Prior to my promotion to sergeant, I was a police officer and my assignments included Patrol, the Parks Enforcement Unit, Field Training Officer Program, and as investigator in the Narcotics/Covert Investigations (NCI) Unit.

While working as a supervisor in the Training Division (2005-2009), I supervised the California Commission on Peace Officers Standards and Training (POST) Force-options Simulator (FOS) program, which was implemented in 1999 in order to fulfill POST "perishable skills" requirements. In this program, my staff and I delivered this training to the sworn members of the San Jose Police Department, as well as other peace officers within Santa Clara County. Additionally, our facility was designated as a "regional skills training center" and we also provided instructor training to others throughout the State of California.

The FOS program concentrated on teaching the state and constitutional laws regarding the use of force by peace officers, as well as decision making involved in using various types of force, up to and including deadly force.

While assigned to the Training Division, I supervised and taught classes in defensive tactics and officer safety and I served as the lead instructor and instructor-trainer for the TASER program for the San Jose Police Department and Basic Academy. I hold a "Master Instructor" certification from TASER® International and I conducted the one-year testing and evaluation of the TASER Cam® for the department. I also served as a "scenario evaluator" in Learning Domain 20 – Use of Force.

As a POST-certified FOS Instructor, I served as an adjunct instructor in the basic FOS program provided by the South Bay Regional Public Safety Consortium from 2002 to 2004. In this

1    capacity, I trained officers in Monterey and San Mateo Counties.  I also served as an adjunct
2    defensive tactics instructor in the Basic Academy at the South Bay Consortium from 2000 to 2004.
3          From 1997 through 2004, I served as an adjunct instructor for the Field Training Seminar at
4    the South Bay Regional Consortium regarding legal and liability issues.  This curriculum included
5    basic search-and-seizure law (Fourth Amendment), and search warrant requirements and
6    exceptions.  I taught in the same program at the San Jose Police Department until 2006.  I also
7    taught legal and liability issues in the POST Supervisors Course at South Bay Regional from
8    approximately 1997 until 2004.  This curriculum included investigating and documenting police use
9    of force.
10         Prior to being hired at the San Jose Police Department, I was an officer with the San
11   Francisco Bay Area Rapid Transit (BART) District Police Department from October 1981 through
12   December 1984.  While there, I worked in both uniformed and plainclothes patrol assignments.
13         During my law enforcement career, I have used various tactics, tools and techniques in order
14   to control subjects in field situations.  This included the use of batons, chemical agents (both CS
15   and OC sprays), the TASER, extended-range impact munitions, and various weaponless measures.
16   I have also controlled numerous violent subjects in the field and have used total-appendage restraint
17   methods including the "hobble" and "The Wrap®."  I also hold multiple instructor-level
18   certifications in various defensive tactics/arrest-control methods and batons. I have also attended
19   multiple training programs regarding "excited delirium" and "sudden in-custody deaths."
20         In April of 2012, I was recruited to develop and deliver a block of instruction on "Lawful
21   Force" for the new "Officer-Involved Shooting Investigations" course produced by the California
22   POST Institute for Criminal Investigation.  I have presented this three-hour block of instruction
23   over 30 times.  During this block of instruction, I co-teach the legal framework required for the use
24   of force by police to meet both state statutory and federal constitutional standards.  This includes
25   the legal concepts of reasonable suspicion to detain, probable cause to arrest, legal authorization to
26   use force, and objective reasonableness.
27         I was also asked to develop and deliver a three-hour block of instruction on "Human
28   Factors" in the same course.  This includes the basics of sensory and cognitive factors and how they
29   form the *perspective* of the reasonable officer.  This includes basic vision, attention, perception,
30   reaction time, officer-subject interactions, pattern (gestalt) v. detailed (feature-intensive) processing,
31   time to stop shooting responses, human memory compared to video cameras, fatigue, and stress
32   reactions.
33         While working in Patrol, the Parks Enforcement Unit, and the NCI Unit, I had occasion to
34   observe and arrest persons who were displaying the objective symptoms of being under the
35   influence of controlled substances, including controlled stimulants such as methamphetamine.  I
36   have also received specific training on detecting those who are displaying the objective symptoms
37   of being under the influence of controlled substances, and I have testified as an expert on evaluating
38   subjects in the field for the objective symptoms of being under the influence of controlled substance
39   and therefore in violation of California Health & Safety (H&S) Code section 11550.  I have
40   observed and arrested well over 100 people for violating 11550 H&S, including heroin, cocaine,
41   methamphetamine, and phencyclidine (PCP). I have assisted in the arrests of many more.
42         I hold a Juris Doctor Degree from Northwestern California University and I am a member of
43   the State Bar of California.  I also hold a Bachelor's Degree in Psychology from California State
44   University at Hayward (now "East Bay").
45         My expertise and qualifications to provide expert testimony on the use of force by police,
46   the basics of attention, perception, memory, and the reaction time of law enforcement officers, and

the interactions of officers and suspects during use-of-force encounters stems from the following:

1. My education, personal experiences, and training;
2. The scope of my expertise is limited to these areas as they relate to investigating and analyzing police force-response events, how police officers are trained in the legal aspects in using force and in the methods used to control and restrain resistive subjects, including the use of deadly force to defend themselves. This also includes how involved officers are trained to recognize deadly threats to their safety, and the strength and endurance of resistive subjects who are under the influence of controlled stimulants;
3. My analysis is similar to that of other force analysts and has a factual foundation based on widely accepted methods of analyzing the objective reasonableness of police force responses, how reasonable officers are trained, including the use of deadly force;
4. My understanding of the facts of this case;
5. My recognition that there will be factors or evidence that may either support, not support, or have a neutral effect upon my opinion; and
6. The fact I have drawn conclusions based on certain assumptions, and I attempted to designate when I relied on disputed evidence.

My curriculum vitae is attached and incorporated into the body of this report by this reference. My professional experiences and activities are more fully set forth in my vitae, along with my publications for the preceding ten years. It also contains a list of other cases I have reviewed or in which I have testified as an expert, in deposition or in trial.

A considerable portion of my professional life involves the study and analysis of the conduct of peace officers and law enforcement agencies and their practices, including liability issues and human-performance factors. I have also rendered opinions as to police practices, as is more fully set forth in my vitae.

My current fee schedule is also attached and incorporated by reference as a statement of the compensation to be paid for the study and testimony in this case.

## DATA AND OTHER INFORMATION CONSIDERED WHEN FORMING OPINIONS

In forming my opinions in this case, I reviewed, studied, and considered materials that are specific to this case as well as materials of general circulation. I have also drawn on the totality of the materials I have read, studied, and examined, as well as the experiences and instruction I have had and/or provided to law enforcement personnel over the entire course of my career. The materials listed herein are the type, quality, and quantity upon which I and others in my profession rely in examining the events surrounding a police practice and in forming opinions and conclusions regarding the matters addressed herein.

All statements and opinions herein are to a reasonable, or higher, degree of professional certainty and/or probability.

I reserve the option to modify, amend, and change any opinion expressed in this document should additional information be provided affecting my understanding of the fact pattern in this case. I also reserve the right to illustrate the points made in this report with demonstrations and/or audio-visual aids.

The specific case materials I have reviewed to date are:

1.  First Amended Complaint, US District Court – Eastern District of California, dated 5/2/14.
2.  Answer to First Amended Complaint – dated 7/14/14.
3.  Redding Police Department Report (RPD) #13-70983 by Inv. Forsberg.
4.  RPD Supplemental Report by Inv. Eric Forsberg.
5.  RPD Supplemental Report by Cpl. Michael Woods.
6.  RPD Supplemental Report by Off. Peggy Porter.
7.  RPD Supplemental Report by Off. Brian Berg.
8.  RPD Supplemental Report by Off. Russell Veilleaux.
9.  RPD Supplemental Report by Off. Chris Smyrnos.
10. RPD Supplemental Report by Inv. Levi Solada (Witnesses A. and J. Russell).
11. RPD Supplemental Report by Inv. Levi Solada (Witness Sullivan Interview).
12. RPD Supplemental Report by Inv. Levi Solada (Witnesses N. Capener & Dionicio).
13. RPD Supplemental Report by Inv. Harry Bishop.
14. RPD Supplemental Report by Inv. Daniel Smetak.
15. RPD Supplemental Report by Off. Douglas Moore.
16. RPD Supplemental Report by Off. Michael Darling (Autopsy).
17. RPD Supplemental Report by Off. Michael Darling (Scene Processing & Attachments).
18. RPD Supplemental Report by Off. Michael Darling (Meeting with CHP MAIT).
19. RPD Supplemental Report by Off. Peggy Porter (CAD excerpts & time intervals).
20. Closed Incident Report (CAD printout) for RPD Case #130070983.
21. List of ID and radio ID numbers for involved units.
22. RPD Supplemental Report by Off. Peggy Porter (Scene photos & analysis).
23. City of Redding Internal Communication re Investigative Summary IA 13-32 by Sgt. Bill Schueller.
24. Transcript of Interview with RPD Off. Becky Zufall.
25. Transcript of Interview with RPD Off. Brandon Largent.
26. Transcript of Interview with Cpl. Chris Jacoby.
27. Transcript of Interview with Off. Jared Herbert.
28. Transcript of Interview with Off. Wesley Townsley.
29. California Highway Patrol (CHP) Multidisciplinary Accident Investigation Team (MAIT) Supplemental Report by N. Parsons & J. Cantrell.
30. Office of the District Attorney – County of Shasta "DA Makes Findings in Death of Steven Motley.
31. Letter by Stephany E. Fiore, M.D. to Josh Lowery, Shasta County D.A.'s Office, dated 5/30/14.
32. TASER Firing Download for X26 Serial # X00-616412.
33. TASER Firing Download for X26 Serial # X00-445483.
34. TASER Firing Download for X26 Serial # X00-617246.
35. TASER Firing Download for X26 Serial # X00-577749.
36. Shasta County Sheriff's Office Report #13-34523 by Det. C. Tippings.
37. Supplemental Report by Det. C. Tippings re canvas on 10/5/16.
38. Supplemental Report by Det. C. Tippings re revisit of Spence property on 10/7/13.
39. Supplemental Report by Det. C. Tippings re radio traffic preservation on 10/18/13.

1   40. Supplemental Report #2 by Det. W. Gardner re Spence & Garroutte interviews on 10/6/13.
2   41. Supplemental Report #2A by Det. W. Gardner re Spence interview on 10/6/13.
3   42. Supplemental Report #2B by Det. W. Gardner re Garroutte interview on 10/6/13.
4   43. Supplemental Report #3 by Det. W. Gardner re Hermann interview on 10/8/13.
5   44. Supplemental Report by Sgt. J. Beaupre re Haselrud interview on 10/5/13.
6   45. Supplemental Report #1 by ID Tech K. Killian re 10/5/13 involved-officer processing.
7   46. Supplemental Report #1 by Sgt. Magrini re supervision.
8   47. Supplemental Report by Sgt. Lozada re evidence collection at hospital on 10/5/13.
9   48. Supplemental Report by Sgt. Lozada re autopsy on 10/10/13.
10  49. Supplemental Report by Sr. Inv. Tech. S. Cheney re scene photography on 10/5/13.
11  50. Supplemental Report by Inv. Tech. Perea re evidence recovered from GMC truck on
12      10/14/13.
13  51. Shasta County Sheriff's Office Closed Incident Report (CAD printout) #130034523.
14  52. Shasta County District Attorney's Office Investigation Division – Critical Incident
15      Supplemental Report: SCSC #13-34523 re canvas on 10/5/13.
16  53. Forensic Medical Group Autopsy Report by Arnold Josselson.
17  54. AMR Patient Care Report – AMR Shasta Unit 834 – Case # 9017082.
18  55. Redding Fire Department Incident Report #2013-9175 by Capt. S. Cramer.
19  56. Redding Fire Department Closed Incident Report (CAD printout) #130009705.
20  57. CHP 555 Collision Report #2013-10-0007.
21
22          **EXPERT OPINION:  BASIS AND REASONS THEREOF**
23
24      **General Opinion:**
25          Redding Police Officers Jared Herbert, Wesley Townsley, Brandon Largent, Becky Zufall,
26  and Corporal Chris Jacoby were employed as police officers for the City of Redding at the time of
27  this incident and California peace officers working in uniform.  They acted upon the totality of the
28  facts known to them at the time and acted reasonably in responding with force to overcome Mr.
29  Motley's active resistance to arrest.  They also acted in a manner that indicated they reasonably
30  believed they were acting in accordance with the law.
31          The officers and Corporal Jacoby followed the training and procedures that are typical of
32  California law enforcement agencies that perform field-enforcement and public safety duties.  At
33  the time of the incident, the officers and Corporal Jacoby were certified as peace officers by
34  California POST.  They were also performing discretionary functions within the course and scope
35  of their duties and they acted in compliance with the use-of-force policies of the Redding Police
36  Department.
37
38          In addition, I have the following specific opinions:
39
40      **Opinion One:**
41      **Mr. Motley's flight from Officer Herbert constituted a dangerous threat to the public.**
42          On October 5, 2013 at approximately 2:32 p.m., Officer Jared Herbert was working in
43  uniform and driving south on Airport Road at Rancho Road in a marked patrol car. At that time, he
44  saw a male subject, subsequently identified as Steven Motley, stopped in a GMC pickup in the lane

1  to his left on southbound Airport Road.  Officer Herbert recognized the truck as a reported stolen
2  vehicle. (CAD Printout, p. 1; Herbert Interview Transcript pp. 2 and 4)
3         When the light turned green for Mr. Motley's direction, Officer Herbert drove behind Mr.
4  Motley and tried to effect a traffic stop.  However, Mr. Motely executed a "three-point turn" in the
5  middle of Airport Road and fled west on Rancho Road at a high rate of speed. By the time Officer
6  Herbert turned to pursue Mr. Motley, Mr. Motley was already approximately 250 to 300 yards
7  ahead of him and traveling about 100 miles per hour.  Mr. Motley's driving was severe enough to
8  cause oncoming traffic to take evasive action as he used both the east and westbound lanes (Herbert
9  Interview Transcript p. 1; CHP 555 #2013-10-0007 p. 9)
10         Officer Herbert slowed down and watched Mr. Motley apparently attempt to turn north onto
11  Alta Camino Drive.  However, Mr. Motley drove onto the yard of the residence at 4976 Alta
12  Camino Drive after driving over the curb.  He next collided with a raised brink planter box and
13  drove through and destroyed a decorative cinderblock wall. (MAIT Supplement, p. 3; Porter
14  Supplement (analysis) photograph 9)  The GMC truck also came to rest within approximately 10
15  feet from where 14-year old Tristan Hermann was sitting. (Shasta Co. DA Inv. Report Supplement
16  by D.A. Inv. Hendrix)
17
18  **Opinion Two:**
19  **Officer Herbert's attempts to use his TASER to apprehend Mr. Motley were**
20  **consistent with the actions of a trained and reasonable peace officer.**
21         Officer Herbert arrived to see Mr. Motley run north through the yard of a neighboring
22  house.  Officer Herbert also noticed that Mr. Motley was wearing a backpack and approaching what
23  appeared to be a seven-foot tall fence.  As Officer Herbert pursued Mr. Motely on foot and noticed
24  that Mr. Motley appeared to be injured.  Officer Herbert drew his TASER and announced at least
25  five warnings that he would use the TASER on Mr. Motley if he did not stop. (SCSO Gardner
26  Supplement #3 – Witness Hermann statement)  Officer Herbert then pulled the trigger on his
27  TASER but it did not discharge.  He looked at the TASER, saw that he had turned it on, and then
28  turned it off and back on.  By this time, Mr. Motley had jumped over the fence into a back yard.
29  (Herbert Interview Transcript pp. 2-4, 8; SCSO Gardner Supplement #3 – Witness Hermann
30  statement)
31         Officer Herbert pursued Mr. Motley into the next two backyards but lost sight of him.  He
32  then noticed Mr. Motley as he was hopping over a wall at the south end of a house.  When Officer
33  Herbert ran toward Mr. Motley, Mr. Motley jumped over a fence leading to the street where Officer
34  Herbert's patrol car was parked.  As Mr. Motley was about to get into Officer Herbert's patrol car,
35  Officer Herbert saw what appeared to be a "big 'ol knife or something on him."  Officer Herbert
36  also noticed that Mr. Motley appeared to be "really zoned out."  Officer Herbert had also drawn his
37  handgun and warned Mr. Motley that he would shoot him if he did not stop.  However, Mr. Motley
38  did not stop and Officer Herbert fired his TASER at him from about 20 feet away, with one dart
39  apparently striking him and the other flying over the top of the patrol car. (Herbert Interview
40  Transcript, p. 3, 7; Solada Supplement – Wit. A. Russell Interview, pp. 1-2; D.A. Inv. Hendrix
41  Supplement – Witness Greg Herman statement p. 5; Townsley Interview Transcript 3:88-119)
42         California peace officers are trained in the lawful use of force in their official capacities.
43  They are specifically trained that they are authorized to "use reasonable force to effect the arrest,
44  prevent escape, or to overcome resistance" when they have "reasonable cause to believe that the

1   person to be arrested has committed a public offense."[1]

2   California peace officers are further trained that the "objective reasonableness" of their force
3   responses must be "fact specific" and is:

4      1.  Judged from the perspective of a reasonable officer.

5      2.  Examined through the eyes of an officer on the scene at the time the force was applied, not
6          the 20/20 vision of hindsight.

7      3.  Based on the facts and circumstances confronting the officer without regard to the officer's
8          underlying intent or motivation.

9      4.  Based on the knowledge that the officer acted properly under the established law at the
10         time.[2]

11  Furthermore, California peace officers are also trained that their decisions should be based
12  on a consideration of the *severity* of the crime at issue, the nature and extent of the *threat* posed by
13  the suspect, the *degree* to which the subject resists, any attempts by the subject to evade arrest by
14  *flight*.[3]  California peace officers are also trained that a "reasonable officer" is "an officer with
15  similar training, experience, and background in a similar set of circumstances, who will react in a
16  similar manner.

17  The facts supporting Officer Herbert's attempted use of his TASER to prevent Mr. Motley
18  from driving away in his patrol car include the following:

19      •  Mr. Motley's initial flight from Officer Herbert in the GMC truck was at high speed
20         (approximately 100 miles per hour), caused other motorists to take evasive action,
21         and resulted in the apparent loss of control of the truck and coming to rest in the
22         front yard of the aforementioned residence;

23      •  Officer Herbert's observation that Mr. Motley appeared to be "zoned out" and to be
24         sweating and have a "lot of energy," which Officer Herbert associated with being
25         under the influence of methamphetamine (Herbert Interview Transcript, p. 7; SCSO
26         Gardner Supplement #3 – Witness Marissa Hermann statement; D.A. Inv. Hendrix
27         Supplement p. 5);

28      •  Officer Herbert saw what appeared to be a knife on Mr. Motley's person;

29      •  The patrol car contained a loaded shotgun; and

30      •  It was reasonable to expect Mr. Motley to continue to drive in a manner that
31         threatened the public and the potential danger to citizens if Mr. Motley used the
32         marked patrol car to endanger others, e.g., use the emergency equipment to stop a
33         citizen's vehicle, and to forcibly take the vehicle or otherwise victimize others.

34

35  Mr. Motley's initial flight from Officer Herbert would not only cause a trained and
36  reasonable officer to perceive it to be a very severe crime, but the nature of the continued flight in
37  the marked patrol car containing a shotgun while potentially under the influence would cause a
38  trained and reasonable officer to reasonably perceive as an extreme threat to the public.

39  Not only was the use of the TASER reasonable under these circumstances, the continuing

---

[1] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 20: Use of Force*, Version 3.0, p. 1-3.
[2] *Ibid.*
[3] *Ibid.* p. 1-5

1    and potentially deadly threat that Mr. Motley's continuing flight presented to the public would
2    cause a trained and reasonable peace officer to believe that even deadly force would be appropriate
3    under the circumstances to end that threat.

4

5        **Opinion Three:**
6        **Officer Townsley's use of his TASER to attempt to apprehend Mr. Motley was**
7        **consistent with the actions of a trained and reasonable peace officer.**

8            As Officer Townsley arrived to assist on Alta Camino Drive, he saw Mr. Motley running
9    toward Officer Herbert's unoccupied patrol car.  Officer Townsley was aware that there were one or
10   more firearms in the patrol car and that Motley's improper use of that car presented a potential
11   threat to the public. (Townsley Interview Transcript, 3:88-119)

12           Townsley also saw Officer Herbert chasing Mr. Motley, trailing about 20 feet behind with
13   his TASER in hand.  As Mr. Motley was getting into Officer Herbert's patrol car, Officer Townsley
14   stopped his patrol car.  Officer Townsley got out of his patrol car with his handgun drawn and
15   approached the passenger side of Officer Herbert's patrol car and yelled for Mr. Motley to stop and
16   to put his hands up.  However, Mr. Motley appeared to be staring straight ahead with a "blank look
17   on his face."  Mr. Motley pressed the accelerator as he tried to put the car into gear, as the car
18   wasn't moving.  Officer Townsley had made the decision to fire at Mr. Motley to stop the threat,
19   but decided not to do so as Officer Herbert was on the opposite side of Mr. Motley, potentially in
20   the line of fire.  At that point, Mr. Motley put the car into gear, backed up (almost striking Officer
21   Herbert), and drove away quickly.  Officer Herbert's TASER was still attached to Mr. Motley or the
22   car, and the TASER was dragged away as Mr. Motley fled in the car. (Townsley Interview
23   Transcript 3:88-119; Herbert Interview Transcript p. 3)

24           Officer Townsley lost sight of Mr. Motley fleeing in Officer Herbert's patrol car.  Officer
25   Townsley used directions from citizens to ultimately find the patrol car, abandoned in front of 4617
26   Alta Saga Drive with the lights still on and the engine running.  However, Officer Townsley did not
27   know what street he was on at the time. (Townsley Interview Transcript 4:121-160; SCSO Cheney
28   Supplement p. 1)

29           After locking Officer Herbert's patrol car, Officer Townsley was directed toward a house by
30   citizens, indicating Mr. Motley's direction of travel.  After ultimately being directed to Mr. Motley
31   in the backward of 4653 Alta Saga by Mr. Dane Spence, who was in the backyard with his mother
32   and father (Sandra and Michael Spence) who live there, as well as his fiancé, Katie Garroutte.
33   (Townsley Interview Transcript, 5:161-200; Bishop Supplement, p. 1-2; SCSO Gardner
34   Supplemental Reports #2A and 2B)

35           Officer Townsley moved to the portion of the yard he was in and looked over the fence.  He
36   could see Mr. Motley, who had his back turned toward Officer Townsley.  Officer Townsley next
37   told Mr. Motley to put his hands up.  However, Mr. Motley started to run away, but not after
38   Officer Townsley noticed a "weird blank stare on his face."  Officer Townsley also noticed that the
39   backpack Mr. Motley was wearing "looked heavy."  In response to Mr. Motley's renewed flight,
40   Officer Townsley fired his TASER at his right side, seeing that the darts landed close together,
41   maybe about four inches apart.[4]  The TASER had the effect of causing Mr. Motley to fall to the

---

[4] The materials reviewed to date do not confirm which part of Mr. Motley's body that the TASER probes struck.
However, one probe was recovered from Mr. Motley's right upper arm by emergency room staff. (Lozada Supplement,
p. 1)

1   ground while making an "uggh" sound, and roll onto his back. (Townsley Interview Transcript
2   5:161-200; Gardner Supplemental Reports #2A and 2B)

3       Officer Townsley kept the trigger on his TASER depressed in order to keep Mr. Motley
4   incapacitated since he was alone and to take the opportunity to visually search Mr. Motley for
5   weapons. However, Mr. Motley grabbed both TASER probes, while under power, and pulled them
6   out. This, along with Officer Townsley's observation that Mr. Motley was of substantial size, made
7   him fear that physically controlling Mr. Motley would be difficult. Officer Townsley was also
8   concerned that Mr. Motley might be under the influence of drugs. (Townsley Interview Transcript
9   5:161-200; TASER Firing Data Download for X26 Serial Number X00-616412[5])

10      It should be noted that the duration would end *after* Officer Townsley perceived that Mr.
11  Motley had pulled the probes out, decided to release the trigger, and actually released the trigger,
12  and end the discharge. This is because if the trigger is continuously depressed after the initial five-
13  second automatic cycle, it will end as soon as the trigger is released. Also, if the distance between
14  the two darts that landed on Mr. Motley was approximately four inches, this would indicate that the
15  distance from the front end of Officer Townsley's X26 was approximately two feet from Mr.
16  Motley at the time of discharge.[6]

17      Keeping in mind how California peace officers are trained as mentioned in Opinion Two, a
18  reasonable peace officer would believe that the use of the TASER in an attempt to overcome Mr.
19  Motley's resistance include the following:

20  • Mr. Motley had been driving the stolen truck as initially reported by Officer Herbert;

21  • Mr. Motley had stolen Officer Herbert's marked patrol car;

22  • Mr. Motley appeared to be under the influence of drugs, which would make Mr.
23    Motley more difficult to control by other weaponless methods

24  • Officer Townsley perceived Mr. Motley to be of substantial size (i.e., "He's not a
25    little guy, either.")

26  • Officer Townsley was alone, had not broadcast his exact location, and was unsure of
27    how long it would take other officers to assist him; and

28  • Mr. Motley, instead of putting his hands up and submitting to arrest as directed by
29    Officer Townsley, started to flee through the residential area.

30

31      Another consideration includes the fact that fleeing suspects sometimes forcibly enter
32  homes or forcibly take vehicles from citizens. This constituted a threat that needed to be stopped at
33  this opportunity. Furthermore, the crimes of auto theft, stealing a marked patrol car, and fleeing
34  through residential neighborhoods are serious crimes.

35      Another consideration is that *how* Officer Townsley used his TASER on Mr. Motely. There
36  is no indication that the TASER probes struck the front of Mr. Motley's chest, which, along with
37  the "rapid loss of consciousness," are the common factors identified by medical professionals who
38  believe that TASERs can causes death from cardiac arrest.[7] While it is somewhat ambiguous as to

---

[5] While it was not apparent from the reports which TASER belonged to which officer, it appears that this is the firing
data for Officer Townsley's X26 due to the duration of the single firing (nine seconds) and the time of discharge.
[6] TASER, International, Instructor Notes, Version 19, Apr. 2013, p. 182.
[7] Zipes, Douglas P. "TASER electronic control devices can cause cardiac arrest in humans." *Circulation* 129.1 (2014):
101-111.

1    exactly where on Mr. Motley's body the TASER probes stuck, it is clear that Mr. Motley did not
2    lose consciousness until significantly later in the struggle to restrain him.
3
4    **Opinion Four:**
5    **Officer Townsley's use of punches and other physical control methods to overcome**
6    **Mr. Motley's active resistance were consistent with the actions of a trained and**
7    **reasonable peace officer.**
8    California peace officers are trained that they may use "personal weapons," i.e., parts of
9    their own bodies to strike resistive subjects, in order to effect arrests, prevent escape, or overcome
10   resistance.[8]  They are also trained that personal weapons may be used to strike suspects during
11   arrests to control combative or resistive subjects, "especially during ground control encounters."[9]
12   After Mr. Motley defeated the TASER, Officer Townsley decided to physically take Mr.
13   Motley to the ground in an attempt to control him.  When Officer Townsley physically engaged Mr.
14   Motley, Mr. Motley turned onto this stomach and tried to get up.  Officer Townsley "drove his knee
15   into his back" in order to keep him flat on the ground.  When Mr. Motley tried to turn toward (spin)
16   Officer Townsley tried to prevent Mr. Motley from doing so by placing his forearm and some of his
17   body weight against the back of Mr. Motley's neck.  Officer Townsley also reached underneath Mr.
18   Motley's left arm with his own left arm (under hook) to prevent Mr. Motley from reaching toward
19   his waist.  During this time, Mr. Motley used his unrestrained right arm to try to get up. (Townsley
20   Interview Transcript 6:201-240)
21   This struggle continued but Officer Townsley was able to continue to apply enough body
22   weight to the back of Mr. Motley's neck in order "keep [Mr. Motley's] face in the dirt."  Officer
23   Townsley became concerned that Mr. Motley might have a weapon in his waist area, as Mr. Motley
24   continued to try to bring his arms down toward his waist. (Townsley Interview Transcript 6:201-
25   240)
26   Officer Townsley also tried to apply wristlocks to the left arm.  However, Mr. Motley was
27   wet with perspiration and Officer Townsley's holds slipped off. Also during this time, Officer
28   Townsley told Mr. Motley to "Stop fighting me. Put your other arm behind your back," and "Stop
29   resisting." (Townsley Interview Transcript 6:201-240; Gardner Supplement #2A – Wit. D. Spence
30   statement)
31   At this point, Officer Townsley decided to render Mr. Motley unconscious by punching Mr.
32   Motely in the jaw.  His decision to do so was based on the following:
33   • The standard "pain-compliance" holds were unsuccessful;
34   • The struggle was continuing, as Officer Townsley could not get Mr. Motley's hands
35     behind his back for handcuffing;
36   • He still did not know where he was or if other officers were on their way to assist
37     him;
38   • Mr. Motley eventually turned and faced Officer Townsley – a dangerous position;
39     and
40   • Mr. Motley was also grabbing at Officer Townsley's uniform and trying to pull

---

[8] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain
33: Arrest and Control,* Version 4.1, p. 1-3.
[9] *Ibid.* pp. 1-13 through 1-14.

1     Officer Townsley down to him
2
3       Officer Townsley placed his legs on Mr. Motley's thighs and squeezed them together to
4   restrict Mr. Motley's movements.  From this "mounted position," Officer Townsley started striking
5   Mr. Motley with both hands (closed fists) on each side of Mr. Motley's jaw.[10]  During this time,
6   Officer Townsley noticed that Mr. Motley was wearing a large knife in a belt sheath, which caused
7   Officer Townsley to conclude that Mr. Motley had been trying to reach for it earlier.   While the
8   punches did not have the intended effect of knocking out Mr. Motley, it did stun him, giving Officer
9   Townsley the opportunity to roll Mr. Motley back onto his stomach and apply a carotid restraint.
10  (Townsley Interview Transcript 7:241-280)
11
12      **Opinion Five:**
13      **Officer Townsley's use of the carotid restraint to over come Mr. Motley's active**
14      **resistance was consistent with the actions of a trained and reasonable peace officer.**
15      California peace officers are trained that the carotid restraint is a viable force option.[11] Since
16  Officer Townsley still did not know if other officers were on their way to him or when they would
17  arrive, and the fact that Officer Townsley's other efforts to overcome Mr. Motley's resistance were
18  unsuccessful, he elected to apply a carotid restraint. One of the considerations in electing to do so
19  was the fact that, when he was attempting to knock out Mr. Motley earlier, he noticed Mr. Motley
20  had a sheathed knife on his belt. (Townsley Interview Transcript 7:241-280)
21      Officer Townsley was conscientious enough and physically able to ensure the restraint was
22  safely applied, i.e., he made sure the front of Mr. Motley's throat was inside the bend of his elbow.
23  This serves to protect the trachea, larynx, and other boney and cartilaginous structures in the neck
24  from being injured, which can result in tissue damage that can lead to other complications.[12]
25      The fact that the Autopsy Report (page 5) indicated there were no injuries to Mr. Motley's
26  "laryngeal cartilages, hyoid bone, or cervical vertebral column," supports that Officer Townsley
27  was able to, under these circumstances, apply the carotid restraint while taking care not to seriously
28  injure Mr. Motley.
29      Once he perceived Mr. Motley to be unconscious, Officer Townsley removed the knife from
30  Mr. Motley's sheath and tossed it away. Next, Officer Townsley started to take Mr. Motley's
31  backpack off since it was interfering with his efforts to handcuff Mr. Motley. While he was doing
32  so, Mr. Motley regained consciousness. Mr. Motley asked Officer Townsley, "I was unconscious?"
33  Officer Townsley replied that he was, that Officer Townsley "choked [him] out," and that he would
34  do it again if Mr. Motley did not cooperate.  Unfortunately, Mr. Motley resumed struggling and
35  fighting to get away from Officer Townsley. (Townsley Interview Transcript 7:241-280)
36      During this period, Officer Townsley could hear radio traffic asking where he was.
37  However, Dane Spence heard that the officer did not know where he was, so Mr. Spence yelled the
38  address to him.  This allowed Officer Townsley to broadcast his location so other officers could

---

[10] It is common knowledge among police combatives instructors that striking the jaw in such a way as to cause the rapid rotation of the head can be a successful method of "knocking out" opponents.
[11] *Supra* at Note 8, p. 4-3.
[12] Kornblum, Ronald N. "Medical Analysis of Police Choke Holds and General Neck Trauma: Part I." *Trauma,* Feb. 1986: 5.

1    find him. (Gardner Supplement # 2A – Wit. D. Spence statement) Officer Townsley was also
2    concerned that there might be weapons in the backpack.  Therefore, Officer Townsley continued to
3    yell for Mr. Motely to stop resisting and to put his hands behind his back, but Mr. Motely continued
4    his active resistance by trying to get onto his hands and knees.  Officer Townsley responded by
5    striking Mr. Motley across the shoulders with his forearm "as hard as he could."  Officer Townsley
6    also tried to control Mr. Motley's left arm by reaching under the arm and pulling it toward him
7    (under hook).  During this period, Officer Townsley noticed that Mr. Motley's knife was only three
8    feet away. (Townsley Interview Transcript 7:280-308)

9           At about this time, the other officers arrived and started to assist in taking Mr. Motley into
10   custody.

11

12      **Opinion Six:**
13      **Officer Largent's use of his baton to overcome Mr. Motley's active resistance was**
14      **consistent with the actions of a trained and reasonable peace officer.**

15        California peace officers are trained that they may use impact weapons (batons) in order to
16  effect an arrest, prevent escape, and to overcome resistance.  They may also use batons in order to
17  defend themselves or others. "Possible target areas" on the human body to strike with batons
18  includes the arms and legs. ***Intentional strikes to the head*** are permitted when objectively
19  reasonable.[13]

20        Officer Largent arrived at 4563 Alta Saga Drive and was directed to Officer Townsley's
21  location by Dane Spence. (Largent Interview Transcript 3:93-102; Gardner Supplement #2A – Wit.
22  D. Spence statement) Corporal Jacoby arrived at about the same time.  Once he was able to find
23  Officer Townsley in the large backyard, he saw Officer Townsley struggling with Mr. Motley on
24  the ground and in the dirt. He heard Officer Townsley scream, "I can't get control of him," or
25  something to that effect. Officer Largent saw that Officer Townsley was in a seated position, on top
26  of Mr. Motley who was on his abdomen.  He could also see Mr. Motley trying to reach and grab
27  onto Officer Townsley and was trying to roll onto his side. (Largent Interview Transcript 3:111-
28  121)

29        Officer Largent drew and extended his baton as he ran to Officer Townsley and Mr. Motley.
30  As he did so, Mr. Motley looked at him, at which time Officer Largent said, "Stop fighting. This is
31  over." Officer Largent also noticed the knife sheath on Mr. Motley's side.  Mr. Motley reached
32  toward one of Officer Largent's feet or legs.  Officer Largent responded by striking Mr. Motley's
33  right arm twice. (Largent Interview Transcript 4:121-143)

34        Mr. Motley responded to the baton strikes by looking directly at Officer Largent and saying,
35  "Yeah, mother fucker!  Harder!"  At this point Officer Largent realized that Mr. Motley was not
36  feeling or reacting to significant pain, despite the fact he had struck Mr. Motley "as hard as [he]
37  could." (Largent Interview Transcript 4:133-143)

38        This caused Officer Largent to suspect that Mr. Motley was under the influence of
39  controlled stimulants. (Largent Interview Transcript 4:143-146) Mr. Motley again reached back
40  toward Officer Townsley, then turned back and reached toward Officer Largent.  Officer Largent
41  responded by striking Mr. Motley's right forearm/wrist area another three to five times.  After the
42  last strike, Officer Largent could see that the right forearm appeared to broken.  However, Mr.

---

[13] *Supra* at Note 8, p. 7-3, 7-6,

1   Motley was still not reacting to pain. Due to the futility of continuing to strike Mr. Motley's right
2   arm, he, Officer Largent threw his baton away without trying to collapse it. Officer Largent had
3   also decided against using his TASER, but elected not to due to the close proximity of everyone,
4   including Corporal Jacoby. (Largent Interview Transcript 4:152-172)

5         Officer Largent then grabbed Mr. Motley's right arm, dropped to his knees next to Officer
6   Townsley, and attempted to obtain enough control to handcuff Mr. Motley. Another officer,
7   although he does not know whom, was trying to get control of Mr. Motley's left arm. At some
8   point, the officers are able to work together to get Mr. Motley handcuffed. Officer Largent also had
9   difficulty in controlling Mr. Motley's right arm due to the apparent injury he inflicted on it. Mr.
10  Motley, however, was also continuing to resist and pull the arm away – which Officer Largent
11  noted should have caused more pain and injury, yet Mr. Motley seemed not to feel or react to that
12  pain either. (Largent Interview Transcript 5:165-186)

13        Even after getting Mr. Motley handcuffed and onto his side to search him, Mr. Motley
14  continued to reach around toward his side as if he was reaching for the knife. Officer Largent had
15  to repeatedly tell Mr. Motley, "You're in handcuffs. This is over. Just knock it off!" Mr. Motley
16  even tried to bite Officer Largent on his knees. Officer Largent responded by using the palm of his
17  hand to press the side of Mr. Motley's head to the ground. (Largent Interview Transcript 5:186-199)

18        Mr. Motley continued to violently kick, causing Officer Zufall to apply her body weight to
19  his legs. However, Mr. Motley was kicking his legs with enough force to raise Officer Zufall off of
20  the ground. Mr. Motley replied to Officer Largent's repeated commands to stop resisting by saying,
21  "Fuck you!" Officer Smyrnos next rolled Mr. Motley to his stomach and pinned one of his legs
22  back in order to finish controlling Mr. Motley. When Corporal Jacoby was away getting leg
23  restraints, they had obtained full control of Mr. Motley. Officer Largent was able to ask Mr. Jacoby
24  his name and he replied. (Largent Interview Transcript 6:236-7:268)

25

26  **Opinion Seven:**
27  **Officer Zufall's use of her baton to overcome Mr. Motley's active resistance was**
28  **consistent with the actions of a trained and reasonable peace officer.**

29        When Officer Zufall arrived to assist, she saw Officer Largent and Officer Townsley on the
30  ground with Mr. Motley. She saw that Mr. Motley was still combative and kicking but not
31  handcuffed. She also saw the knife sheath hanging from his waistband, Mr. Motley's shirt covering
32  the top part. Therefore, Officer Zufall was unable to tell if there was a knife in the sheath at the
33  time. Officer Zufall attempted to assist in overcoming Mr. Motley's continuing active resistance by
34  striking him on his legs "several" times with her collapsible baton. As she did so, she also yelled,
35  "Stop resisting." (Zufall Interview Transcript p. 2-4; Gardner Supplement #2B – Wit. K. Garroutte;
36  Gardner Supplement #2A – Wit. D. Spence)

37        Officer Peggy Porter arrived and was able to assist with getting Mr. Motley handcuffed.
38  Officer Zufall then applied her body weight to Mr. Motley's legs while the other officers finished
39  handcuffing Mr. Motely. She also noticed that Mr. Motley was continuing to resist and be
40  combative even after being handcuffed. (Zufall Interview Transcript p. 2-3)

41        Officer Zufall's actions were consistent with a trained and reasonable peace officer due to
42  the following:

43        •   She saw the Mr. Motley was continuing to actively resist by kicking and was not
44            handcuffed;

1  • Mr. Motley was continuing his resistance despite the combined efforts of Officers
2     Largent and Townsley;
3  • She saw the knife sheath on Mr. Motley, reasonably causing concern that he might
4     be armed with a knife; and
5  • Mr. Motley's legs were the only targets available given the close proximity of
6     Officer's Townsley and Largent.
7

8  **Opinion Eight:**
9  **Corporal Jacoby's use of his baton to overcome Mr. Motley's active resistance was**
10 **consistent with the actions of a trained and reasonable peace officer.**

11       When Corporal Jacoby arrived at 4653 Alta Saga Drive, he was greeted by Mr. Dane
12 Spence who, in a "panicked" manner, said, "You're partner needs help! You're partner needs help
13 back there," and "Get back there!" (Jacoby Interview Transcript 3:99-106).

14       Upon reaching Officer Townsley with another officer (Largent), he saw Officer Townsley
15 on top of Mr. Motley in a "controlling position" (i.e., he's straddling him with his body weight
16 lowered), while attempting to control his left arm. He could see that Officer Townsley was
17 perspiring and that he was having a difficult time controlling Mr. Motley – even given his size and
18 skill level. Corporal Jacoby also recognized Mr. Motley as someone with an extensive criminal
19 history, including drugs, that he had contact with in the past. (Jacoby Interview Transcript 3:107-
20 4:121)

21       Corporal Jacoby perceived that Mr. Motley was under the influence of drugs and in a
22 "psychotic state." (Jacoby Interview Transcript 4:121-123)

23       Corporal Jacoby also approached and said to Mr. Motley, something to the effect of, "Dude.
24 There's two of us here now. You're under arrest. Knock it off." However, Mr. Motley continued
25 fighting. (Jacoby Interview Transcript 4:121-126)

26       Corporal Jacoby noticed that Mr. Motley's hand was free and that there was a large knife
27 sheath extending off of his belt. This caused him to fear that Mr. Motley was still armed with the
28 knife and that he was going to try to draw it and use it against Officer Townsley. Corporal Jacoby
29 responded to this perceived threat by yelling to Officer Townsley that he was "going to baton."
30 Corporal Jacoby struck Mr. Motley with his wooden baton as Mr. Motley was "coming up to
31 punch" Officer Townsley. Corporal Jacoby's one or two baton strikes appeared to land on one of
32 Mr. Motley's forearms. This had two results: (1) Corporal Jacoby's baton broke; and (2) Mr.
33 Motley had no reaction. (Jacoby Interview Transcript 4:126-132; Cheney Supplement p. 6)

34       Corporal Jacoby discarded his broken baton and communicated this to Officer Largent.
35 Corporal Jacoby then saw Officer Largent draw his baton. During this time, Corporal Jacoby
36 noticed that Mr. Motley was still fighting the officers, and that Officer Townsley looked up at him
37 and said, "I'm gassed. I gotta get out! I need out!" At this point, Corporal Jacoby saw Officer
38 Zufall start to use her baton. Corporal Jacoby then went to the left side of Mr. Motley and tried to
39 take control of his left arm, using all of his body force and strength to get Mr. Motley's arm behind
40 his back and handcuffed. Despite this, Mr. Motley was still fighting and trying to head butt and bite
41 Corporal Jacoby. (Jacoby Interview Transcript 4:150-159)

42       Corporal Jacoby left the immediate scene to retrieve a leg restraint from a patrol car. Upon
43 returning, he saw that Officer Smyrnos had arrived and was assisting by placing Mr. Motley's legs
44 into a control position. (Jacoby Interview Transcript 4:159-171; Smyrnos Supplement)

**Opinion Nine:**

**Any injuries to Mr. Motley's head that were actually caused by baton strikes were most likely inadvertent or "secondary."**

There are three types of head strikes with batons and other impact weapons:

1. Intentional: Used when the totality of the circumstances dictate;
2. Inadvertent: When the officer intends to strike one part of the body, and when, due to the fact that the officer, the impact weapon, and the suspect are in motion, the strike lands on the suspect's head; and
3. Secondary: When the baton strikes one part of the body and then bounces off or is otherwise deflected and strikes the head.

While Mr. Motley sustained wounds to his head that could have been caused by the officers' collective or individual baton strikes, there is nothing to indicate that such strikes were intentional. It is important to remember that while Officers Largent and Jacoby were using their batons to strike Mr. Motley's arms, Mr. Motley was moving and Officer Townsley was still trying to control him and also effecting his movement. This most likely combined to make it more difficult for the officers using their batons to accurately strike their intended targets. Officer Townsley also took evasive action to avoid being struck. (Townsley Interview Transcript 7:280-308)  Therefore, while the cause of Mr. Motley's non-fatal head injuries (Autopsy Report) could have been caused by baton strikes, they were most like inadvertent or secondary.

I have personally missed my intended targets while using the baton in the field, and I have also been accidentally struck by at least one other officer during an arrest situation.

**Opinion Ten:**

**The officers rendered first aid and summoned emergency medical personnel in a timely manner.**

Officer Largent continued to talk to Mr. Motley as they waited for Corporal Jacoby to return with the leg restraints. Mr. Motley was still cursing and being verbally uncooperative. Suddenly, Officer Largent noticed that Mr. Motley's color changed. Specifically, Mr. Motley turned very grey and blue. Officer Largent continued to monitor Mr. Motley's airway and noticed that he had a lot of dirt and debris in his mouth (Mr. Motley had been grabbing at the ground with his mouth earlier during the struggle). Officer Largent could tell that Mr. Motley was still breathing as bark and dirt were expelled from his mouth as he exhaled. (Largent Interview Transcript 7:252-281)

When Corporal Jacoby returned with the leg restraint, Officer Largent told him that he was no longer worried about having to restrain Mr. Motley's legs. Officer Smyrnos had released his hold on Mr. Motley's legs and, in addition to the change in color, Mr. Motley's legs were laying on the ground and Mr. Motley was no longer actively resisting other than movement in his arms. Officer Largent said to the other officers, "This might be excited delirium," as he had encountered that before. (Largent Interview Transcript 8:281-289)

Corporal Jacoby immediately called for an emergency medical response. (Jacoby Interview Transcript 5:164-171; RPD CAD)

Officer Largent decided to move Mr. Motley to the driveway so the responding medical

1  personnel could have faster access to him.  He rolled Mr. Motley onto his back, supported the back
2  of his neck and sat him up, keeping his knees behind Mr. Motley's back.  He lifted Mr. Motley with
3  Officer Zufall picking up one side of Mr. Motley's legs and Corporal Jacoby the other side – using
4  the leg restraints as a carry assist.  They carried him approximately 50 yards to the driveway.
5  (Largent Interview Transcript 8:301-319)

6          Officer Largent placed Mr. Motley into a recovery position (on his right side).  Officer
7  Largent was monitoring Mr. Motley's carotid pulse and respirations while trying to wake him by
8  talking to him.  Officer Largent noticed that Mr. Motley was expelling dirt out of his mouth as he
9  exhaled.  Officer Largent then noticed that Mr. Motley's pulse had stopped and that he went
10  "lifeless."  Officer Largent announced that he no longer felt a pulse and that he was starting CPR.
11  He rolled Mr. Motley onto his back and performed one cycle of 15 chest compressions.  He
12  checked for and found a strong pulse and noticed that Mr. Motley's eyes fluttered and that he
13  exhaled.  (Largent Interview Transcript 8:319-9:332)

14          Officer Largent rolled Mr. Motley back to his side and continued talking to Mr. Motley,
15  calling him by his first name.  Mr. Motley continued to breath on his own with a strong pulse until
16  about one and a half minutes went by.  Officer Largent, in response to not feeling a pulse,
17  performed another cycle of 15 chest compressions, and then checked his pulse and breathing.  He
18  found that Mr. Motley had started breathing again, had a pulse, and that his eyes opened and closed.
19  Officer Largent continued to monitor Mr. Motley, this time using both his carotid and brachial
20  arteries.  Medical personnel arrived shortly thereafter and took over the care of Mr. Motley.
21  (Largent Interview Transcript 9:332-358)

22          The RPD Closed Incident (CAD) Report indicates that an entry for having medical
23  personnel stage to the front of 4653 Alta Saga Drive was made at 2:42 p.m.  Later, at 2:50 p.m., the
24  CAD Report indicates that Corporal Jacoby provided an update that Mr. Jacoby was "unresponsive"
25  and that they needed an emergency medical response.

26          AMR Paramedic Unit #834 received the call to respond at 2:51 p.m.  They arrived at Mr.
27  Motley's side at 3:02 p.m.  Redding Fire Department Engine 5 was dispatched at 2:56 p.m. and
28  arrived at 3:01 p.m. to find AMR Unit #834 already on the scene and caring for Mr. Motley. (AMR
29  Patient Care Report; Redding Fire Department Incident Report)

30          Once it was clear that Mr. Motley was in medical distress, Officer Largent clearly
31  communicated this to Corporal Jacoby, who requested the expedited EMS response.  Officer
32  Largent then followed procedures and provided basic life support for Mr. Motley and maintained it
33  until relieved by AMR Unit #835 personnel.  Only about one minute elapsed from the time
34  Corporal Jacoby made the Code-3 EMS request until AMR Unit #834 was dispatched.  They
35  arrived in about 13 minutes, with Redding Fire Department Engine #5 arriving just afterward.

36          The RPD officers summoned emergency medical assistance for Mr. Motley as soon as they
37  perceived he was in medical distress and provided effective basic life support for him until relieved
38  by paramedic personnel.  Therefore, they provided medical assistance to Mr. Motley in a timely
39  manner.

40

41  **4.   Conclusion**

42          It is my opinion that the relative culpability for this incident lays with Mr. Motley for
43  ingesting methamphetamine (Toxicology Report), which gave him extraordinary strength,
44  endurance and tolerance for pain; for engaging in threatening flight from Officers Herbert and
45  Townsley (partially in a stolen police vehicle), and violently resisting the officers in an active and

1   assaultive manner.  Mr. Motley knew or should have known that these actions would create in the
2   mind of trained and reasonable peace officers the need to respond with intermediate levels of force.
3          Mr. Motley's actions presented a series of events that presented the officers, both
4   individually and collectively, with circumstances that were tense, uncertain and rapidly evolving.
5          Mr. Motley's overall behavior would lead a trained and reasonable peace officer to believe
6   he was in a state of excited delirium as he displayed extraordinary strength, endurance, pain
7   tolerance, bizarre behavior (trying to eat the dirt), and continuing to violently struggle even after it
8   was clearly futile and for an extended period of time.  Mr. Motley's condition suddenly changed,
9   i.e., he was conscious one minute then suddenly went quiet with a change of pallor, followed by
10  sudden unconsciousness and cardiac arrest.
11
12
13  Respectfully Submitted,
14
15
16  JEFFREY A. MARTIN
17
18
19
20  Date: 7/7/2016
21  San Carlos, California

**CURRICULIM VITAE 6/2016**

**Jeffrey A. Martin**
727 Industrial Rd. Ste. #102
San Carlos, CA 94070
Telephone (650) 595-2452
E-mail:  jeff@dsiconsult.com

---

## EDUCATION

**Juris Doctor – 2007**
Northwestern California University School of Law, Sacramento, California
- State Bar of California, License No. 262839

**Bachelor of Arts, Psychology - 1981**
California State University - East Bay, Hayward, CA

**Associate in Risk Management - 2000**
Insurance Institute of America, Malvern, PA

---

## EMPLOYMENT

**DSI Consulting, LLC**                                                2014 - Present

    **Chief Consultant**
    Provides training and consulting on internal affairs investigations, police practices, and expert witness services.

**SELF-EMPLOYED, San Carlos, CA**                                      2009 -Present

    **Consultant/Trainer/Attorney**
    Provides expert-witness services and adjunct instruction for California P.O.S.T. Institute of Criminal Investigations Officer-involved Shootings Investigations Course.

**BERRY WILKINSON LAW GROUP**                                          2009 - 2014

    **Associate Attorney**
    Provided legal representation for public safety personnel in disciplinary and other administrative matters.

**FORCE SCIENCE INSTITUTE, LTD.**                                      2012 - 2013

    **Staff Consultant**
    Assisted with operations pertaining to training, research and administrative functions.

**LEXIPOL, LLC.**                                                      2009-2013

    **Contract "Daily Training Bulleting" Author**
    Authored approximately four to six daily training bulletins per month on various law enforcement topics including use of force, pursuits, ethics, officer safety, and other topics related to policy compliance.

**SAN JOSE POLICE DEPARTMENT, San Jose, CA**                          **1984 - 2010**

**Sergeant, Bureau of Field Operations**        **2009 - 2010, 2000 - 2003, 1995 - 1997**
**Patrol Division**
Supervised one or more patrol areas and supervised criminal investigations, tactical operations, conducted use-of-force investigations, and community-oriented policing activities.  Engaged in other supervisory duties such as writing performance appraisals, coaching, and responding to citizen complaints. Member of the Crisis Intervention Team since April 2001.

**Sergeant, Bureau of Administration**        **2005 - 2009**
**Training Division**
Supervised the P.O.S.T. Force-Options Simulator (FOS) and Law Enforcement Driving Simulator Programs, which delivered training to the San Jose Police Department and peace officers within Santa Clara County.  Delivered and supervised FOS instructor training to other trainers throughout the state of California.  Taught and supervised classes in defensive tactics and officer safety.  Served as the lead instructor and instructor-trainer for the TASER program for the San Jose Police Department and Basic Academy.  Revised pursuit policy and designed, delivered and supervised mandated training for all sworn personnel to meet legislative requirements.  Delivered instruction on use-of-force investigations in the Night Detective Academy.

**Sergeant, Bureau of Field Operations**        **2003 - 2005**
**Patrol Division, Main Lobby and Pre-Processing Center**
Supervised operations in the main lobby of the Witness Center during serious, criminal investigations and the department's temporary holding facility, as regulated by Title 24 of the California Code of Regulations.  Also, completed bi-weekly assignments for regular patrol supervision.

**Sergeant, Bureau of Field Operations**        **1998 - 2000**
**Administrative Unit**
Served as the patrol bureau training coordinator for 800 sworn personnel and supervised sworn and non-sworn employees in the Administrative Unit.

**Sergeant, Bureau of Field Operations**        **1997 - 1998**
**Airport Division**
Supervised the policing and security functions by sworn personnel at San Jose International Airport. Ensured compliance with FAA and other regulations.

**Police Officer, Bureau of Field Operations**
**Patrol Division**        **1984 - 1986, 1988 - 1989, 1994 - 1995**
Engaged in proactive enforcement activities, investigated felony and misdemeanor crimes, and participated in community-oriented policing activities.

**Field Training Officer, Bureau of Field Operations**        **1992 - 1994**
**Patrol Division**
Directly trained and evaluated new officers in basic patrol officer functions, including criminal investigations, patrol tactics and report writing.

**Police Officer, Bureau of Investigations**        **1989 - 1992**
**Narcotics/Covert Investigations Unit**
Investigated drug and narcotic-related crimes, conducted and/or participated in undercover activities including sting operation support, conducting parole and probation searches, working with informants, obtaining and serving search warrants, and conducting surveillance.  Also, served as the firearms instructor for the unit.

**Police Officer, Bureau of Field Operations**                    1986 - 1988
**Special Operations Division, Parks Enforcement Unit**
Engaged in proactive enforcement activity throughout the city and its parks, including the investigation of misdemeanor and felony crimes, conducting parole and probation searches, obtaining and executing search warrants, and working with informants.  Also, responded to and handled regular patrol calls as needed.

**BAY AREA RAPID TRANSIT (BART) DIST. POLICE DEPARTMENT, San Francisco, CA   1981 - 1984**

**Police Officer**
Assignments included both uniformed and plain clothes patrol.

**SOUTH BAY REGIONAL PUBLIC SAFETY TRAINING CONSORTIUM, San Jose, CA   1997 - 2004**

**Adjunct Instructor – Multiple Courses and Programs**
Taught liability issues and use-of-force investigations in the Supervisor School, Liability and Officer Safety in the Field Training Officer Course, Liability Issues in FTO Updates, Force-options Simulator Instructor, and Defensive Tactics Instructor in the Basic Academy.

---

## TEACHING/PRESENTATIONS

2016            **Eyewitness Dynamics.**  Presented at the Bay Area Gang Alliance monthly meeting.

2015 - Present   Officer-involved Shootings Investigations – **"Lawful Force," "Human Factors," "Analyzing Video Evidence," Eyewitness Dynamics,"** and other topics.  Curriculum designer and instructor - 3 presentations to date on behalf of Cutting Edge Training, LLC.

2015            **"Human Factors," and "Eyewitness Dynamics."**  Presented to the California Highway Patrol – Critical Incident Response Team.

2014            **"Understanding the Deadly Bluff: When Unarmed Subjects Commit Suicide by Cop."** Presented at the *Suicide Identification, Prevention and Investigation for Law Enforcement & Correctional Officers: Train-the-Trainer Program*, sponsored by the Institute for the Prevention of In-custody Deaths, Las Vegas, NV.

2012 - Present   **Officer-involved Shootings Investigations Course - "Lawful Force" and "Human Factors"** curriculum designer and instructor - 38 presentations. California P.O.S.T. Robert Presley Institute of Criminal Investigation.

2006 – 2009     **TASER X-26 Instructor and Instructor-Trainer.** San Jose Police Department Basic Academy and In-service Training Unit.

2006 – 2009     **California P.O.S.T. LD 20 (Use of Force) Scenario Evaluator**. San Jose Police Basic Academy.

2007            **SB719 Pursuit Policy Update.**  Curriculum designer and instructor, San Jose Police Department.

2005 – 2009     **Force Options Simulator; Law Enforcement Driving Simulator; TASER X-26, TASER Update; Officer Safety Update; First Aid; Defensive Tactics; Tactical Field Exercises.** Supervision and delivery in San Jose Police Department In-service Training Unit.

2004 – 2007     **Liability.** San Jose Police Department Communications Training Officer Seminar.

2002 – 2004     **Force Options Simulator**, South Bay Regional Public Safety Training Center.

3

| | |
|---|---|
| 2001 | **Police Pursuit Driving.** Featured expert regarding pursuit decision making in the training videotape "produced by Performance Dimensions Publishing. |
| 2001 | **Pursuit Decision Making,** course developer and instructor for interactive training CD-ROM for The Backup, Inc. |
| 2000 – 2004 | **Defensive Tactics**, Basic Academy, South Bay Regional Public Safety Training Consortium. |
| 1999 – 2003 | **Pursuit Decision Making**, developed and delivered course curriculum, nine presentations in seven states. |
| 1997 – 2001 | **SWAT Weapons Retention, Performance Appraisals, and Field Tactics for Patrol**, various departments. |
| 1997 – 2006 | **FTO Liability**, San Jose Police Department Field Training Officer Seminar. |
| 1997 – 2004 | **FTO Liability, Officer Safety, and Supervisor Liability** (Including use-of-force investigation and documentation), South Bay Regional Public Safety Training Consortium. |
| 1997, 1998, 2000, and 2003 | **In-custody Death Update, Universal Weapon Retention, Evaluating Physical Skills Training, and Multiple-Officer Takedowns, and Dealing with the Mentally Ill**, presented at the *Defensive Tactics Newsletter* Instructors Conferences. |
| 1995 – 1998 | **Constitutional Limitations on the Use of Force**, taught to selected patrol teams, San Jose Police Department. |
| 1992 | **Redefining the Basics of Patrol Tactics**, taught to selected patrol teams, San Jose Police Department. |
| 1991-1992 | **Raid Planning and Entry,** assistant instructor, San Jose Police Department, Narcotics/Covert Investigations Unit. |
| 1990-1992 | **Firearms**, San Jose Police Department, Narcotics/Covert Investigations Unit. |
| 1987 | **Side-handle baton (PR-24),** developed and delivered curriculum for the San Jose Police Department.  This included the initial and in-service training to over 100 sworn department members, as well as writing the Side-handle baton specifications and requirements for the department. |
| 1986 | **Modern Pistol Technique**, delivered to the San Jose Police Department Youth Services Detail. |
| 1983 | **Side-handle baton (PR-24)** researched and developed program for the BART Police Department.  This included the initial and in-service training for all 130 sworn members. |

---

## COMMITTEE PARTICIPATION

- 2008 – 2011/2014 California POST SAFE Driving Campaign – Subject Matter Expert Committee
- 2007    San Jose Police Department Lead SB 719 Pursuit Policy Revision
- 2006    Calif. POST SB 719 (pursuit legislation) Subject Matter Expert Committee
- 2006    San Jose Police Department Awards & Commendation Board
- 2004    San Jose Police Department TASER/Use of Force policy update Consultant
- 1999    Calif. POST Supervisors School Redesign Committee
- 1998    San Jose Police Department Duty Manual Update Consultant

4

- 1998   Calif. Commission on Peace Officers Standards & Training (POST) Field Training Officer School Review Committee
- 1998   San Jose Police Department Crisis Intervention Team Implementation Task Force
- 1998   San Jose Police Department Carbine Program Deployment Committee
- 1997   San Jose Police Department Pursuit Policy Update Committee
- 1995   San Jose Police Department Bureau of Field Operations Training Committee
- 1992   San Jose Police Department Training Committee (Academy Subcommittee)

---

## PUBLICATIONS

### Peer Reviewed

Martin, J. (Accepted for publication on March 17, 2016) Applied Human-Error Theory: A Police TASER-Confusion Shooting Case Study. *Proceedings of the HFES 60th Annual Meeting.*

Martin, J. (2016). Science, Experience and the Law Support Changing Traditional Vehicle-Stop Tactics. *Law Enforcement Executive Forum, 16(1),* 58-69.

Kaminsky, R.J., Martin, J.A. (2000). An Analysis of Police Officer Satisfaction with Defense and Control Tactics. *Policing: An International Journal of Police Strategies and Management, 23(2),* 132-153.

### Non-peer Reviewed

Martin, J. (2003, September/October). What's Missing in Police Pursuit Decision Making? *The Police Marksman, 28(5),* 16-18.

Martin, J. (2003, March/April). Suicide by Cop: What the Responding Officer Needs to Know. *The Police Marksman, 28(2),* 31-32.

Martin, J. (2002, July). Revising Policy and Procedure Manuals. *Law and Order, 50 (7),* 114-116.

Martin, J. (2002, May). Making Appraisal Writing Easy. *The Police Chief.*

Martin, J. (2002). Dealing with the Mentally Ill: The Importance of the Subject Control Instructor. *The Defensive Tactics Newsletter, 12(1),* 1, 3.

Martin, J. (2002). Clarifying the "Cover Fire" Issue. *The Backup, 5(1).*

Martin, J. (2001, September). 3QFC Pursuit Decision Making Model. *Law and Order, 49(9),* 16-17.

Martin, J. (2001, July). Pursuit Termination: A Lifesaver? *Law and Order, 49(7),* 30-33.

Martin, J. (2000, November). The Pitfalls of the FTO as Instant Backup. *Law and Order, 48(7),* 20, 22.

Martin, J. (2000, November). Force 101 – Part IV: *Tennessee v. Garner. The Vanguard, 27(11).*

Martin, J. (2000, October). Force 101 – Part III: *Graham v. Connor. The Vanguard, 27(10),* 17.

Martin, J. (2000, September). Force 101 – Part II: Rules of Force Conduct. *The Vanguard, 27(9),* 14.

Martin, J. (2000, August). Force 101 – Part I: The "Core Transaction." *The Vanguard, 27(8),* 15-16.

Martin, J. (2000). Getting Over the Hurdle of Your First Article. *The Defensive Tactics Newsletter, 10(1),* 5-8.

Martin, J., Papenfuhs, S. (2000, January/February).  The "Sneak Attack" vs. the "Tactical Distance" Approach to Handcuffing. *The Police Marksman, 25(1).*

Martin, J., Williams, G.T. (2000, January).  Extracting Suspects from Commercial Aircraft Safely. *Police, 24(1),* 60-63.

Martin, J. (1999). Evaluating the Effectiveness of Subject Control and Defensive Tactics Training. *The Defensive Tactics Newsletter,* 9(1), 1, 10-11.

Martin, J., Williams, G.T. (1998). 1998 California Peace Officers Murdered. *The Journal of California Law Enforcement, 32(4),* 1-11.

Martin, J., Williams, G.T. (1998). 1997 California Officers Murdered Study. *The Journal of California Law Enforcement, 32(3),* 18-28.

Martin, J. (1997, November). Arrest and Control Tactics: A Risk Management Perspective. *Law and Order, 45(11),* 74-76.

Martin, J. (1997). Reducing Suspect Resistance Through "Direct" Handcuffing. *The Defensive Tactics Newsletter, 6(4),* 1, 10-12.

Martin, J. (1997, September/October). Krav Maga: Serious Training for Serious Times. *The Police Marksman, 22(5),* 40-42.

Martin, J. (1997, July/August). The Myth of Control. *The Police Marksman, 22(4),* 54-55.

Martin, J. (1996, August). The Dangers of Dual Force. *Law and Order, 44(8),* 86-88.

Martin, J. (1996). The Wrap: A Definitive Solution Finally Arrives. *The Defensive Tactics Newsletter, 6(2),* 1, 4-7.

Martin, J. (1996, Spring).  The Pat Search: Clarifying the Issues for Trainees. *NAFTO News*, 5(1), 18-20.

Martin, J. (1990, September/October). The Secondary Sidearm. *The Police Marksman, 15(5),* 43-44.

Martin, J. (1990, May/June). The Training Attitude. *The Police Marksman, 15(3),* 59-60.

---

## AWARDS

1997    Defensive Tactics Newsletter Leadership Award, presented by Dr. Les Knight, publisher of the Defensive Tactics Newsletter.

---

## PROFESSIONAL MEMBERSHIPS

California State Bar Association
California Peace Officers' Association – Police Legal Advisors Committee
International Association of Chiefs of Police – Legal Officers' Section
Human Factors and Ergonomics Society – Affiliate Member

---

**SPECIALIZED TRAINING**

**Electronic Control Weapons**

TASER® Master Instructor - TASER® Training Academy – 2007, 2009, 2011 & 2014

TASER® X-26 Instructor – TASER, International – 2003

Advanced TASER® (M26) Instructor – TASER International – 2001

TASER Instructors Course, Tasertron, Inc. – 1996, 2000

**Arrest/Subject Control and Defensive Tactics**

FBI Defensive Tactics Instructor – Federal Bureau of Investigation – 2000

C.L.A.M.P. Instructors Course – Law Enforcement & Security Trainers, Inc. – 1999

G.R.A.S.P. Instructors Course – Law Enforcement & Security Trainers, Inc. – 1999

Arrest & Control Instructor – Los Angeles Police Department – 1998

Master Instructor Handcuffing – ISC Division of Wellness – 1998

Defensive Tactics Instructors Course – Krav Maga Assoc. of America, Law Enforcement Training Division – 1997

Control Points – ISC Division of Wellness – 1997

Police Close Defense Instructor – Williams Defense Systems (now Cutting Edge Training) – 1997

**Edged Weapons**

Tactical Folding Knife Instructor – CQC Service Group – 1997

**Firearms**

P.O.S.T. Certified Firearms Instructors Course – Napa Valley College Criminal Justice Training Center – 1997

MP5 Submachinegun Operators Course – Heckler & Koch, International Training Division – 1997

Tactical Shotgun – International Law Enforcement Training & Consulting – 1994

Urban Rifle – Thunder Ranch/International Training Consultants - 1993

Defensive Pistol-Level II – Thunder Ranch/International Training Consultants – 1993

Police Shotgun- Level I – Yavapai Firearms Academy – 1988

Intermediate Pistol Course – American Pistol Institute (Gunsite) – 1987

Basic Pistol Course – American Pistol Institute (Gunsite) – 1986

**Impact Weapons**

ASP Tactical Baton Instructors Course – Armament Systems & Procedures – 1995, 1997

Side-handle Baton Instructors Update – Gavilan College – 1988

Side-handle Baton Instructors Update – Santa Rosa Criminal Justice Training Center – 1987

Side-handle Baton Instructors Workshop – Martinez Adult School – 1984

P.O.S.T. Certified Side-handle Baton Instructors Course – Martinez Adult School – 1984

**Chemical Agents**

Aerosol Defense Spray (O.C.) Instructor – CQB Supply – 2005

**Use of Force**

P.O.S.T. Force-options Simulator Instructor – San Jose Police Department – 2002

Confrontational Simulation/Use of Force Instructor – Con Sim International – 1995

**Arrest-related Deaths**

Forensic Analyst: Excited Delirium, Sudden In-Custody Deaths Program – I.P.I.C.D. – 2009, 2014

In-custody Death Prevention Instructor – I.P.I.C.D. – 2005

Legal, Medical, and Scientific Constraints on Human Restraints Symposium – I.P.I.C.D. – 2014

**Emergency Vehicle Operations**

Law Enforcement Driving Simulator Instructor – San Jose Police Department – 2005

Pursuit Intervention Technique – Oakland Police Department – 2005

Driver Awareness Instructor – San Jose Police Department – 2005

Emergency Vehicle Operation Instructor – San Jose Police Department – 2005

**Crisis Intervention**

Suicide by Cop/Suicide Response – San Jose Police Department CIT update – 2002

Crisis Intervention Team Academy – San Jose Police Department – 2001

Crisis Management and Resolution – San Francisco Police Department – 1998

**Human Factors**

Human Factors/Ergonomics (ISE 210) – San Jose State University – 2015

Investigating Human Fatigue Factors – National Transportation Safety Board – 2009

Principles of Force Science Certification Course – Force Science Research Center – 2008

8

**Specialized Investigations**

Internal Affairs Investigations – San Jose State University – 2009

Responding to Officer-Involved Shootings – Police Training Services Company – 2008

Officer-Involved Shootings Investigations Course – LAPD, Force Investigations Division – 2008

Narcotic Investigation – California Department of Justice – 1990

**Supervision/Leadership**

P.O.S.T. Police Supervision – Gavilan College – 1995

Supervisors In-house Academy – San Jose Police Department – 1995

Sergeants Workshop in Community Oriented Policing – Justice Training Institute – 1994

Situational Leadership, Train the Trainer – Center for Leadership Studies – 1994

---

**CONSULTANT AND EXPERT WITNESS**

<u>Civil Matters - Defense</u>

February 2016   Daniel Acedo v. City of Chula Vista, et al., United States District Court – Southern District of California. Areas of Expertise: ***"Probable Cause to Arrest," "Warrantless Entry onto Property Based Upon Fresh Pursuit," "Pointing of Firearms While Making Arrest," "Use of Police Dog While Making Arrest," and "Conformance with Departmental Policy."*** (Report Submitted – Attorney: Karen Rogan)

January 2016   Jovan Jimenez v. County of San Diego, et al., United States District Court – Southern District of California. Areas of Expertise: ***"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Arrest based on Citizens Arrest," "Use of Handcuffs During Detentions," "Reasonable Force to Control Handcuffed Suspects,"*** and ***"Factors Supporting that Head Strike with an Impact Weapon was Accidental."*** (Report Pending – Attorney: James Chapin)

January 2016   Gary Lawman v. City and County of San Francisco, et al., United States District Court – Central District of California. Areas of Expertise: ***"Probable Cause to Arrest," "Booking of Misdemeanant Arrestees," "Explicit Probable Cause to Detain Pursuant to Section 5150 W&I," "Policy Conformance,"*** and ***"Monell Liability."*** (Submitted Report & Deposed – Attorney: James Hannawalt)

August 2015   Michael Nichols et al v. City of Palm Springs, et al., United States District Court - Central District of California. Areas of Expertise: ***"Proper Use of Informants," "Determining the Status of Informants,"*** and ***"Creation of Duty to Protect Informants."*** (Submitted Report - Attorney: Michael Tam)

July 2015   Civil: Robert Barron v. City of Redding et al., United States District Court - Eastern District of California. Areas of Expertise: ***"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Reasonable Use of Deadly Force," "Patrol Tactics"*** and ***"Policy Compliance."*** (Submitted report & **deposed** - Attorney: Sean O'Dowd)

9

March 2015      Civil:  Estate of Yanira Serrano v. County of San Mateo, et al., United States District Court -
Northern District of California.  Areas of Expertise: *"Reasonable Use of Deadly Force," "Force
Options," "Patrol Tactics," "Policy Compliance," "Pointing of Firearm," "Monell Liability."*
(Submitted report & **deposed** - Attorney: David Levy)

August 2014     Civil: Jose Antonio Aguilar Jaramillo v. City of San Mateo, et al., United States District Court -
Northern District of California.  Areas of Expertise: *"Reasonable Suspicion to Detain,"
"Probable Cause to Arrest," "Reasonable Force," "Post-arrest care," and "Policy
Compliance."* (Submitted report – Attorney: Jeffrey Vucinich)

December 2013 Civil: United States Automobile Assoc. v. Las Vegas Metropolitan Police Department
Consolidated with Dennis Wallace v. Las Vegas Metropolitan Police Department, et al. Nevada
District Court, Clark County, Nevada.  Areas of  Expertise: *"Vehicular Pursuits," "Policy
Compliance," "Threat Assessment of Suspect Driving," "Emergency Vehicle Operations."*
(Consulted – Attorney: Adam Fulton)

June 2013       Civil:  Nicholas Damante v. City of Hayward, et al.  Alameda County Superior Court. Areas of
Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Differentiation of
Knives Under 653k PC," "Reasonable Force."* (Consulted – Attorney: Jeffrey Vucinich)

February 2013   Civil:  A.K.H., a minor by and through her Guardian Ad Litem, Elizabeth Landeros; Maria Cerda
Reyes; and Benito Herrera v. City of Tustin et al.  United States District Court - Central District of
California.  Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest,"
"Reasonable Use of Deadly Force," "Human Perception and Reaction Time," "Suicide by
Cop," "Timely Rendering of First Aid," and "Policy Compliance."* (Submitted report & **deposed**
- Attorney: Robert Kaufman)

December 2011 Civil: Carrillo/Correa v. Las Vegas Metropolitan Police Department, et al. United States
District Court - District of Nevada.  Areas of Expertise: *"Vehicular Pursuits," "Policy
Compliance," "Threat Assessment of Suspect Driving," "Emergency Vehicle Operations"* and
*"Perception and Memory."* (Submitted report and **deposed** - Attorney: Sean Lyttle)

October 2011    Civil:  Mary & Charles Piskura v. TASER, International, et al. United States District Court –
Southern District of Ohio.  Areas of Expertise: *"Eyewitness Perception and Memory of Events"*
and *"The Biomechanics of Officer-Suspect Interactions."* (Submitted report – Attorney: Andrew
Yosowitz)

November 2010 Civil:  Kenneth Carrethers v. Bay Area Rapid Transit, et al. San Francisco, CA.  United
States District Court – Northern District of California.  Areas of Expertise:  *"Reasonable
Suspicion to Detain, Probable Cause to Arrest, and Reasonable Force"* and *"Reasonable Use of
Leg Restraint for Defense of a §1983 Action Alleging Unlawful Arrest and Excessive Force."*
(Submitted report and **deposed** – Attorney: Dale Allen)

December 2008 Civil:  John Garcia v. County of Merced, et al., CA.  U.S. District Court - Eastern
District of California.  Area of Expertise:   *"Officers' Training Regarding Proper Search
Warrant Affidavit Procedures in a Narcotic Investigation."*  (Submitted report – Attorney: Roger
Matzkind - Defense)

February 2008   Civil:  Randy Sewell v. Dustin James Hutchcraft, et. al. Lane County, OR.  Second Judicial
District of Oregon. Area of Expertise: *"Off-duty Police Practices in Assault and Battery by
Police Plaintiff."* (Consulted – Attorney: Kevin Crawford)

April 2004      Civil:  Steven May v. Maaco Auto Body, Modesto, CA. Superior Court of California,
Stanislaus County.  Area of Expertise: *"Proper Police Procedures and Policies Related to
Emergency Vehicle Operation and Pursuits."*  (Consultation – Attorney: Dale Thayer - Defense)

10

May 2003        Civil:  Peruzzaro v. San Mateo County Transit District, Redwood City, CA. Superior Court
                of California, San Mateo County. Area of Expertise:  ***Current Training and Proper Procedure
                Related to Emergency Vehicle Operation, "Code-3" Driving and Safety Measures.***  (**Deposed** –
                Attorney: Albert Wenzell, Jr. - Defense)

June 1999       Civil:  Steve Hatzigeorgiou vs. Camelot Park, et al. Modesto, CA.  Superior Court of
                California, Stanislaus County. Area of Expertise:  ***Appropriate Off-Duty Conduct by Peace
                Officers.*** (Consultation – Attorney: Michael Amaro - Defense)

Civil – Plaintiff

March 2015      Angel Keith Toscano, Jr., et al. v. City of Fresno, et al., United States District Court - Eastern
                District of California.  Areas of Expertise: ***Probable Cause to Arrest," "Reasonable Force –
                Patrol Vehicle v. Bicyclist," "Driving with Due Regard During Pursuit of Bicyclist," "Effect of
                Use of Emergency Lights and Siren," "increasing the Danger to Struck Fleeing Suspect," and
                "Emergency Vehicle Operations Training.*** (Submitted Report – Attorneys: Andrew Jones &
                Adam Rushing)

October 2013    Steve Armstrong v. El Rancho Market of Chandler, Inc., Superior Court of Arizona – Maricopa
                County. Areas of Expertise: ***Proper Procedure for Detaining Suspected Shoplifters by Retail
                Loss-prevention Personnel," "Inadequate Training of Loss-prevention Personnel," and
                Improper Use of Handcuffs.*** (Consulted – Attorney: Robert Trop)

October 2012    Austin Koval v. United States of America. United States District Court – Eastern District of
                California. Areas of Expertise: ***Reasonable Suspicion to Detain," "Probable Cause to Arrest,"
                "Reasonable Officer's Application of Criminal Statute," "Unreasonable Seizure of Personal
                Property Without Cause," and "Duty to Intercede.*** (Submitted report & **deposed** – Attorney:
                Robert Trop)

March 2009      Civil:  Steven Morrow v. Park-Gaylord Apartments, Paul Pries, et al. San Jose, CA. Superior
                Court of California, Santa Clara County.  Area of Expertise:  ***Proper Police Practices in Foot
                Pursuits.*** (Submitted report – Attorney: Peter Timewell)

Criminal – Prosecution

September 2014 Criminal: People of the State of California v. Brian Rathjen, Superior Court of California, Santa
                Clara County.  Areas of Expertise: ***"Reasonable Force" and "Dealing with Mentally Ill
                Individuals."*** (Consulted – Attorney: Angela Bernhard - Prosecution for Murder and Resisting
                Arrest with Injury to Peace Officer)

September 2014 Criminal: People of the State of California v. Christopher Melton, Superior Court of California,
                Stanislaus County.  Areas of Expertise: ***"Reasonable Force" and "Arrest & Control Tactics."***
                (**Testified** – Attorney: Blythe Harris - Prosecution for Assault Under Color of Authority)

August 2009     Criminal:  People v. Romel Custodio, Marlo Custodio, and Marilou Alvarado, San Jose, CA.
                Superior Court of California, Santa Clara County. Areas of Expertise: ***Operation and Use of the
                TASER® Brand Electronic Control Device*** and ***The Use of Force in the Prosecution for
                Resisting Arrest/Obstructing and Delaying a Peace Officer.*** (**Testified** – Attorney: Donald
                Shearer)  STATUS:  Uncompensated expert witness as part of normal police duties.

December 2006 Criminal:  People v. Phouc Ngoc Pham, San Jose, CA.  Superior Court of California, Santa
                Clara County. Area of Expertise: ***Brandishing a Firearm by Off-Duty Police Defendant.***
                (Submitted report – Attorney: Raymond Mendoza)  STATUS:  Uncompensated expert witness as
                part of normal police duties.

11

August 2006      Criminal:  People v. Joe Reyes Guerra, San Jose, CA.  Superior Court of California, Santa Clara County. Areas of Expertise:  ***"Police Use of Force," "Force Options and Operation"*** and ***"Proper Application of the TASER® Brand Electronic Control Device."*** (**Testified** – Attorney: James Leonard)  STATUS:  Uncompensated expert witness as part of normal police duties.

February 2005    Criminal: People vs. Michael Kan and Craig Daniel Lee, San Jose, CA. Superior Court of California, Santa Clara County.  Areas of Expertise:  ***"Assault Under Color of Authority," "Officers' Training as to Facts Amounting to Reasonable Suspicion to Detain & Probable Cause to Arrest***" and ***"Policy and Practices Regarding Use of Force."*** (Submitted report & **testified** – Attorney: Peter Waite)   STATUS:  Uncompensated expert witness as part of normal police duties.

November 2005 Criminal:  People vs. Jose Murillo, Santa Clara, CA.  Area of Expertise:  ***"Effect of a Stun Baton."*** (Submitted report – Attorney: Benjamin Field - Prosecution)   STATUS:  Uncompensated expert witness as part of normal police duties.

May 2005         Criminal:  People vs. Marvin Evenorlazo Amaya, Santa Clara, CA.  Areas of Expertise: ***"Officers' Training as to Facts Amounting to Reasonable Suspicion to Detain"*** and ***"Policy and Practices Regarding Use of Force."*** (**Testified** – Attorney: Angela Bernard)  STATUS: Uncompensated expert witness as part of normal police duties.

December 2002 Criminal:  People vs. Lugo Santillan Silva, Santa Clara, CA.  Area of Expertise***:  "Use of Force/Police Service Dogs as an Instrumentality of Force."*** (**Testified** – Attorney: Judith Sklar - Prosecution) STATUS: Uncompensated expert witness as part of normal police duties.

September 2001Criminal:  People vs. Craig Winton Mosher, Monterey, CA.  Superior Court of California, Monterey County.  Area of Expertise - ***"Assault Under Color."***  (Consulted – Attorney: Gary Thelander - Prosecution)  STATUS:  Uncompensated expert witness

<u>Criminal – Defense</u>

October 2014    People v. Jeffrey Smock, Superior Court - County of Marin.  Areas of Expertise: ***"Factors of Reasonable Force in Self Defense by a Civilian."*** (Excluded – Attorney: M. Gerald Schwartzbach)

July 2011        Criminal:  State of Nevada v. Aron Carpenter, Las Vegas, NV. Eighth Judicial District of Nevada. Areas of Expertise:  ***"Pursuit Policy," "Determining Policy Compliance", "Pursuit Dynamics," "Distinguishing Policy from Law,"*** and ***"Human Perception and Reaction Time."*** (**Testified** – Attorney: Bret Whipple)

April 2010       Criminal:  People v. Julio Morales, San Jose, CA.  Superior Court of California, Santa Clara County. Areas of Expertise: ***"Consensual Encounters, Reasonable Suspicion to Detain," "Probable Cause for Pat Searches," "San Jose Police Department Regulations, San Jose Police Department Performance Appraisal Practices, and Under the Influence (11550 H&S) Investigative Procedures for the Defense of a San Jose Police Officer Charged with Sexual Battery and False Imprisonment."*** (**Testified** – Attorney: Craig M. Brown)

<u>Administrative – Grievant</u>

March 2015       In the Matter of the Appeal of Rodolfo Gomez, Jr., Board of Fire and Police Commissioners of the City of Milwaukee.  Area of Expertise: "***"Importance of Proper Analysis of Video Evidence in Use-of-Force Investigations."*** (Testified – Attorney: Brendan Matthews)

June 2013        Civil Service Hearing:  Juan Vara & Kevin Wheeler v. New Orleans Police Department, New Orleans, LA.  Areas of Expertise: *"Use of Force," "TASER" and "Human Factors" (Basic vision, light & dark adaptation, lighting and attention).* (Submitted report & **Testified -** Attorneys: Donovan Livacarri & Raymond Burkett, III)

March 2012       Arbitration Hearing:  Alfonzo Basurto v. Santa Clara County Sheriff's Department, San Jose, CA.  Areas of Expertise: *"Use-of-Force Policy Compliance," "Force Options" and "Arrest and Control Tactics."* (**Testified** – Attorney: William Rapoport - Grievant)

August 2011      Arbitration Hearing:  Aron Carpenter v. Las Vegas Metropolitan Police Department, Las Vegas, NV. Areas of Expertise: *"Pursuit Policy and Compliance," "Recognition of Suicidal Behavior," "Vehicle Dynamics," "Basic Collision Report Writing,"* and *"Perception, Memory and Reaction Time."* (**Testified –** Attorney: John Harper - Grievant)

March 2011       Arbitration Hearing:  City of Grover Beach v. Lopez, Grover Beach. Areas of Expertise: *"Human Perception and Memory," "Operation and Capabilities of the TASER® X26 and TASER Cam®,"* and *"Reasonable Use of the TASER®"* and *"Reasonable Force Per Department Policy."* (**Testified** – Attorney: Alison Berry Wilkinson)

March 2003       Arbitration Hearing:  Daysog vs. City of San Jose, San Jose, CA.  Areas of Expertise: *"Use of Force/Police Service Dogs as an Instrumentality of Force."* (**Testified** – Attorney: Craig M. Brown - Grievant) STATUS: Uncompensated expert witness subpoenaed by officer.

Consultation/Review

July 2015        Consultation & Review: Force-Response Analysis of Officer-Involved Shooting: Fridoon Rawshan Nehad.  Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Human Perception v. Video Evidence," "Force Options," "Reasonable Use of Deadly Force."* (Submitted report – San Diego County District Attorney's Office – Attorney: Fiona Khalil)

March 2015       Consultation: Confidential Client (Chief of Police) – Review of reports and examination and interpretation of in-car camera video of arrest to determine reasonableness of force during arrest.

January 2015     Consultation & Training: Confidential Client (Police Internal Affairs Unit) – Examination and interpretation of two body-worn camera videos of two separate incidents, one involving physical non-lethal force (physical force, TASERs, and OC spray) and the other of an officer-involved shooting. Provided training to IA investigators about how to examine and interpret video of force incidents.

March 2000       Interviewed for review of claim regarding a training injury in a defensive tactics course at a basic academy for Keenan & Associates (TPA).

July 1998        Reviewed evidence and documentation for the U.S. Department of Justice Civil Rights Division and rendered an opinion as to reasonableness of force for patterns and practices. Case name is confidential.

Professional/Peer Review

August 2008      Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP), Department of Homeland Security.

November 2006 Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP), Department of Homeland Security.  STATUS:  Compensated consultant.

13

February 2006   Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP) Department of Homeland Security.

August 2001   Professional Review of Research Report, National Institute of Justice.

March 1999   Professional Review of Research Report, National Institute of Justice

August 1998   Peer Review Panel member for grant proposals, National Institute of Justice

---

## ADJUDICATION

March 2014   Confidential File No. 033.14284.15294. Neutral board member agreed to by the California Highway Patrol and Appellant in good cause hearing for revocation of a retired peace officer's concealed weapon endorsement pursuant to California Penal Code Sections 25740 and 26305(b) et seq.

14



## FEE AGREEMENT

**Re the matter of:** _____

**CASE REVIEW AND OPINION:**
A Complete review of all materials furnished will be done on a timely basis, and written opinion will be completed if requested.  A review of materials provided will be performed at the rate of $200.00 per hour with a minimum of 24 hours ($4,800.00) required in advance of commencement of review.  This $4,800.00 fee is nonrefundable and must accompany this signed Fee Agreement acknowledging Jeffrey A. Martin's participation in the case as an expert. Payment to Jeffrey A. Martin is not dependent upon the client-attorney's decision to continue to use the services of Jeffrey A. Martin in this matter.  Designating Jeffrey A. Martin as an expert in any case matter without his consent, signing the fee agreement and paying the minimum $4,800.00 fee is prohibited.  If the fee arrives before case materials are sent or received, the receipt of the fee is considered an agreement to retain.  Jeffrey A. Martin reserves the right to withdraw from assisting in the matter if the client-attorney misrepresents or withholds any information about the case or any relationships constituting potential conflicts.  The $4,800.00 minimum billing will be credited toward subsequent invoices.

**TESTIMONY:**
Actual testimony in a proceeding (i.e., trial, deposition, or hearing) will be billed at $400.00 per hour with a four-hour minimum of $1,600.00.  Waiting to testify at the venue of the proceeding before actually testifying will be billed at $200.00 hour.  If the case settles, is dismissed, or otherwise rescheduled after arrival at the venue of the proceeding, a four-hour minimum of $1,600.00 will be billed. The four-hour minimum of $1,600.00 will be billed if the case settles, is dismissed, or otherwise rescheduled within 24 hours (excluding Saturdays and Sundays) of scheduled testimony.

**READING, CONSULTATION, PREPARATION, RESEARCH & REPORTS*:**  $200.00 per hour.

**CASE/DOCUMENT ORGANIZATION:**  $75.00 per hour.

**SITE VISIT:**  $1,600.00 if travel time is more than four hours, portal-to-portal. $200.00 per hour otherwise.

**TRAVEL (Does not include travel expenses):**  $95 per hour.

**FILING/BILLING/OFFICE SUPPLY FEE (One time fee per case):**  $175.00

Airfare will be booked at an unrestricted coach fare.
Mileage will be charged at the current IRS rate.
After 45 days a 10 percent late fee will be charged.
Expenses will be billed as incurred.
Invoices may be issued every 30 days when the case is active.
The hiring firm/organization is responsible for ensuring that all fees are paid in full and in a timely manner.
**All hourly rates will be billed per tenth hour.**
***An Expedited-Report fee of $1,000.00 is billed if a report is needed in less than 10 business days.**

**I HAVE READ THIS FEE SCHEDULE IN ITS ENTIRETY AND AGREE TO THE TERMS THEREIN.**

_____          _____
Jeffrey A. Martin                                                           Signature of retaining attorney            Date

                                                                                 _____
                                                                                 Typed or printed name of retaining attorney

727 Industrial Road, Suite 102   •   San Carlos, CA 94070   •   650.595.2452   •   dsiconsult.com