1  **GARY BRICKWOOD (SBN 94892)**
   **BRICKWOOD LAW OFFICE**
2  1135 Pine St., Suite 210
   Redding, CA 96001
3  Tel  (530) 245-1877
   Fax (530) 245-1879
4

5  Attorneys for Defendants
   CITY OF REDDING, CHIEF ROBERT F. PAOLETTI,
6  JARED HEBERT, PEGGY PORTER and CHRIS SMYRNOS

7

8                     UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| L.M. by and through her guardian ad Litem ASHLEY MCCAIN, individually and as successor in interest to the Estate of STEVEN MOTLEY; CAROL ADAMS, individually, | Lead Case No. 2:14-cv-00767-MCE-AC (Consolidated Case No.: 2:14-cv-01736-TLN CMK) |
| Plaintiffs, | **DEFENDANTS CITY OF REDDING AND ROBERT PAOLETTI'S MOTION FOR SUMMARY JUDGMENT: NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| CITY OF REDDING, et al., | |
| Defendants. _____/ | Date:  April 20, 2017 Time:  2:00 p.m. |
| S M-B, a minor, by and through his guardian ad litem DAWN BIANCO, individually and as successor in interest to the Estate of STEVEN MOTLEY, | Courtroom:  7 Honorable Morrison C. England, Jr. |
| Plaintiff, | |
| vs. | |
| CITY OF REDDING, et al., | |
| Defendants. _____/ | |

# NOTICE OF MOTION

**TO PLAINTIFFS[1] AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 20, 2017 at 2:00 p.m. or as soon thereafter as the matter may be heard in Courtroom 7 of the above captioned court located at 501 I Street, Sacramento, CA 95814, defendants City of Redding and Robert Paoletti will and hereby do move the Court for an order pursuant to Federal Rule of Civil Procedure 56(a) granting summary judgment as to those defendants on the Fourth and Fifth (McCain Complaint) and Sixth and Seventh (Bianco Complaint) Claims for Relief in plaintiffs' complaints.

The motion is based on the ground that there are no genuine disputes as to the material facts of plaintiffs' Fourth and Fifth Claims For Relief (McCain Complaint) or Sixth and Seventh Claims For Relief (Bianco Complaint) and defendants are entitled to judgment as a matter of law. More specifically, the motion is made on the following grounds:

1. As to the Fourth (McCain Complaint) and Sixth (Bianco Complaint) Claims For Relief, against the City of Redding, plaintiffs cannot establish that they suffered any injury to their federal civil rights caused by an official policy of the City of Redding.

2. As to the Fifth (McCain Complaint) and Seventh (Bianco Complaint) Claim for Relief, against Redding Police Chief Robert Paoletti as an individual, plaintiffs cannot establish that they suffered any injury to their federal civil rights caused by any alleged misconduct attributable to defendant Paoletti's individual acts or omissions.

This motion is based on this notice of motion and motion, the attached memorandum of points and authorities, the accompanying declarations and supporting evidence, the complete files of this case and any argument or evidence the Court may entertain at the hearing of this matter.

---

[1] For ease of reference in this consolidated action, moving defendants will refer to Case No. 2:14-CV-00767 MCE-AC as the McCain Complaint and Case No. 2:14-cv-01736 TLN-CMK as the Bianco Complaint.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    **INTRODUCTION**

On October 5, 2013, Stephen Motley crashed a stolen truck while pursued by Redding Police Officer Jared Hebert; then, after being confronted by Hebert, stole Hebert's police vehicle, which he abandoned less than a mile away. Fleeing the scene, he was caught by Officer Wesley Townsley in the back yard of a residence. After a violent struggle first with Townsley and then with other officers who arrived in response to Officer Townsley's call for assistance, he was eventually handcuffed. Shortly after he was finally detained, he exhibited symptoms of medical distress for which he was treated at the scene by police officers and emergency medical personnel. He was transported to the hospital and died on October 8, 2013. The medical examiner who conducted the autopsy concluded that Motley, who had multiple blunt force injuries and low toxic levels of methamphetamine in his blood, died from cardiopulmonary arrest attributable to excited delirium.

Decedent Motley's estate, along with surviving family members, have sued multiple Redding police officers as well as the City of Redding and Redding Police Chief Robert Paoletti, asserting violations of their federal civil rights under 42 U.S.C. §1983 and state law personal injury claims, including, inter alia, wrongful death.

As developed below, defendants City of Redding and Chief Paoletti are entitled to judgment as to plaintiffs'[2] §1983 claims against those defendants in that plaintiffs cannot show that their injuries were caused by an official policy of the City of Redding, nor can they show any act or omission by Chief Paoletti as an individual that caused any deprivation of their civil rights.

///
///
///
///
///

---

[2] For ease of reference in this consolidated action, moving defendants will refer to Case No. 2:14-CV-00767 MCE-AC as the McCain Complaint and Case No. 2:14-cv-01736 TLN-CMK as the Bianco Complaint.

DEFENDANTS CITY OF REDDING AND ROBERT PAOLETTI'S MOTION FOR SUMMARY JUDGMENT; NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES

3

## II. STATEMENT OF FACTS

### A. Stephen Motley's Confrontation With Police

On October 5, 2013, Redding Police Officer Jared Hebert saw Stephen Motley driving what Officer Hebert believed to be a stolen GMC truck. Defendants Supporting Evidence Re: Motion For Summary Judgment (DSE) Exh. A(1) 6:17-7:4. When Hebert attempted to make a traffic stop, Motley made a three point turn and took off at a high rate of speed. *Id.*, 7:5-14.

Officer Hebert gave pursuit, but lost sight of the vehicle because it was going so fast. He eventually spotted the truck crashed into a cinderblock wall in a residential area. DSE, Exh. A(1) 7:15-21. As he approached, he saw people all around, and Motley running down the street. *Id.*, 7:22-8:2. Motley, with Hebert in pursuit, scaled several fences, eventually circling back and stealing Hebert's patrol car. *Id.*, 8:11-9:19. Hebert, who had closed with Motley, deployed his Taser, but to no effect:  Motley took off in the patrol car, revving the engine, ignoring demands to stop and swerving around Officer Wesley Townsley's police car, which had just arrived on the scene. *Id.*, 9:16-11:14.

Motley drove the stolen police car a short distance before abandoning it. Officer Townsley, who was by then in pursuit on foot, saw Motley on the other side of a fence in the backyard of a residence. DSE, Exh. A(2) 26:12-27:6. Townsley jumped over the fence and confronted Motley, who began to run. Townsley deployed his Taser; Motley fell to the ground momentarily stunned, but then pulled the probes out of his arm. *Id.*, 27:16-29:13. As Townsley attempted to handcuff him, despite having been tased, Motley strenuously resisted, attempting to escape. Townsley applied various pain compliance techniques and struck Motley in the jaw with his fist, but Motley continued to resist. Those attempts to subdue Motley having been ineffective, Officer Townsley employed a carotid restraint, which briefly rendered Motley unconscious, but he quickly revived and renewed his struggle. *Id.*, 22:13-23:4; 32:4-41:1.

Other officers arrived in response to Townsley's call for backup. Officers Largent and Jacoby arrived first and assisted in an attempt to gain control of Motley who continued to struggle strenuously, in fact appearing reinvigorated upon the arrival of additional officers. DSE, Exh. A(3) 18:1- 20:12; A(5) 13:11-17:23; 21:6-9; A(2) 99:8-24.   Officer Zufall arrived next and

attempted to gain control of Motley's legs.  In his attempt to subdue Motley, Officer Largent struck Motley's right arm 5 to 7 times with his baton, but those efforts too proved ineffective in stopping Motley's resistance.  DSE, Exh. A(3) 16:9-24:2.  Corporal Jacoby struck Motley with his baton twice in the right forearm area.  DSE, Exh. A(6) 9:21-11:18.  Officer Zufall used her body to attempt to control Motley's legs, but he persisted in thrashing, lifting her off the ground.  Officer Zufall struck Motley's legs 3 or 4 times with her baton and further attempted to control his legs through a standard procedure involving crossing Motley's legs and pressing them towards his buttocks.  DSE, Exh. A(3) 41:11-42:12; A(4) 14:23-18:6; 55:6-57:4.  Officers Porter and Zufall arrived to provide assistance.  Largent and Porter were then able to handcuff Motley.  He continued to thrash and kick his legs.  Officer Smyrnos replaced Officer Zufall in the effort to control Mr. Motley's legs.  DSE, Exh. A(3) 26:22-27:15.  Officer Zufall struck his legs 3 to 4 times with her baton and further attempted to control them through a standard procedure involving crossing Motley's legs and pressing them towards his buttocks.  DSE, Exh. A(4) 12:7-13:4, 14:6-15:22; 19:19-23:2.  Officers at the scene made a call to police dispatch to send emergency medical assistance in the form of an ambulance for Motley, who at the time remained responsive and was verbally engaged with officers, but appeared to have sustained a broken arm.  *Id*., A(3) 33:7-34:2; 43:22-45:5; A(6) 26:19-27:16.

After Motley was handcuffed, Officer Largent was in the process of pat-searching Mr. Motley and had rolled him to his side.  Officer Largent observed that Motley was breathing and was talking to Largent.  Thereafter, Largent saw Motley's face change color.  Officer Largent checked for a pulse which he detected.  Officer Largent, together with other officers at the scene decided to move Mr. Motley closer to the street to reduce the time that it would take the emergency medical technicians who were responding to reach Mr. Motley.  On the way closer to the street, Officer Largent observed Motley in distress and placed Motley into a rescue position, checked for a pulse, and began to administer CPR.   DSE, Exh. A(3) 43:15-45:14; 71:11-73:22; 74:5-80:10; 85:23-86:17.   Officer Jacoby contacted dispatch again about emergency medical assistance, making sure that the assistance previously requested had been dispatched Code 3.  *Id*., 75:14-23; A(6) 34:9-13.  Motley regained his pulse and was breathing when EMT personnel

arrived, but lost it again shortly thereafter. DSE, Exh. A(3) 80:23-82:5.

Motley was transported by ambulance to Mercy Medical Center in Redding and then transported by air ambulance to Sacramento for further treatment to his broken arm. He died at the hospital in Sacramento on October 8, 2013. An autopsy concluded that Motley died of cardiopulmonary arrest that was likely attributable to excited delirium. DSE, Exh. A(7) 14:8-15:10. He had methamphetamine in his blood system at the low end of the potentially toxic level. *Id*., 49:18-50:7. The autopsy also revealed multiple injuries, including a broken wrist, broken leg, broken ribs, bruising on his back, and contusions to his head consistent with blunt force trauma. *Id*., 30:15-37:22. Dr. Arnold Josselson, the medical examiner who conducted the autopsy, testified that absent excited delirium syndrome, low levels of methamphetamine in conjunction with broken bones would not lead to cardiac arrest. Dr. Josselson testified that none of the physical injuries in and of themselves were consistent with a cause of death. *Id*., Exh. A(7) 57:14-25.[3]

### B.    The Critical Incident Protocol Investigation.

In keeping with state law as well as best practices and standards for law enforcement agencies in California, the City of Redding has adopted a "critical incident" protocol which is in force between the City, Shasta County and other law enforcement agencies in the Redding area. DSE, Exh. B 6:16-7:1. A critical incident protocol provides that law enforcement agencies other than the agency that employed the officers implicated in an incident involving the death of a person will take the lead in the subsequent investigation. *Id*., 6:23-27. In the case of Mr. Motley's death, the lead investigating agency was the Shasta County Sheriff's Office. *Id.*, 7:1-7. Consistent with the critical incident protocol, the Redding Police Department provided investigative services as requested by and necessary to the Sheriff's investigation, including compelled interviews of the officers involved and facilitation in obtaining answers to written

---

[3] Stephanie Fiore, a medical examiner retained by the District Attorney's office, also opined that the cause of death was cardiopulmonary arrest following a violent struggle that resulted in blunt force injuries in which methamphetamine might have been a factor. She observed however that several factors which can accompany "excited delirium" were not present, specifically an elevated body temperature and a high blood level of methamphetamine. She also said asphyxiation might have been a cause of death. <u>See</u> DSE, Exh. A(7) 45:15-57:25

DEFENDANTS CITY OF REDDING AND ROBERT PAOLETTI'S MOTION FOR SUMMARY JUDGMENT; NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES

6

questions by the Shasta County District Attorney's Office, which conducted its own review of the incident pursuant to the protocol. *Id*., 7:9-14.

As an aspect of its own investigation pursuant to the critical incident protocol, the District Attorney's Office issued "findings" that raised questions about the use of force by officers who used baton strikes in an effort to subdue Motley. DSE, Exh. B 7:15-18. However, the District Attorney concluded that, given the chaotic circumstances confronting the officers, there was no basis to second-guess the officers' use of force, and the DA declined to file charges against any Redding Police Officer involved in Motley's apprehension. *Id*., 7:18-21.

### C. City Of Redding Police Officer Training.

Each of the defendant officers passed a POST certified police academy prior to beginning their career as police officers. DSE, Exh. B 4:22-25. Each defendant officer also went through a field-training program at the department where they began their police careers. As to those officers who came to Redding from other departments, the training records of those officers shows that they satisfactorily completed lateral field training at the City of Redding. *Id*., 4:25-5:9.

The City of Redding provides training to its officers in all aspects of law enforcement that meets or exceeds POST standards, including use of force, response to critical incident circumstances and the provision of reasonable and necessary medical care. DSE, Exh. B 5:10-6:3. The individual defendant officers involved in the altercation with Motley received training that met or exceeded POST standards, sometimes by significant amounts, in all aspects of law enforcement, including the use of force, positional asphyxia, as well as other law enforcement domains. *Id*.; *see also* Exh. A(2) 9:17-18; 12:11-13:3; 92:22-94:1; A(3) 70:9-19; 100:5-101:14; 106:7-109:18; A(4) 6:14-7:2; 47:22-50:4; A(6) 7:20-8:24. Following this incident, the City of Redding conducted additional training of its police officers in techniques for dealing with suspects exhibiting signs of "excited delirium." DSE, Exh. A(2) 89:17-92:10.

///

///

///

### III.  LEGAL ARGUMENT

**A. Plaintiffs Cannot Show That They Suffered Any Deprivation Of Their Civil Rights Caused By An Official Policy Of The City Of Redding.**

A plaintiff claiming a deprivation of his or her civil rights by a municipality like the City of Redding under 42 U.S.C. §1983 can prevail only if they can show that the alleged deprivation was caused by an official policy of the City.  See *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978).

A plaintiff can meet that burden in several ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore,* 979 F.2d 1342, 1346-47 (9th Cir. 1992).

Review of plaintiffs' complaints indicate that they seek municipal liability under the first and third of the grounds identified in *Gillette*: "practice or custom" and ratification. Neither of these is a viable basis for recovery on this record.

**1. Plaintiffs Cannot Establish Any Constitutional Injury Caused By A "Practice Or Custom" Of The City Of Redding.**

Plaintiffs' "practice or custom" allegations have two components. First, plaintiffs claim that there is a persistent practice on the part of Redding police officers to use excessive force, submit incorrect police reports, conduct inadequate investigations, and other purported transgressions. McCain Complaint, ¶¶ 53-59; Bianco Complaint, ¶¶ 59-64. These deprecations, however, are offered without any evidence. The only specifics identified are two earlier lawsuits

filed by the McCain plaintiffs' counsel in this case, both of which settled. <u>See</u> DSE, Exh. A, ¶ 9.[4]

That is insufficient. Without specific evidence of constitutional violations that have gone unpunished by the City, neither a list of citizen complaints nor settled lawsuits constitutes proof of a custom and practice of deliberate indifference to citizens' civil rights adequate to support municipal liability. <u>See Pharaoh v. Dewees</u>, 2016 WL 2593842 at *5 (E.D. Pennsylvania 2016) and cases cited therein; <u>see also</u> Mettler *v. Whitledge*, 165 F.3d 1197, 1204-1205 (8th Cir. 1999). In the words of one district court with respect to the proffer of prior settled lawsuits as evidence of municipal culpability:

> the court is at a complete loss to understand what possible relevance this evidence has in proving the Department maintains a widespread practice of allowing its officers to use excessive force. Just because somebody alleges something does not make it so. And [plaintiff] himself admits these cases were settled, so there was never any finding of liability on the officers' part. How such evidence could show a widespread practice of using excessive force within the Department is beyond the court.

*Hernandez v. Nielsen*, 2002 WL 31804788 at *1 (N.D. Illinois 2002).

Plaintiffs also allege that their injuries were caused by a policy of inadequate training of police officers in such things as use of force, report writing, and seeking medical attention for arrestees. McCain Complaint, ¶ 60; Bianco Complaint, ¶66. The record shows these allegations too are without merit.

"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). And so liability may arise "in a narrow range of circumstances, that a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id*. at 410. However, liability requires proof that such a violation of a federal right was the "plainly obvious consequence" of a "particular glaring omission in a training regimen." *Id.* Moreover, a particular officer's lack of training "will not alone suffice to fasten liability on the city, for the officer's shortcomings may

---

[4] Plaintiffs' complaints allege that both Hebert and Largent were the subject of prior lawsuits. McCain Complaint, ¶59; Bianco Complaint, ¶ 65. Hebert has been dropped as a defendant in this suit.

1  have resulted from factors other than a faulty training program." *Id*.

2  Here, it is beyond reasonable dispute that the City's training regimen in general, and the defendant officers' training in particular, met or exceeded the professional standards by which police officers' training is measured throughout California. <u>See</u> DSE, Exh. B 4:22-6:3; Exh. A(2) 9:17-18; 12:11-13:3;  92:22-94:1; A(3) 70:9-19; 100:5-101:14; 106:7-109:18; A(4) 6:14-7:2; 47:22-50:4; A(6) 7:20-8:24.  There is no basis whatsoever on this record by which plaintiff might meet the Supreme Court's strict causation standard:  that their claimed injuries were the "plainly obvious consequence" of the City of Redding's inadequate training of its police officers.  <u>See</u> *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410 (1997) ("The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.")  The City accordingly cannot be liable under a "failure to train" theory.

**2.    Plaintiffs Cannot Show That A Policy Making Official Of The City Of Redding Ratified Unconstitutional Conduct By Subordinate Officers, And The Basis For It.**

"To show ratification, a plaintiff must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it.'"  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).  Municipal liability on the basis of ratification may occur only "when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).

Plaintiffs' ratification theory here appears to be premised on the assertion that the City ratified unconstitutional conduct by ostensibly failing to discipline the officers involved in the incident in question.  McCain Complaint, ¶ 53; Bianco Complaint, ¶ 59.  However, without more, failure to discipline officers accused of unconstitutional conduct, or mere acquiescence in their behavior is insufficient to support municipal liability.  *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014) (overruled on other grounds *Sheehan v. City and County of San Francisco*, ___ U.S. _____ ; 135 S.Ct. 1765 (2015)).  Here, of course, the only "acquiescence" on the part of the City was to the findings of the investigation undertaken pursuant

to the critical incident protocol, which concluded that there was no basis to "second guess" the officers' use of force. That is insufficient to support municipal liability under a ratification theory as a matter of law. <u>See Booke v. County of Fresno</u>, 98 F.Supp.3d 1103, 1129-1130 (E.D. Cal. 2015); <u>see also</u> DSE, Exh. B 7:15-6:4.

The concerns expressed in the District Attorney's "findings" about the use of batons in subduing plaintiff do not compel a different result. Those concerns are after the fact observations concerning a single incident that cannot be said to represent a *policy* that caused plaintiffs' constitutional injuries. <u>See</u> *Trevino v. Gates*, 99 F.3d at 918 ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.")

This is particularly so given the DA's determination that there was no basis to second-guess the use of batons under the circumstances. As this Court has observed

> The law does not say that every failure to discipline an officer who has shot someone is evidence of a "whitewash" policy or some other policy of "sham" investigations. The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under §1983. If that were the law, counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more."

*Kong Meng Xiang v. City of Merced*, 2015 WL 4598861 at *29 (internal citations omitted)

Moreover, the Department *did* initiate additional training with respect to excited delirium. Given this record, plaintiffs cannot establish that they suffered any injury to their constitutional rights traceable to a policy of deliberate indifference on the part of the City to those rights, and the City is entitled to judgment accordingly.

///
///
///
///
///

### B. Plaintiffs Cannot Show Any Constitutional Injury Caused By Chief Paoletti's Own Alleged Misconduct.

Plaintiffs' Fifth (McCain Complaint) and Seventh (Bianco Complaint) Claims for Relief seek damages against Redding Police Chief Robert Paoletti as an individual for alleged violations of their civil rights. Those claims too are unavailing.

"Section 1983 lawsuits…do not support vicarious liability." *OSU Student Alliance v. Ray*, 699 F.3d 1052, 1069 (9th Cir. 2012). "Each government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id*. (*citing Iqbal v. Ashcroft*, 556 U.S. 662, 677 (2009).) Thus, to state a valid § 1983 claim against an official as an individual, a plaintiff must show that "each government-official defendant, through the official's own individual action…violated the constitution." *Id*.

In assessing culpability for the individual official, "constitutional claims against supervisory defendants turn on the requirements of the particular claim—and more specifically, on the state of mind required by the particular claim—not on the generally applicable concept of supervisory liability." *OSU Student Alliance* at 1071. Thus, in an excessive force claim, a supervisor may be liable if he or she

> set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury. Supervisory liability is imposed against a supervisory official in his individual capacity for his "own culpable action or inaction in the training, supervision, or control of his subordinates, for his " 'acquiesce[nce] in the constitutional deprivations of which [the] complaint is made, or for conduct that showed a 'reckless or callous indifference to the rights of others.

*Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1996) (internal citations omitted; ellipses in original.)

There is no evidence on this record that defendant Paoletti did any of these things. As developed above, there is no evidence connecting any officers' conduct to a putative failure of training. Given that unassailable fact, there is no evidence sufficient to show that Chief Paoletti "disregarded the known or obvious consequence that a particular omission" in the Department's

training program would cause the defendants "to violate citizens' constitutional rights." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158-1160 (9th Cir. 2014).

Plaintiff does allege that Chief Paoletti should have known about a purported "propensity for violence" of Redding police officers generally "based on prior citizen complaints" and the settled lawsuits described above. McCain Complaint, ¶ 69; Bianco Complaint, ¶ 74. . This too is insufficient. First, plaintiffs offer no facts establishing that Chief Paoletti knew of any such purported pattern of citizen complaints sufficient to establish individual liability. An official cannot be held responsible for conduct of which he or she is unaware. See *Star v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 1211 ("We therefore conclude that a plaintiff may state a claim against a supervisor for deliberate indifference *based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates.*" (emphasis supplied)). More fundamentally, beyond listing prior cases that have settled with no findings of liability, plaintiffs provide no details about the basis for those "citizen complaints" such that a trier of fact might infer a pattern of unconstitutional conduct in which the Chief might reasonably be claimed to have acquiesced. See *Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1116 (E.D. Cal. 2011) (six citizen complaints against same officer for which he was exonerated insufficient to support individual liability against chief of police); *Pharaoh v. Dewees*, 2016 WL 2593842 at *5.

In summary, in the absence of evidence of culpable conduct by Chief Paoletti as an individual demonstrating his "knowledge of and acquiescence in unconstitutional conduct" by his subordinate officers, he is entitled to judgment as to plaintiffs' Fifth (McCain Complaint) and Seventh (Bianco Complaint) Claims for Relief as a matter of law.

///
///
///
///
///
///
///

DEFENDANTS CITY OF REDDING AND ROBERT PAOLETTI'S MOTION FOR SUMMARY JUDGMENT; NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES

13

### III. CONCLUSION

Plaintiffs cannot establish that they suffered any injury to their civil rights caused by an official policy of the City of Redding, nor can they show any injury to those rights attributable to individual misconduct by Redding Police Chief Robert Paoletti as an individual. For these and all the foregoing reasons, the moving defendants respectfully urge this Court to grant their motion, and to enter judgment on their behalf as a matter of law.

DATED: February 23, 2017          Respectfully submitted,

BRICKWOOD LAW OFFICE


　　　　　　/s/     *GARY BRICKWOOD*
　　　　　　GARY BRICKWOOD