# EXHIBIT A

# L.M. by and through her guardian ad litem v. City of Redding, et al.,

## United States District Court (Eastern District of California)
### No.: 2:14-CV-00767 MCE-AC

### Interim Report of Expert Witness Jeffrey A. Martin
#### Pursuant to Rule 26(a)(2)(B)

## IDENTIFICATION AND QUALIFICATIONS OF EXPERT WITNESS

My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose, California Police Department. I currently divide my time between providing consulting and expert witness services and teaching. I am a former labor relations attorney representing public safety personnel in administrative matters. I also worked as an author of "Daily Training Bulletins" for Lexipol, LLC, regarding various practices including the use of force, search and seizure, and other police practices.

I was promoted to sergeant in 1995 and have worked in the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the Training Coordinator, the Airport Division, and as a supervisor in the Training Division. As a patrol supervisor, I investigated and documented several uses of force by officers, whether as a matter of routine or due to citizen complaints.

Prior to my promotion to sergeant, I was a police officer and my assignments included Patrol, the Parks Enforcement Unit, Field Training Officer Program, and as investigator in the Narcotics/Covert Investigations (NCI) Unit.

While working as a supervisor in the Training Division (2005-2009), I supervised the California Commission on Peace Officers Standards and Training (POST) Force-options Simulator (FOS) program, which was implemented in 1999 in order to fulfill POST "perishable skills" requirements. In this program, my staff and I delivered this training to the sworn members of the San Jose Police Department, as well as other peace officers within Santa Clara County. Additionally, our facility was designated as a "regional skills training center" and we also provided instructor training to others throughout the State of California.

The FOS program concentrated on teaching the state and constitutional laws regarding the use of force by peace officers, as well as decision making involved in using various types of force, up to and including deadly force.

While assigned to the Training Division, I supervised and taught classes in defensive tactics and officer safety and I served as the lead instructor and instructor-trainer for the TASER program for the San Jose Police Department and Basic Academy. I hold a "Master Instructor" certification from TASER® International and I conducted the one-year testing and evaluation of the TASER Cam® for the department. I also served as a "scenario evaluator" in Learning Domain 20 – Use of Force.

As a POST-certified FOS Instructor, I served as an adjunct instructor in the basic FOS program provided by the South Bay Regional Public Safety Consortium from 2002 to 2004. In this

1　capacity, I trained officers in Monterey and San Mateo Counties. I also served as an adjunct
2　defensive tactics instructor in the Basic Academy at the South Bay Consortium from 2000 to 2004.

3　　From 1997 through 2004, I served as an adjunct instructor for the Field Training Seminar at
4　the South Bay Regional Consortium regarding legal and liability issues. This curriculum included
5　basic search-and-seizure law (Fourth Amendment), and search warrant requirements and
6　exceptions. I taught in the same program at the San Jose Police Department until 2006. I also
7　taught legal and liability issues in the POST Supervisors Course at South Bay Regional from
8　approximately 1997 until 2004. This curriculum included investigating and documenting police use
9　of force.

10　　Prior to being hired at the San Jose Police Department, I was an officer with the San
11　Francisco Bay Area Rapid Transit (BART) District Police Department from October 1981 through
12　December 1984. While there, I worked in both uniformed and plainclothes patrol assignments.

13　　During my law enforcement career, I have used various tactics, tools and techniques in order
14　to control subjects in field situations. This included the use of batons, chemical agents (both CS
15　and OC sprays), the TASER, extended-range impact munitions, and various weaponless measures.
16　I have also controlled numerous violent subjects in the field and have used total-appendage restraint
17　methods including the "hobble" and "The Wrap®." I also hold multiple instructor-level
18　certifications in various defensive tactics/arrest-control methods and batons. I have also attended
19　multiple training programs regarding "excited delirium" and "sudden in-custody deaths."

20　　In April of 2012, I was recruited to develop and deliver a block of instruction on "Lawful
21　Force" for the new "Officer-Involved Shooting Investigations" course produced by the California
22　POST Institute for Criminal Investigation. I have presented this three-hour block of instruction
23　over 30 times. During this block of instruction, I co-teach the legal framework required for the use
24　of force by police to meet both state statutory and federal constitutional standards. This includes
25　the legal concepts of reasonable suspicion to detain, probable cause to arrest, legal authorization to
26　use force, and objective reasonableness.

27　　I was also asked to develop and deliver a three-hour block of instruction on "Human
28　Factors" in the same course. This includes the basics of sensory and cognitive factors and how they
29　form the *perspective* of the reasonable officer. This includes basic vision, attention, perception,
30　reaction time, officer-subject interactions, pattern (gestalt) v. detailed (feature-intensive) processing,
31　time to stop shooting responses, human memory compared to video cameras, fatigue, and stress
32　reactions.

33　　While working in Patrol, the Parks Enforcement Unit, and the NCI Unit, I had occasion to
34　observe and arrest persons who were displaying the objective symptoms of being under the
35　influence of controlled substances, including controlled stimulants such as methamphetamine. I
36　have also received specific training on detecting those who are displaying the objective symptoms
37　of being under the influence of controlled substances, and I have testified as an expert on evaluating
38　subjects in the field for the objective symptoms of being under the influence of controlled substance
39　and therefore in violation of California Health & Safety (H&S) Code section 11550. I have
40　observed and arrested well over 100 people for violating 11550 H&S, including heroin, cocaine,
41　methamphetamine, and phencyclidine (PCP). I have assisted in the arrests of many more.

42　　I hold a Juris Doctor Degree from Northwestern California University and I am a member of
43　the State Bar of California. I also hold a Bachelor's Degree in Psychology from California State
44　University at Hayward (now "East Bay").

45　　My expertise and qualifications to provide expert testimony on the use of force by police,
46　the basics of attention, perception, memory, and the reaction time of law enforcement officers, and

1   the interactions of officers and suspects during use-of-force encounters stems from the following:

3      1. My education, personal experiences, and training;

4      2. The scope of my expertise is limited to these areas as they relate to investigating and analyzing police force-response events, how police officers are trained in the legal aspects in using force and in the methods used to control and restrain resistive subjects, including the use of deadly force to defend themselves. This also includes how involved officers are trained to recognize deadly threats to their safety, and the strength and endurance of resistive subjects who are under the influence of controlled stimulants;

10      3. My analysis is similar to that of other force analysts and has a factual foundation based on widely accepted methods of analyzing the objective reasonableness of police force responses, how reasonable officers are trained, including the use of deadly force;

13      4. My understanding of the facts of this case;

14      5. My recognition that there will be factors or evidence that may either support, not support, or have a neutral effect upon my opinion; and

16      6. The fact I have drawn conclusions based on certain assumptions, and I attempted to designate when I relied on disputed evidence.

My curriculum vitae is attached and incorporated into the body of this report by this reference. My professional experiences and activities are more fully set forth in my vitae, along with my publications for the preceding ten years. It also contains a list of other cases I have reviewed or in which I have testified as an expert, in deposition or in trial.

A considerable portion of my professional life involves the study and analysis of the conduct of peace officers and law enforcement agencies and their practices, including liability issues and human-performance factors. I have also rendered opinions as to police practices, as is more fully set forth in my vitae.

My current fee schedule is also attached and incorporated by reference as a statement of the compensation to be paid for the study and testimony in this case.

## DATA AND OTHER INFORMATION CONSIDERED WHEN FORMING OPINIONS

In forming my opinions in this case, I reviewed, studied, and considered materials that are specific to this case as well as materials of general circulation. I have also drawn on the totality of the materials I have read, studied, and examined, as well as the experiences and instruction I have had and/or provided to law enforcement personnel over the entire course of my career. The materials listed herein are the type, quality, and quantity upon which I and others in my profession rely in examining the events surrounding a police practice and in forming opinions and conclusions regarding the matters addressed herein.

All statements and opinions herein are to a reasonable, or higher, degree of professional certainty and/or probability.

I reserve the option to modify, amend, and change any opinion expressed in this document should additional information be provided affecting my understanding of the fact pattern in this case. I also reserve the right to illustrate the points made in this report with demonstrations and/or audio-visual aids.

The specific case materials I have reviewed to date are:

1. First Amended Complaint, US District Court – Eastern District of California, dated 5/2/14.
2. Answer to First Amended Complaint – dated 7/14/14.
3. Redding Police Department Report (RPD) #13-70983 by Inv. Forsberg.
4. RPD Supplemental Report by Inv. Eric Forsberg.
5. RPD Supplemental Report by Cpl. Michael Woods.
6. RPD Supplemental Report by Off. Peggy Porter.
7. RPD Supplemental Report by Off. Brian Berg.
8. RPD Supplemental Report by Off. Russell Veilleaux.
9. RPD Supplemental Report by Off. Chris Smyrnos.
10. RPD Supplemental Report by Inv. Levi Solada (Witnesses A. and J. Russell).
11. RPD Supplemental Report by Inv. Levi Solada (Witness Sullivan Interview).
12. RPD Supplemental Report by Inv. Levi Solada (Witnesses N. Capener & Dionicio).
13. RPD Supplemental Report by Inv. Harry Bishop.
14. RPD Supplemental Report by Inv. Daniel Smetak.
15. RPD Supplemental Report by Off. Douglas Moore.
16. RPD Supplemental Report by Off. Michael Darling (Autopsy).
17. RPD Supplemental Report by Off. Michael Darling (Scene Processing & Attachments).
18. RPD Supplemental Report by Off. Michael Darling (Meeting with CHP MAIT).
19. RPD Supplemental Report by Off. Peggy Porter (CAD excerpts & time intervals).
20. Closed Incident Report (CAD printout) for RPD Case #130070983.
21. List of ID and radio ID numbers for involved units.
22. RPD Supplemental Report by Off. Peggy Porter (Scene photos & analysis).
23. City of Redding Internal Communication re Investigative Summary IA 13-32 by Sgt. Bill Schueller.
24. Transcript of Interview with RPD Off. Becky Zufall.
25. Transcript of Interview with RPD Off. Brandon Largent.
26. Transcript of Interview with Cpl. Chris Jacoby.
27. Transcript of Interview with Off. Jared Herbert.
28. Transcript of Interview with Off. Wesley Townsley.
29. California Highway Patrol (CHP) Multidisciplinary Accident Investigation Team (MAIT) Supplemental Report by N. Parsons & J. Cantrell.
30. Office of the District Attorney – County of Shasta "DA Makes Findings in Death of Steven Motley.
31. Letter by Stephany E. Fiore, M.D. to Josh Lowery, Shasta County D.A.'s Office, dated 5/30/14.
32. TASER Firing Download for X26 Serial # X00-616412.
33. TASER Firing Download for X26 Serial # X00-445483.
34. TASER Firing Download for X26 Serial # X00-617246.
35. TASER Firing Download for X26 Serial # X00-577749.
36. Shasta County Sheriff's Office Report #13-34523 by Det. C. Tippings.
37. Supplemental Report by Det. C. Tippings re canvas on 10/5/16.
38. Supplemental Report by Det. C. Tippings re revisit of Spence property on 10/7/13.
39. Supplemental Report by Det. C. Tippings re radio traffic preservation on 10/18/13.

1    40. Supplemental Report #2 by Det. W. Gardner re Spence & Garroutte interviews on 10/6/13.
2    41. Supplemental Report #2A by Det. W. Gardner re Spence interview on 10/6/13.
3    42. Supplemental Report #2B by Det. W. Gardner re Garroutte interview on 10/6/13.
4    43. Supplemental Report #3 by Det. W. Gardner re Hermann interview on 10/8/13.
5    44. Supplemental Report by Sgt. J. Beaupre re Haselrud interview on 10/5/13.
6    45. Supplemental Report #1 by ID Tech K. Killian re 10/5/13 involved-officer processing.
7    46. Supplemental Report #1 by Sgt. Magrini re supervision.
8    47. Supplemental Report by Sgt. Lozada re evidence collection at hospital on 10/5/13.
9    48. Supplemental Report by Sgt. Lozada re autopsy on 10/10/13.
10   49. Supplemental Report by Sr. Inv. Tech. S. Cheney re scene photography on 10/5/13.
11   50. Supplemental Report by Inv. Tech. Perea re evidence recovered from GMC truck on
12      10/14/13.
13   51. Shasta County Sheriff's Office Closed Incident Report (CAD printout) #130034523.
14   52. Shasta County District Attorney's Office Investigation Division – Critical Incident
15      Supplemental Report: SCSC #13-34523 re canvas on 10/5/13.
16   53. Forensic Medical Group Autopsy Report by Arnold Josselson.
17   54. AMR Patient Care Report – AMR Shasta Unit 834 – Case # 9017082.
18   55. Redding Fire Department Incident Report #2013-9175 by Capt. S. Cramer.
19   56. Redding Fire Department Closed Incident Report (CAD printout) #130009705.
20   57. CHP 555 Collision Report #2013-10-0007.
21
22                **EXPERT OPINION: BASIS AND REASONS THEREOF**
23
24       **General Opinion:**
25       Redding Police Officers Jared Herbert, Wesley Townsley, Brandon Largent, Becky Zufall,
26   and Corporal Chris Jacoby were employed as police officers for the City of Redding at the time of
27   this incident and California peace officers working in uniform. They acted upon the totality of the
28   facts known to them at the time and acted reasonably in responding with force to overcome Mr.
29   Motley's active resistance to arrest. They also acted in a manner that indicated they reasonably
30   believed they were acting in accordance with the law.

31       The officers and Corporal Jacoby followed the training and procedures that are typical of
32   California law enforcement agencies that perform field-enforcement and public safety duties. At
33   the time of the incident, the officers and Corporal Jacoby were certified as peace officers by
34   California POST. They were also performing discretionary functions within the course and scope
35   of their duties and they acted in compliance with the use-of-force policies of the Redding Police
36   Department.
37
38       In addition, I have the following specific opinions:
39
40       **Opinion One:**
41       **Mr. Motley's flight from Officer Herbert constituted a dangerous threat to the public.**
42       On October 5, 2013 at approximately 2:32 p.m., Officer Jared Herbert was working in
43   uniform and driving south on Airport Road at Rancho Road in a marked patrol car. At that time, he
44   saw a male subject, subsequently identified as Steven Motley, stopped in a GMC pickup in the lane

1     to his left on southbound Airport Road. Officer Herbert recognized the truck as a reported stolen
2     vehicle. (CAD Printout, p. 1; Herbert Interview Transcript pp. 2 and 4)

3          When the light turned green for Mr. Motley's direction, Officer Herbert drove behind Mr.
4     Motley and tried to effect a traffic stop. However, Mr. Motely executed a "three-point turn" in the
5     middle of Airport Road and fled west on Rancho Road at a high rate of speed. By the time Officer
6     Herbert turned to pursue Mr. Motley, Mr. Motley was already approximately 250 to 300 yards
7     ahead of him and traveling about 100 miles per hour. Mr. Motley's driving was severe enough to
8     cause oncoming traffic to take evasive action as he used both the east and westbound lanes (Herbert
9     Interview Transcript p. 1; CHP 555 #2013-10-0007 p. 9)

10        Officer Herbert slowed down and watched Mr. Motley apparently attempt to turn north onto
11    Alta Camino Drive. However, Mr. Motley drove onto the yard of the residence at 4976 Alta
12    Camino Drive after driving over the curb. He next collided with a raised brink planter box and
13    drove through and destroyed a decorative cinderblock wall. (MAIT Supplement, p. 3; Porter
14    Supplement (analysis) photograph 9) The GMC truck also came to rest within approximately 10
15    feet from where 14-year old Tristan Hermann was sitting. (Shasta Co. DA Inv. Report Supplement
16    by D.A. Inv. Hendrix)

17

18      **Opinion Two:**
19      **Officer Herbert's attempts to use his TASER to apprehend Mr. Motley were**
20      **consistent with the actions of a trained and reasonable peace officer.**

21        Officer Herbert arrived to see Mr. Motley run north through the yard of a neighboring
22    house. Officer Herbert also noticed that Mr. Motley was wearing a backpack and approaching what
23    appeared to be a seven-foot tall fence. As Officer Herbert pursued Mr. Motely on foot and noticed
24    that Mr. Motley appeared to be injured. Officer Herbert drew his TASER and announced at least
25    five warnings that he would use the TASER on Mr. Motley if he did not stop. (SCSO Gardner
26    Supplement #3 – Witness Hermann statement) Officer Herbert then pulled the trigger on his
27    TASER but it did not discharge. He looked at the TASER, saw that he had turned it on, and then
28    turned it off and back on. By this time, Mr. Motley had jumped over the fence into a back yard.
29    (Herbert Interview Transcript pp. 2-4, 8; SCSO Gardner Supplement #3 – Witness Hermann
30    statement)

31        Officer Herbert pursued Mr. Motley into the next two backyards but lost sight of him. He
32    then noticed Mr. Motley as he was hopping over a wall at the south end of a house. When Officer
33    Herbert ran toward Mr. Motley, Mr. Motley jumped over a fence leading to the street where Officer
34    Herbert's patrol car was parked. As Mr. Motley was about to get into Officer Herbert's patrol car,
35    Officer Herbert saw what appeared to be a "big 'ol knife or something on him." Officer Herbert
36    also noticed that Mr. Motley appeared to be "really zoned out." Officer Herbert had also drawn his
37    handgun and warned Mr. Motley that he would shoot him if he did not stop. However, Mr. Motley
38    did not stop and Officer Herbert fired his TASER at him from about 20 feet away, with one dart
39    apparently striking him and the other flying over the top of the patrol car. (Herbert Interview
40    Transcript, p. 3, 7; Solada Supplement – Wit. A. Russell Interview, pp. 1-2; D.A. Inv. Hendrix
41    Supplement – Witness Greg Herman statement p. 5; Townsley Interview Transcript 3:88-119)

42        California peace officers are trained in the lawful use of force in their official capacities.
43    They are specifically trained that they are authorized to "use reasonable force to effect the arrest,
44    prevent escape, or to overcome resistance" when they have "reasonable cause to believe that the

1   person to be arrested has committed a public offense."[1]

2   California peace officers are further trained that the "objective reasonableness" of their force
3   responses must be "fact specific" and is:

4      1. Judged from the perspective of a reasonable officer.

5      2. Examined through the eyes of an officer on the scene at the time the force was applied, not
6         the 20/20 vision of hindsight.

7      3. Based on the facts and circumstances confronting the officer without regard to the officer's
8         underlying intent or motivation.

9      4. Based on the knowledge that the officer acted properly under the established law at the
10        time.[2]

11   Furthermore, California peace officers are also trained that their decisions should be based
12   on a consideration of the *severity* of the crime at issue, the nature and extent of the *threat* posed by
13   the suspect, the *degree* to which the subject resists, any attempts by the subject to evade arrest by
14   *flight*.[3]   California peace officers are also trained that a "reasonable officer" is "an officer with
15   similar training, experience, and background in a similar set of circumstances, who will react in a
16   similar manner.

17   The facts supporting Officer Herbert's attempted use of his TASER to prevent Mr. Motley
18   from driving away in his patrol car include the following:

19      • Mr. Motley's initial flight from Officer Herbert in the GMC truck was at high speed
20        (approximately 100 miles per hour), caused other motorists to take evasive action,
21        and resulted in the apparent loss of control of the truck and coming to rest in the
22        front yard of the aforementioned residence;

23      • Officer Herbert's observation that Mr. Motley appeared to be "zoned out" and to be
24        sweating and have a "lot of energy," which Officer Herbert associated with being
25        under the influence of methamphetamine (Herbert Interview Transcript, p. 7; SCSO
26        Gardner Supplement #3 – Witness Marissa Hermann statement; D.A. Inv. Hendrix
27        Supplement p. 5);

28      • Officer Herbert saw what appeared to be a knife on Mr. Motley's person;

29      • The patrol car contained a loaded shotgun; and

30      • It was reasonable to expect Mr. Motley to continue to drive in a manner that
31        threatened the public and the potential danger to citizens if Mr. Motley used the
32        marked patrol car to endanger others, e.g., use the emergency equipment to stop a
33        citizen's vehicle, and to forcibly take the vehicle or otherwise victimize others.

34

35   Mr. Motley's initial flight from Officer Herbert would not only cause a trained and
36   reasonable officer to perceive it to be a very severe crime, but the nature of the continued flight in
37   the marked patrol car containing a shotgun while potentially under the influence would cause a
38   trained and reasonable officer to reasonably perceive as an extreme threat to the public.

39   Not only was the use of the TASER reasonable under these circumstances, the continuing

---

[1] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 20: Use of Force*, Version 3.0, p. 1-3.
[2] *Ibid.*
[3] *Ibid.* p. 1-5

1  and potentially deadly threat that Mr. Motley's continuing flight presented to the public would
2  cause a trained and reasonable peace officer to believe that even deadly force would be appropriate
3  under the circumstances to end that threat.

5  **Opinion Three:**
6  **Officer Townsley's use of his TASER to attempt to apprehend Mr. Motley was**
7  **consistent with the actions of a trained and reasonable peace officer.**

8      As Officer Townsley arrived to assist on Alta Camino Drive, he saw Mr. Motley running
9  toward Officer Herbert's unoccupied patrol car. Officer Townsley was aware that there were one or
10  more firearms in the patrol car and that Motley's improper use of that car presented a potential
11  threat to the public. (Townsley Interview Transcript, 3:88-119)

12     Townsley also saw Officer Herbert chasing Mr. Motley, trailing about 20 feet behind with
13  his TASER in hand. As Mr. Motley was getting into Officer Herbert's patrol car, Officer Townsley
14  stopped his patrol car. Officer Townsley got out of his patrol car with his handgun drawn and
15  approached the passenger side of Officer Herbert's patrol car and yelled for Mr. Motley to stop and
16  to put his hands up. However, Mr. Motley appeared to be staring straight ahead with a "blank look
17  on his face." Mr. Motley pressed the accelerator as he tried to put the car into gear, as the car
18  wasn't moving. Officer Townsley had made the decision to fire at Mr. Motley to stop the threat,
19  but decided not to do so as Officer Herbert was on the opposite side of Mr. Motley, potentially in
20  the line of fire. At that point, Mr. Motley put the car into gear, backed up (almost striking Officer
21  Herbert), and drove away quickly. Officer Herbert's TASER was still attached to Mr. Motley or the
22  car, and the TASER was dragged away as Mr. Motley fled in the car. (Townsley Interview
23  Transcript 3:88-119; Herbert Interview Transcript p. 3)

24     Officer Townsley lost sight of Mr. Motley fleeing in Officer Herbert's patrol car. Officer
25  Townsley used directions from citizens to ultimately find the patrol car, abandoned in front of 4617
26  Alta Saga Drive with the lights still on and the engine running. However, Officer Townsley did not
27  know what street he was on at the time. (Townsley Interview Transcript 4:121-160; SCSO Cheney
28  Supplement p. 1)

29     After locking Officer Herbert's patrol car, Officer Townsley was directed toward a house by
30  citizens, indicating Mr. Motley's direction of travel. After ultimately being directed to Mr. Motley
31  in the backward of 4653 Alta Saga by Mr. Dane Spence, who was in the backyard with his mother
32  and father (Sandra and Michael Spence) who live there, as well as his fiancé, Katie Garroutte.
33  (Townsley Interview Transcript, 5:161-200; Bishop Supplement, p. 1-2; SCSO Gardner
34  Supplemental Reports #2A and 2B)

35     Officer Townsley moved to the portion of the yard he was in and looked over the fence. He
36  could see Mr. Motley, who had his back turned toward Officer Townsley. Officer Townsley next
37  told Mr. Motley to put his hands up. However, Mr. Motley started to run away, but not after
38  Officer Townsley noticed a "weird blank stare on his face." Officer Townsley also noticed that the
39  backpack Mr. Motley was wearing "looked heavy." In response to Mr. Motley's renewed flight,
40  Officer Townsley fired his TASER at his right side, seeing that the darts landed close together,
41  maybe about four inches apart.[4] The TASER had the effect of causing Mr. Motley to fall to the

---

[4] The materials reviewed to date do not confirm which part of Mr. Motley's body that the TASER probes struck.
However, one probe was recovered from Mr. Motley's right upper arm by emergency room staff. (Lozada Supplement,
p. 1)

1 ground while making an "uggh" sound, and roll onto his back. (Townsley Interview Transcript
2 5:161-200; Gardner Supplemental Reports #2A and 2B)

3 Officer Townsley kept the trigger on his TASER depressed in order to keep Mr. Motley
4 incapacitated since he was alone and to take the opportunity to visually search Mr. Motley for
5 weapons. However, Mr. Motley grabbed both TASER probes, while under power, and pulled them
6 out. This, along with Officer Townsley's observation that Mr. Motley was of substantial size, made
7 him fear that physically controlling Mr. Motley would be difficult. Officer Townsley was also
8 concerned that Mr. Motley might be under the influence of drugs. (Townsley Interview Transcript
9 5:161-200; TASER Firing Data Download for X26 Serial Number X00-616412[5])

10 It should be noted that the duration would end *after* Officer Townsley perceived that Mr.
11 Motley had pulled the probes out, decided to release the trigger, and actually released the trigger,
12 and end the discharge. This is because if the trigger is continuously depressed after the initial five-
13 second automatic cycle, it will end as soon as the trigger is released. Also, if the distance between
14 the two darts that landed on Mr. Motley was approximately four inches, this would indicate that the
15 distance from the front end of Officer Townsley's X26 was approximately two feet from Mr.
16 Motley at the time of discharge.[6]

17 Keeping in mind how California peace officers are trained as mentioned in Opinion Two, a
18 reasonable peace officer would believe that the use of the TASER in an attempt to overcome Mr.
19 Motley's resistance include the following:

20 • Mr. Motley had been driving the stolen truck as initially reported by Officer Herbert;

21 • Mr. Motley had stolen Officer Herbert's marked patrol car;

22 • Mr. Motley appeared to be under the influence of drugs, which would make Mr.
23 Motley more difficult to control by other weaponless methods

24 • Officer Townsley perceived Mr. Motley to be of substantial size (i.e., "He's not a
25 little guy, either.")

26 • Officer Townsley was alone, had not broadcast his exact location, and was unsure of
27 how long it would take other officers to assist him; and

28 • Mr. Motley, instead of putting his hands up and submitting to arrest as directed by
29 Officer Townsley, started to flee through the residential area.

30

31 Another consideration includes the fact that fleeing suspects sometimes forcibly enter
32 homes or forcibly take vehicles from citizens. This constituted a threat that needed to be stopped at
33 this opportunity. Furthermore, the crimes of auto theft, stealing a marked patrol car, and fleeing
34 through residential neighborhoods are serious crimes.

35 Another consideration is that *how* Officer Townsley used his TASER on Mr. Motely. There
36 is no indication that the TASER probes struck the front of Mr. Motley's chest, which, along with
37 the "rapid loss of consciousness," are the common factors identified by medical professionals who
38 believe that TASERs can causes death from cardiac arrest.[7] While it is somewhat ambiguous as to

---

[5] While it was not apparent from the reports which TASER belonged to which officer, it appears that this is the firing
data for Officer Townsley's X26 due to the duration of the single firing (nine seconds) and the time of discharge.
[6] TASER, International, Instructor Notes, Version 19, Apr. 2013, p. 182.
[7] Zipes, Douglas P. "TASER electronic control devices can cause cardiac arrest in humans." *Circulation* 129.1 (2014):
101-111.

1  exactly where on Mr. Motley's body the TASER probes stuck, it is clear that Mr. Motley did not
2  lose consciousness until significantly later in the struggle to restrain him.

3

4  **Opinion Four:**

5  **Officer Townsley's use of punches and other physical control methods to overcome**
6  **Mr. Motley's active resistance were consistent with the actions of a trained and**
7  **reasonable peace officer.**

8  California peace officers are trained that they may use "personal weapons," i.e., parts of
9  their own bodies to strike resistive subjects, in order to effect arrests, prevent escape, or overcome
10 resistance.[8]  They are also trained that personal weapons may be used to strike suspects during
11 arrests to control combative or resistive subjects, "especially during ground control encounters."[9]

12 After Mr. Motley defeated the TASER, Officer Townsley decided to physically take Mr.
13 Motley to the ground in an attempt to control him.  When Officer Townsley physically engaged Mr.
14 Motley, Mr. Motley turned onto this stomach and tried to get up.  Officer Townsley "drove his knee
15 into his back" in order to keep him flat on the ground.  When Mr. Motley tried to turn toward (spin)
16 Officer Townsley tried to prevent Mr. Motley from doing so by placing his forearm and some of his
17 body weight against the back of Mr. Motley's neck.  Officer Townsley also reached underneath Mr.
18 Motley's left arm with his own left arm (under hook) to prevent Mr. Motley from reaching toward
19 his waist.  During this time, Mr. Motley used his unrestrained right arm to try to get up. (Townsley
20 Interview Transcript 6:201-240)

21 This struggle continued but Officer Townsley was able to continue to apply enough body
22 weight to the back of Mr. Motley's neck in order "keep [Mr. Motley's] face in the dirt."  Officer
23 Townsley became concerned that Mr. Motley might have a weapon in his waist area, as Mr. Motley
24 continued to try to bring his arms down toward his waist. (Townsley Interview Transcript 6:201-
25 240)

26 Officer Townsley also tried to apply wristlocks to the left arm.  However, Mr. Motley was
27 wet with perspiration and Officer Townsley's holds slipped off. Also during this time, Officer
28 Townsley told Mr. Motley to "Stop fighting me. Put your other arm behind your back," and "Stop
29 resisting." (Townsley Interview Transcript 6:201-240; Gardner Supplement #2A – Wit. D. Spence
30 statement)

31 At this point, Officer Townsley decided to render Mr. Motley unconscious by punching Mr.
32 Motely in the jaw.  His decision to do so was based on the following:

33 • The standard "pain-compliance" holds were unsuccessful;

34 • The struggle was continuing, as Officer Townsley could not get Mr. Motley's hands
35   behind his back for handcuffing;

36 • He still did not know where he was or if other officers were on their way to assist
37   him;

38 • Mr. Motley eventually turned and faced Officer Townsley – a dangerous position;
39   and

40 • Mr. Motley was also grabbing at Officer Townsley's uniform and trying to pull

---

[8] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 33: Arrest and Control,* Version 4.1, p. 1-3.
[9] *Ibid.* pp. 1-13 through 1-14.

1     Officer Townsley down to him

2

3         Officer Townsley placed his legs on Mr. Motley's thighs and squeezed them together to
4     restrict Mr. Motley's movements. From this "mounted position," Officer Townsley started striking
5     Mr. Motley with both hands (closed fists) on each side of Mr. Motley's jaw.[10] During this time,
6     Officer Townsley noticed that Mr. Motley was wearing a large knife in a belt sheath, which caused
7     Officer Townsley to conclude that Mr. Motley had been trying to reach for it earlier. While the
8     punches did not have the intended effect of knocking out Mr. Motley, it did stun him, giving Officer
9     Townsley the opportunity to roll Mr. Motley back onto his stomach and apply a carotid restraint.
10    (Townsley Interview Transcript 7:241-280)

11

12    **Opinion Five:**
13    **Officer Townsley's use of the carotid restraint to over come Mr. Motley's active**
14    **resistance was consistent with the actions of a trained and reasonable peace officer.**

15        California peace officers are trained that the carotid restraint is a viable force option.[11] Since
16    Officer Townsley still did not know if other officers were on their way to him or when they would
17    arrive, and the fact that Officer Townsley's other efforts to overcome Mr. Motley's resistance were
18    unsuccessful, he elected to apply a carotid restraint. One of the considerations in electing to do so
19    was the fact that, when he was attempting to knock out Mr. Motley earlier, he noticed Mr. Motley
20    had a sheathed knife on his belt. (Townsley Interview Transcript 7:241-280)

21        Officer Townsley was conscientious enough and physically able to ensure the restraint was
22    safely applied, i.e., he made sure the front of Mr. Motley's throat was inside the bend of his elbow.
23    This serves to protect the trachea, larynx, and other boney and cartilaginous structures in the neck
24    from being injured, which can result in tissue damage that can lead to other complications.[12]

25        The fact that the Autopsy Report (page 5) indicated there were no injuries to Mr. Motley's
26    "laryngeal cartilages, hyoid bone, or cervical vertebral column," supports that Officer Townsley
27    was able to, under these circumstances, apply the carotid restraint while taking care not to seriously
28    injure Mr. Motley.

29        Once he perceived Mr. Motley to be unconscious, Officer Townsley removed the knife from
30    Mr. Motley's sheath and tossed it away. Next, Officer Townsley started to take Mr. Motley's
31    backpack off since it was interfering with his efforts to handcuff Mr. Motley. While he was doing
32    so, Mr. Motley regained consciousness. Mr. Motley asked Officer Townsley, "I was unconscious?"
33    Officer Townsley replied that he was, that Officer Townsley "choked [him] out," and that he would
34    do it again if Mr. Motley did not cooperate. Unfortunately, Mr. Motley resumed struggling and
35    fighting to get away from Officer Townsley. (Townsley Interview Transcript 7:241-280)

36        During this period, Officer Townsley could hear radio traffic asking where he was.
37    However, Dane Spence heard that the officer did not know where he was, so Mr. Spence yelled the
38    address to him. This allowed Officer Townsley to broadcast his location so other officers could

---

[10] It is common knowledge among police combatives instructors that striking the jaw in such a way as to cause the rapid
rotation of the head can be a successful method of "knocking out" opponents.
[11] *Supra* at Note 8, p. 4-3.
[12] Kornblum, Ronald N. "Medical Analysis of Police Choke Holds and General Neck Trauma: Part I." *Trauma*, Feb.
1986: 5.

1   find him. (Gardner Supplement # 2A – Wit. D. Spence statement) Officer Townsley was also
2   concerned that there might be weapons in the backpack. Therefore, Officer Townsley continued to
3   yell for Mr. Motely to stop resisting and to put his hands behind his back, but Mr. Motley continued
4   his active resistance by trying to get onto his hands and knees. Officer Townsley responded by
5   striking Mr. Motley across the shoulders with his forearm "as hard as he could." Officer Townsley
6   also tried to control Mr. Motley's left arm by reaching under the arm and pulling it toward him
7   (under hook). During this period, Officer Townsley noticed that Mr. Motley's knife was only three
8   feet away. (Townsley Interview Transcript 7:280-308)

9       At about this time, the other officers arrived and started to assist in taking Mr. Motley into
10  custody.

11

12  **Opinion Six:**
13  **Officer Largent's use of his baton to overcome Mr. Motley's active resistance was**
14  **consistent with the actions of a trained and reasonable peace officer.**

15      California peace officers are trained that they may use impact weapons (batons) in order to
16  effect an arrest, prevent escape, and to overcome resistance. They may also use batons in order to
17  defend themselves or others. "Possible target areas" on the human body to strike with batons
18  includes the arms and legs. *Intentional strikes to the head* are permitted when objectively
19  reasonable.[13]

20      Officer Largent arrived at 4563 Alta Saga Drive and was directed to Officer Townsley's
21  location by Dane Spence. (Largent Interview Transcript 3:93-102; Gardner Supplement #2A – Wit.
22  D. Spence statement) Corporal Jacoby arrived at about the same time. Once he was able to find
23  Officer Townsley in the large backyard, he saw Officer Townsley struggling with Mr. Motley on
24  the ground and in the dirt. He heard Officer Townsley scream, "I can't get control of him," or
25  something to that effect. Officer Largent saw that Officer Townsley was in a seated position, on top
26  of Mr. Motley who was on his abdomen. He could also see Mr. Motley trying to reach and grab
27  onto Officer Townsley and was trying to roll onto his side. (Largent Interview Transcript 3:111-
28  121)

29      Officer Largent drew and extended his baton as he ran to Officer Townsley and Mr. Motley.
30  As he did so, Mr. Motley looked at him, at which time Officer Largent said, "Stop fighting. This is
31  over." Officer Largent also noticed the knife sheath on Mr. Motley's side. Mr. Motley reached
32  toward one of Officer Largent's feet or legs. Officer Largent responded by striking Mr. Motley's
33  right arm twice. (Largent Interview Transcript 4:121-143)

34      Mr. Motley responded to the baton strikes by looking directly at Officer Largent and saying,
35  "Yeah, mother fucker! Harder!" At this point Officer Largent realized that Mr. Motley was not
36  feeling or reacting to significant pain, despite the fact he had struck Mr. Motley "as hard as [he]
37  could." (Largent Interview Transcript 4:133-143)

38      This caused Officer Largent to suspect that Mr. Motley was under the influence of
39  controlled stimulants. (Largent Interview Transcript 4:143-146) Mr. Motley again reached back
40  toward Officer Townsley, then turned back and reached toward Officer Largent. Officer Largent
41  responded by striking Mr. Motley's right forearm/wrist area another three to five times. After the
42  last strike, Officer Largent could see that the right forearm appeared to broken. However, Mr.

---

[13] *Supra* at Note 8, p. 7-3, 7-6,

1 Motley was still not reacting to pain. Due to the futility of continuing to strike Mr. Motley's right
2 arm, he, Officer Largent threw his baton away without trying to collapse it. Officer Largent had
3 also decided against using his TASER, but elected not to due to the close proximity of everyone,
4 including Corporal Jacoby. (Largent Interview Transcript 4:152-172)

5 Officer Largent then grabbed Mr. Motley's right arm, dropped to his knees next to Officer
6 Townsley, and attempted to obtain enough control to handcuff Mr. Motley. Another officer,
7 although he does not know whom, was trying to get control of Mr. Motley's left arm. At some
8 point, the officers are able to work together to get Mr. Motley handcuffed. Officer Largent also had
9 difficulty in controlling Mr. Motley's right arm due to the apparent injury he inflicted on it. Mr.
10 Motley, however, was also continuing to resist and pull the arm away – which Officer Largent
11 noted should have caused more pain and injury, yet Mr. Motley seemed not to feel or react to that
12 pain either. (Largent Interview Transcript 5:165-186)

13 Even after getting Mr. Motley handcuffed and onto his side to search him, Mr. Motley
14 continued to reach around toward his side as if he was reaching for the knife. Officer Largent had
15 to repeatedly tell Mr. Motley, "You're in handcuffs. This is over. Just knock it off!" Mr. Motley
16 even tried to bite Officer Largent on his knees. Officer Largent responded by using the palm of his
17 hand to press the side of Mr. Motley's head to the ground. (Largent Interview Transcript 5:186-199)

18 Mr. Motley continued to violently kick, causing Officer Zufall to apply her body weight to
19 his legs. However, Mr. Motley was kicking his legs with enough force to raise Officer Zufall off of
20 the ground. Mr. Motley replied to Officer Largent's repeated commands to stop resisting by saying,
21 "Fuck you!" Officer Smyrnos next rolled Mr. Motley to his stomach and pinned one of his legs
22 back in order to finish controlling Mr. Motley. When Corporal Jacoby was away getting leg
23 restraints, they had obtained full control of Mr. Motley. Officer Largent was able to ask Mr. Jacoby
24 his name and he replied. (Largent Interview Transcript 6:236-7:268)

25

26 **Opinion Seven:**
27 **Officer Zufall's use of her baton to overcome Mr. Motley's active resistance was**
28 **consistent with the actions of a trained and reasonable peace officer.**

29 When Officer Zufall arrived to assist, she saw Officer Largent and Officer Townsley on the
30 ground with Mr. Motley. She saw that Mr. Motley was still combative and kicking but not
31 handcuffed. She also saw the knife sheath hanging from his waistband, Mr. Motley's shirt covering
32 the top part. Therefore, Officer Zufall was unable to tell if there was a knife in the sheath at the
33 time. Officer Zufall attempted to assist in overcoming Mr. Motley's continuing active resistance by
34 striking him on his legs "several" times with her collapsible baton. As she did so, she also yelled,
35 "Stop resisting." (Zufall Interview Transcript p. 2-4; Gardner Supplement #2B – Wit. K. Garroutte;
36 Gardner Supplement #2A – Wit. D. Spence)

37 Officer Peggy Porter arrived and was able to assist with getting Mr. Motley handcuffed.
38 Officer Zufall then applied her body weight to Mr. Motley's legs while the other officers finished
39 handcuffing Mr. Motely. She also noticed that Mr. Motley was continuing to resist and be
40 combative even after being handcuffed. (Zufall Interview Transcript p. 2-3)

41 Officer Zufall's actions were consistent with a trained and reasonable peace officer due to
42 the following:

43 • She saw the Mr. Motley was continuing to actively resist by kicking and was not
44 handcuffed;

1    • Mr. Motley was continuing his resistance despite the combined efforts of Officers
2       Largent and Townsley;

3    • She saw the knife sheath on Mr. Motley, reasonably causing concern that he might
4       be armed with a knife; and

5    • Mr. Motley's legs were the only targets available given the close proximity of
6       Officer's Townsley and Largent.

7

8    **Opinion Eight:**

9    **Corporal Jacoby's use of his baton to overcome Mr. Motley's active resistance was**
10   **consistent with the actions of a trained and reasonable peace officer.**

11   When Corporal Jacoby arrived at 4653 Alta Saga Drive, he was greeted by Mr. Dane
12   Spence who, in a "panicked" manner, said, "You're partner needs help! You're partner needs help
13   back there," and "Get back there!" (Jacoby Interview Transcript 3:99-106).

14   Upon reaching Officer Townsley with another officer (Largent), he saw Officer Townsley
15   on top of Mr. Motley in a "controlling position" (i.e., he's straddling him with his body weight
16   lowered), while attempting to control his left arm. He could see that Officer Townsley was
17   perspiring and that he was having a difficult time controlling Mr. Motley – even given his size and
18   skill level. Corporal Jacoby also recognized Mr. Motley as someone with an extensive criminal
19   history, including drugs, that he had contact with in the past. (Jacoby Interview Transcript 3:107-
20   4:121)

21   Corporal Jacoby perceived that Mr. Motley was under the influence of drugs and in a
22   "psychotic state." (Jacoby Interview Transcript 4:121-123)

23   Corporal Jacoby also approached and said to Mr. Motley, something to the effect of, "Dude.
24   There's two of us here now. You're under arrest. Knock it off." However, Mr. Motley continued
25   fighting. (Jacoby Interview Transcript 4:121-126)

26   Corporal Jacoby noticed that Mr. Motley's hand was free and that there was a large knife
27   sheath extending off of his belt. This caused him to fear that Mr. Motley was still armed with the
28   knife and that he was going to try to draw it and use it against Officer Townsley. Corporal Jacoby
29   responded to this perceived threat by yelling to Officer Townsley that he was "going to baton."
30   Corporal Jacoby struck Mr. Motley with his wooden baton as Mr. Motley was "coming up to
31   punch" Officer Townsley. Corporal Jacoby's one or two baton strikes appeared to land on one of
32   Mr. Motley's forearms. This had two results: (1) Corporal Jacoby's baton broke; and (2) Mr.
33   Motley had no reaction. (Jacoby Interview Transcript 4:126-132; Cheney Supplement p. 6)

34   Corporal Jacoby discarded his broken baton and communicated this to Officer Largent.
35   Corporal Jacoby then saw Officer Largent draw his baton. During this time, Corporal Jacoby
36   noticed that Mr. Motley was still fighting the officers, and that Officer Townsley looked up at him
37   and said, "I'm gassed. I gotta get out! I need out!" At this point, Corporal Jacoby saw Officer
38   Zufall start to use her baton. Corporal Jacoby then went to the left side of Mr. Motley and tried to
39   take control of his left arm, using all of his body force and strength to get Mr. Motley's arm behind
40   his back and handcuffed. Despite this, Mr. Motley was still fighting and trying to head butt and bite
41   Corporal Jacoby. (Jacoby Interview Transcript 4:150-159)

42   Corporal Jacoby left the immediate scene to retrieve a leg restraint from a patrol car. Upon
43   returning, he saw that Officer Smyrnos had arrived and was assisting by placing Mr. Motley's legs
44   into a control position. (Jacoby Interview Transcript 4:159-171; Smyrnos Supplement)

1

**Opinion Nine:**

**Any injuries to Mr. Motley's head that were actually caused by baton strikes were most likely inadvertent or "secondary."**

There are three types of head strikes with batons and other impact weapons:

1. Intentional: Used when the totality of the circumstances dictate;

2. Inadvertent: When the officer intends to strike one part of the body, and when, due to the fact that the officer, the impact weapon, and the suspect are in motion, the strike lands on the suspect's head; and

3. Secondary: When the baton strikes one part of the body and then bounces off or is otherwise deflected and strikes the head.

While Mr. Motley sustained wounds to his head that could have been caused by the officers' collective or individual baton strikes, there is nothing to indicate that such strikes were intentional. It is important to remember that while Officers Largent and Jacoby were using their batons to strike Mr. Motley's arms, Mr. Motley was moving and Officer Townsley was still trying to control him and also effecting his movement. This most likely combined to make it more difficult for the officers using their batons to accurately strike their intended targets. Officer Townsley also took evasive action to avoid being struck. (Townsley Interview Transcript 7:280-308) Therefore, while the cause of Mr. Motley's non-fatal head injuries (Autopsy Report) could have been caused by baton strikes, they were most like inadvertent or secondary.

I have personally missed my intended targets while using the baton in the field, and I have also been accidentally struck by at least one other officer during an arrest situation.

**Opinion Ten:**

**The officers rendered first aid and summoned emergency medical personnel in a timely manner.**

Officer Largent continued to talk to Mr. Motley as they waited for Corporal Jacoby to return with the leg restraints. Mr. Motley was still cursing and being verbally uncooperative. Suddenly, Officer Largent noticed that Mr. Motley's color changed. Specifically, Mr. Motley turned very grey and blue. Officer Largent continued to monitor Mr. Motley's airway and noticed that he had a lot of dirt and debris in his mouth (Mr. Motley had been grabbing at the ground with his mouth earlier during the struggle). Officer Largent could tell that Mr. Motley was still breathing as bark and dirt were expelled from his mouth as he exhaled. (Largent Interview Transcript 7:252-281)

When Corporal Jacoby returned with the leg restraint, Officer Largent told him that he was no longer worried about having to restrain Mr. Motley's legs. Officer Smyrnos had released his hold on Mr. Motley's legs and, in addition to the change in color, Mr. Motley's legs were laying on the ground and Mr. Motley was no longer actively resisting other than movement in his arms. Officer Largent said to the other officers, "This might be excited delirium," as he had encountered that before. (Largent Interview Transcript 8:281-289)

Corporal Jacoby immediately called for an emergency medical response. (Jacoby Interview Transcript 5:164-171; RPD CAD)

Officer Largent decided to move Mr. Motley to the driveway so the responding medical

1  personnel could have faster access to him. He rolled Mr. Motley onto his back, supported the back
2  of his neck and sat him up, keeping his knees behind Mr. Motley's back. He lifted Mr. Motley with
3  Officer Zufall picking up one side of Mr. Motley's legs and Corporal Jacoby the other side – using
4  the leg restraints as a carry assist. They carried him approximately 50 yards to the driveway.
5  (Largent Interview Transcript 8:301-319)

6      Officer Largent placed Mr. Motley into a recovery position (on his right side). Officer
7  Largent was monitoring Mr. Motley's carotid pulse and respirations while trying to wake him by
8  talking to him. Officer Largent noticed that Mr. Motley was expelling dirt out of his mouth as he
9  exhaled. Officer Largent then noticed that Mr. Motley's pulse had stopped and that he went
10 "lifeless." Officer Largent announced that he no longer felt a pulse and that he was starting CPR.
11 He rolled Mr. Motley onto his back and performed one cycle of 15 chest compressions. He
12 checked for and found a strong pulse and noticed that Mr. Motley's eyes fluttered and that he
13 exhaled. (Largent Interview Transcript 8:319-9:332)

14     Officer Largent rolled Mr. Motley back to his side and continued talking to Mr. Motley,
15 calling him by his first name. Mr. Motley continued to breath on his own with a strong pulse until
16 about one and a half minutes went by. Officer Largent, in response to not feeling a pulse,
17 performed another cycle of 15 chest compressions, and then checked his pulse and breathing. He
18 found that Mr. Motley had started breathing again, had a pulse, and that his eyes opened and closed.
19 Officer Largent continued to monitor Mr. Motley, this time using both his carotid and brachial
20 arteries. Medical personnel arrived shortly thereafter and took over the care of Mr. Motley.
21 (Largent Interview Transcript 9:332-358)

22     The RPD Closed Incident (CAD) Report indicates that an entry for having medical
23 personnel stage to the front of 4653 Alta Saga Drive was made at 2:42 p.m. Later, at 2:50 p.m., the
24 CAD Report indicates that Corporal Jacoby provided an update that Mr. Motley was "unresponsive"
25 and that they needed an emergency medical response.

26     AMR Paramedic Unit #834 received the call to respond at 2:51 p.m. They arrived at Mr.
27 Motley's side at 3:02 p.m. Redding Fire Department Engine 5 was dispatched at 2:56 p.m. and
28 arrived at 3:01 p.m. to find AMR Unit #834 already on the scene and caring for Mr. Motley. (AMR
29 Patient Care Report; Redding Fire Department Incident Report)

30     Once it was clear that Mr. Motley was in medical distress, Officer Largent clearly
31 communicated this to Corporal Jacoby, who requested the expedited EMS response. Officer
32 Largent then followed procedures and provided basic life support for Mr. Motley and maintained it
33 until relieved by AMR Unit #835 personnel. Only about one minute elapsed from the time
34 Corporal Jacoby made the Code-3 EMS request until AMR Unit #834 was dispatched. They
35 arrived in about 13 minutes, with Redding Fire Department Engine #5 arriving just afterward.

36     The RPD officers summoned emergency medical assistance for Mr. Motley as soon as they
37 perceived he was in medical distress and provided effective basic life support for him until relieved
38 by paramedic personnel. Therefore, they provided medical assistance to Mr. Motley in a timely
39 manner.
40

41 **4.    Conclusion**
42     It is my opinion that the relative culpability for this incident lays with Mr. Motley for
43 ingesting methamphetamine (Toxicology Report), which gave him extraordinary strength,
44 endurance and tolerance for pain; for engaging in threatening flight from Officers Herbert and
45 Townsley (partially in a stolen police vehicle), and violently resisting the officers in an active and

1     assaultive manner.  Mr. Motley knew or should have known that these actions would create in the
2     mind of trained and reasonable peace officers the need to respond with intermediate levels of force.
3          Mr. Motley's actions presented a series of events that presented the officers, both
4     individually and collectively, with circumstances that were tense, uncertain and rapidly evolving.
5          Mr. Motley's overall behavior would lead a trained and reasonable peace officer to believe
6     he was in a state of excited delirium as he displayed extraordinary strength, endurance, pain
7     tolerance, bizarre behavior (trying to eat the dirt), and continuing to violently struggle even after it
8     was clearly futile and for an extended period of time.  Mr. Motley's condition suddenly changed,
9     i.e., he was conscious one minute then suddenly went quiet with a change of pallor, followed by
10    sudden unconsciousness and cardiac arrest.
11
12
13   Respectfully Submitted,
14
15
16   JEFFREY A. MARTIN
17
18
19
20   Date: 7/7/2016
21   San Carlos, California

# EXHIBIT B

# L.M. by and through her guardian ad litem v. City of Redding, et al.,

### United States District Court (Eastern District of California)
### No.: 2:14-CV-00767 MCE-AC

### Supplemental Report of Expert Witness Jeffrey A. Martin
#### Pursuant to Rule 26(a)(2)(B)

## ADDITIONAL DATA AND OTHER INFORMATION CONSIDERED IN SUPPORT OF OPINIONS

In forming my opinions in this case, I reviewed, studied, and considered materials that are specific to this case as well as materials of general circulation. I have also drawn on the totality of the materials I have read, studied, and examined, as well as the experiences and instruction I have had and/or provided to law enforcement personnel over the entire course of my career. The materials listed herein are the type, quality, and quantity upon which I and others in my profession rely in examining the events surrounding a police practice and in forming opinions and conclusions regarding the matters addressed herein.

All statements and opinions herein are to a reasonable, or higher, degree of professional certainty and/or probability.

I reserve the option to modify, amend, and change any opinion expressed in this document should additional information be provided affecting my understanding of the fact pattern in this case. I also reserve the right to illustrate the points made in this report with demonstrations and/or audio-visual aids.

The additional case materials I have received after submitting my Interim Rule 26 report reviewed to date are:

1. Transcript of Interview of Officer Wesley Townsley on 5/29/14.
2. Deposition of Officer Wesley Townsley, taken 6/23/16.
3. Transcript of Interview of Brandon Largent on 5/29/14.
4. Deposition of Officer Brandon Largent, taken 6/24/16.
5. Transcript of Interview of Officer Rebecca Zufall on 5/29/14.
6. Deposition of Officer Rebecca Zufall, taken 6/24/16.
7. Transcript of Interview of Corporal Chris Jacoby on 5/29/14.
8. Deposition of Corporal Chris Jacoby, taken 6/24/16.
9. Transcript of Interview of Officer Jared Herbert on 5/29/14.
10. Deposition of Officer Jared Herbert, taken 6/23/16.
11. Deposition of Carol (Adams) Motley, taken 6/23/16.
12. Deposition of Ashley McCain, taken 6/23/16.
13. 120 mp3 audio files containing radio traffic from SHASCOM, time indexes ranging from 14.53.41 through 15.58.30.

## SUPPLEMENTAL INFORMATION AND OPINIONS

**Background Information:**

Although not listed in the First Amended Complaint, there were questions in the depositions by the Plaintiffs' attorney that suggested the issues of "positional asphyxia" or "weight-force compression" may be raised. As a result, it is important to discuss those theories, what it theoretically takes for death to result according to those theories, and whether the facts in this case indicate whether the involved officers actions were consistent with those of trained and reasonable peace officers in their force responses.

The "positional asphyxia" theory provides that if someone is placed in a prone position after being "hogtied" (placed into a total-appendage restraint), the person's ability to breathe and ventilate to such a degree that the person does not get enough oxygen into bloodstream, which, after enough time passes, causes the person to stop breathing altogether, which, again, after enough time passes, causes death.[1] This theory was first developed and put into the law enforcement context by Dr. Donald T. Reay.[2,3]

Subsequent research, however, has fairly well diminished the theory that placing arrested subjects in prone positions impairs breathing sufficiently to eventually result in death. Specifically,

> ...scientific research has contradicted this theory and showed that placing a
> combative arrestee in the prone position and restraining the person with their
> hands behind their back and/or hobbled did not reveal evidence that the prone
> restraint position does not result in changes in ventilation sufficient to cause
> death.[4]

The authors of this study had analyzed 1,085 incidents where subjects were restrained by prone restraint, including incidents where weight was applied to the backs of the arrestees, and ***none*** of the arrestees died. This included uses of both handcuffs and the hobble over periods from one to five minutes.

An earlier study of subjects actually restrained in prone positions by multiple law enforcement agencies over a six-year period found that of the 2,015 arrestees who were placed in prone positions, none died. However, one of the 2,358 arrestees who were not placed into prone

---

[1] Ross, Darrell L., and Ted Chan, eds. *Sudden deaths in custody.* Humana Press, 2007. – Chapter by Tom Neuman on Positional and Restraint Asphyxia.

[2] Reay, Donald T., John D. Howard, Corinne L. Fligner, and Richard J. Ward. "Effects of positional restraint on oxygen saturation and heart rate following exercise." *The American Journal of Forensic Medicine and Pathology* 9, no. 1 (1988): 16-18.

[3] Reay, Donald T., et al. "Positional asphyxia during law enforcement transport." *The American journal of forensic medicine and pathology* 13.2 (1992): 90-97.

[4] Ross, Darrell L., Michael H. Hazlett. "A Prospective Analysis of the Outcomes of Violent Prone Restraint Incidents in Policing. *Forensic Research & Criminology International Journal.* 2, no. 1 (2016) Accessed August 8, 2016 at: http://medcraveonline.com/FRCIJ/FRCIJ-02-00040.pdf

1   positions died.[5]

2       The "weight-force compression" theory (also referred to as "restraint asphyxia") suggests
3   that "asphyxia death [is] caused by active restraint by another person." This occurs by
4   "compressing the thorax – preventing adequate breathing leading to respiratory muscle
5   exhaustion, or preventing circulation throughout the heart."[6] However, it is important to note
6   that researchers have found that "the addition of weight force to the back/shoulders of a subject
7   in the prone position does not significantly impact pulmonary/cardiopulmonary function in
8   healthy volunteers."[7]

9       Even if one were to accept the theories of either positional or restraint asphyxia, officers'
10  actions can be evaluated by asking (1) whether they placed a subject into one of the theoretically
11  "dangerous" positions," (2) how long they kept the subject in one of those positions, and (3) even
12  if the they did both, were the officers' actions still consistent with their training regarding the
13  objectively reasonable use of force in overcoming Mr. Motley's resistance, such as the
14  availability of other means of restraint?

15

16  **Supplemental Opinion One:**
17  **Officer Townsley's actions in effecting the arrest of Mr. Townsley and overcoming**
18  **his resistance were consistent with those of a trained and reasonable officer as he**
19  **had tried to use commands, the TASER, grappling, strikes, and a vascular neck**
20  **restraint - all of which were unsuccessful.**

21

22      Officer Townsley initially tried to subdue Mr. Motley using his TASER. Officer
23  Townsley fired the TASER probes at Mr. Motley's right side with one or both darts landing on
24  Mr. Motley's upper arm and only four inches apart. (Townsley Interview 5:161-200; Lozada
25  Supplement, P. 1) After Mr. Motley fell to the ground, he rolled onto his back, looked at Officer
26  Townsley, and pulled the probes out of his arm with his left hand. This occurred while Officer
27  Townsley maintained the TASER discharge.

28      Officer Townsley decided to physically engage Mr. Motley by jumping on him while Mr.
29  Motley was still on the ground. Mr. Motley, at that point, ended up on his stomach in an
30  apparent attempt to get up onto his feet and run. Officer Townsley prevented this by driving his
31  knee into Mr. Motley's back and pushing him flat onto the ground. During this portion of the
32  overall incident, the following took place:

33

34      • Mr. Motley tried to turn and face Officer Townsley;

35      • Mr. Motley used his free right arm to try to pull himself up off the ground or away
36        from Officer Townsley;

37      • Officer Townsley placed his right forearm on the back of Mr. Motley's neck and

---

[5] Hall, Christine, Kristine Votova, Christopher Heyd, Matthew Walker, Scott MacDonald, Doug Eramian, and Gary
M. Vilke. "Restraint in police use of force events: examining sudden in custody death for prone and not-prone
positions." *Journal of forensic and legal medicine* 31 (2015): 29-35.
[6] O'Halloran, Ron. "Restraint Asphyxia Deaths." Lecture, 9th Annual Excited Delirium, Arrest-Related and Sudden
In-Custody Death Conference, Institute for the Prevention of In-Custody Deaths, Las Vegas, Nov. 4, 2014.
[7] *Supra* at Note 5, p. 34.

1           applied body weight to it;

2        • Officer Townsley used his left hand to control Mr. Motley's left arm by pulling it
3           toward him using an under hook;

4        • The backpack Mr. Motley was wearing caused Officer Townsley to maintain the
5           mounted position on Mr. Motley's waist, while keeping his legs outside of Mr.
6           Motley's legs while squeezed together;

7        • Mr. Motley continued to grab at Officer Townsley's uniform and pull Officer
8           Townsley down toward him;

9        • Mr. Motley was subsequently able to turn into a supine position at which point
10          Officer Townsley punched Mr. Motley on both sides of his jaw several times;

11       • Officer Townsley noticed the large sheath knife Mr. Motley was wearing on his
12          front waistband;

13       • After stunning Mr. Motley with the punches, Officer Townsley rolled Mr. Motley
14          back into a prone position; and

15       • Mr. Motley continued to actively fight and resist Officer Townsley as Officer
16          Townsley applied a carotid restraint and rendered Mr. Motley unconscious.
17          (Townsley Interview 6:201-280)

18

19      During this period, Mr. Motley continuously and forcefully fought Officer Townsley.
20 The typical "mounted" position used by Officer Townsley most likely placed a majority of his
21 body weight on Mr. Motely's waist and not on his thorax. Most importantly, Mr. Motley
22 remained conscious and actively resisted Officer Townsley until Officer Townsley stunned him
23 with the punches (while Mr. Motley was supine) and then rendered Mr. Motley unconscious with
24 the carotid restraint.

25      While Mr. Motley was unconscious, Officer Townsley took the opportunity to remove
26 the fix-bladed knife from the sheath on Mr. Motley's belt and throw it away.  Officer Townsley
27 was in the process of trying to remove the backpack Mr. Motley was wearing because it was also
28 making it more difficult to control him.  Unfortunately, Mr. Motley regained consciousness,
29 asked Officer Townsley if he had been unconscious, and then resumed his active resistance by
30 trying to get onto his hands and knees. Officer Townsley responded by striking Mr. Motley
31 across the shoulders with his forearm "as hard as he could" and by controlling Mr. Motley's left
32 arm with a left under hook hold.  It was about this time the other officers arrived to assist Officer
33 Townsley.

34      By reviewing the audio files of the radio transmissions, it appears that all of this took
35 place between time index 14.39.39 (when Officer Townsley broadcast the "148") and 14.41.08
36 (when Corporal Jacoby and Officer Largent arrived), or about one and a half minutes (1:29).
37 During this period, Mr. Motley had been in a prone position, then a supine position, and then
38 back to a prone position.

39      With all of Mr. Motley's movement, combined with the fact he regained consciousness
40 within a short period of time after the application of the carotid restraint, it is unlikely that
41 Officer Townsley did anything that interfered with Mr. Motley's ability to breathe.  In addition,
42 Mr. Motley never showed any signs of fatigue or having any difficulty with breathing.

43

1     **Supplemental Opinion Two:**

2     **The individual and collective actions of Officer Townsley, Corporal Jacoby, Officer**
3     **Largent, Officer Zufall, and Officer Smyrnos in overcoming Mr. Motley's**
4     **continuing violent resistance and restraining him were consistent with those of**
5     **trained and reasonable officers and did not place Mr. Motley into one of the**
6     **aforementioned theoretically dangerous positions.**

7

8     Since the different officers applied different force responses in getting Mr. Motley into
9 custody at various times, it is important to try to reconstruct how the event unfolded. How the
10 officers participated, individually or collectively and whether their efforts placed Mr. Motley into
11 a "dangerous" position (i.e., that would theoretically place Mr. Motley in danger of positional or
12 restraint asphyxia) needs to be examined.

13     When Corporal Jacoby and Officer Largent arrived at about 14.41.08 (per time index
14 from audio segment). At that time, Corporal Jacoby reported that Officer Townsley was on top
15 of and straddling Mr. Motley, who was prone yet "thrashing about in an uncontrolled manner."
16 Corporal Jacoby also saw that Mr. Motley's legs were free and he was trying to get up or punch
17 Officer Townsley and that Officer Townsley had to spend his efforts just to stay on top of Mr.
18 Motley. This was because Mr. Motely was thrusting his hips up off the ground in a "bucking"
19 fashion. (Jacoby 5/29/14 Interview pp. 4-5)

20     Officer Largent also reported that he found Officer Townsley and Mr. Motley in the same
21 position, i.e., "...seated on top of the suspect's buttocks." Officer Largent also reported that Mr.
22 Motley was struggling with both of his arms rolling on his side as if he's trying to face Officer
23 Townsley and was reaching toward him. (Largent 10/8/13 Interview p. 3) Officer Largent also
24 noted that Mr. Motley's chest was "very high up off the ground; although his hips were planted
25 on the ground. Mr. Motley was also pushing up with his hands and arching his back. (Largent
26 Deposition 18:19-19:12)

27     At this time, Corporal Jacoby and Officer Largent (after hearing Officer Townsley say,
28 "I'm gassed," and "I can't control him) started delivering baton strikes to Mr. Motley's right
29 arm. After Corporal Jacoby's baton broke and after Officer Largent noticed that he had probably
30 injured Mr. Motley's arm without it having any effect on his resistance, the two stopped using
31 their batons.

32     Officer Zufall arrived next and began using her baton on Mr. Motley's legs.

33     Corporal Jacoby next went to the ground and grabbed Mr. Motley's left arm and tried to
34 muscle and leverage it into a handcuffing position. During this time Mr. Motley tried to bite
35 Corporal Jacoby and strike him with his head.

36     At the same time, Officer Largent had dropped to his knees and grabbed Mr. Motley's
37 right arm to put it behind his back.

38     Officer Zufall moved and got on top of Mr. Motley's legs, at which time Officer Porter
39 took Officer Zufall's handcuffs from her duty belt and was able to handcuff Mr. Motely. At that
40 point, Officer Berg radioed that the suspect was "in custody" at time index 14.42.23.

41     The facts support that from the arrival of Corporal Jacoby along with Officers Largent,
42 Zufall and Porter, Mr. Motley was fighting so hard that the officers were unable to keep him flat
43 on the ground and that they did not apply enough weight to Mr. Motley's thorax so as to hinder
44 his ability to ventilate and become unconscious. Mr. Motley was still very conscious at this

1    point. Only about 1 minute and 35 seconds passed from the time of Corporal Jacoby's and
2    Officer Largent's arrival until the officers were able to get Mr. Motley handcuffed (i.e., from
3    time index 14.41.08 until 14.42.23). Mr. Motley continued to resist for some period after this.

4

5       **Supplemental Opinion Three:**
6       **The individual and collective actions of Officers Largent, Zufall and Smyrnos in**
7       **obtaining and maintaining control of Mr. Motley were consistent with those of**
8       **trained and reasonable officers and did not place Mr. Motley into one of the**
9       **aforementioned theoretically dangerous positions.**

10

11       Immediately after the officers were able to get Mr. Motley handcuffed, Officer Largent
12    immediately started a systematic prone search. This entailed rolling Mr. Motley onto his sides
13    while maintaining holding onto or pressing down on the suspect with the hand not conducting
14    the search. During this time, Mr. Motley is also trying to bite Officer Largent, which caused
15    Officer Largent to tell Mr. Motley to stop doing that and to press the side of Mr. Motley's head
16    to the ground. Mr. Motley's resistance was so severe, Officer Largent called out to Corporal
17    Jacoby to get a hobble to use to restrain Mr. Motley's legs. (Largent 10/8/13 Interview pp. 6-7)

18       By this time, Officer Largent had placed Mr. Motley back into a prone position and he
19    maintained contact with or held the back of Mr. Motley's neck. Because Mr. Motley was
20    kicking so hard that he was lifting Officer Zufall off the ground, Officer Smyrnos relieved her
21    and took control of Mr. Motley's legs.

22       Officer Smyrnos crossed Mr. Motley's ankles and then pushed them toward Mr. Motley's
23    buttocks and held them in place with his body weight. At this point, only Officers Smyrnos and
24    Largent were in physical contact with Mr. Motley. Officer Largent was still to the right of Mr.
25    Motley with his knees on the ground and his hand on Mr. Motley's right shoulder. During this
26    time, Mr. Motley was "chewing the dirt" and "biting mouthfuls [of dirt]." (Largent Deposition
27    69:3-9) Since having been handcuffed, Officer Zufall had also asked Mr. Motley his name and
28    she radioed it to the dispatcher (Time Index. 14.45.22). Mr. Motley remained conscious about 3
29    minutes and 53 seconds after having been handcuffed, as he could be heard in the background of
30    Officer Smyrnos' radio transmission at Time Index 14.46.16.

31       Officer Smyrnos maintained his hold on Mr. Motley's lower body and Officer Largent
32    continued to hold the back of Mr. Motley's neck (Largent 8/5/13 Interview p. 7) for about the
33    next 3 minutes and 43 seconds until Officer Largent noticed that Mr. Motley's color changed,
34    i.e., "Very grey, pale grey and blue color washed over his face, neck and head." It was at about
35    this point in time when Corporal Jacoby returned to the scene and Officer Largent informed him
36    in the change of Mr. Motley's condition. However, Officer Largent could also see that Mr.
37    Motley was still breathing, as he was expelling dirt and debris from his mouth. By this time,
38    Officer Smyrnos had released Mr. Motley's legs as Mr. Motley had stopped resisting and "his
39    body seemed relaxed." (Largent 10/8/13 Interview p. 8)

40       The total time that Mr. Motley remained conscious after being handcuffed was about 7
41    minutes and 36 seconds. During that time, Mr. Motley was placed on his side(s), and then back
42    into a prone position due to the level of his continuing resistance. Officer Zufall was also able to
43    get Mr. Motley's name and radio it to the dispatcher, and Mr. Motley could be heard in the
44    background of Officer Smyrnos' radio transmission, which was 3 minutes and 53 seconds after
45    being handcuffed.

It is very unlikely that the prone position with Officer Smyrnos pressing Mr. Motley's crossed ankles towards his buttocks and Officer Largent holding the back of Mr. Motley's neck created a condition that would have interfered with Mr. Motley's ability to ventilate. There was no pressure or weight being placed onto Mr. Motley's thorax. In addition, the loss of consciousness from compression of the thorax and impaired ventilation can take several minutes. Officer Largent nor any of the other officers present reported Mr. Motley to have had difficulty in breathing, complaining of the inability to breathe, or to give any other indications he was in medical distress prior to the sudden change in color and subsequent loss of consciousness.

The officers' individual and collective efforts were consistent with those of trained and reasonable officers; their force responses in obtaining and maintaining control of Mr. Motley were applied so as not to increase or create any further danger to Mr. Motley. In addition, there were no other feasible alternatives in obtaining and maintaining control of Mr. Motley.

**Supplemental Opinion Four:**

**Mr. Motley's behavior was consistent with that of a person who was fueled by a drug-induced state that made caused him to continue to fight and resist the officers beyond the point he was handcuffed and it would be clear to a reasonable and prudent person that such resistance would not permit him to escape.**

Mr. Motley displayed several characteristics, some of which were detailed by some of the involved officers that were consistent with someone who was under the influence of drugs, was suffering from a mental illness, or both. California peace officers are trained that such individuals may display the following characteristics that can make it extremely difficult to take them into custody:

- Irrational behaviors (e.g., driving at 100 mph and crashing into a residential yard);

- Fleeing from peace officers;

- Extraordinary strength (e.g., being able make it difficult for multiple officers to take them into custody; being able to push themselves or parts of their bodies upward while having multiple officers trying to subdue them);

- Not feeling or reacting to pain (e.g., withstanding multiple baton strikes to a lower arm; suffering a severe bone fracture, yet continuing to fight and not show pain when an officer grabs said broken forearm);

- Extraordinary endurance (e.g., continuing to fully exert oneself without responding to the normal cues of exhaustion; Continuing said fight against a single and multiple officers – after running away from officers and being subjected to a TASER; Continuing to try to bite officers and violently resist even after being handcuffed for over eleven minutes);

- Bizarre behavior (e.g., biting into the dirt during officers' attempts to maintain control); and

- Continuing to violently fight and struggle against officers and restraints until they suddenly stop, usually due to the loss of consciousness.

It is well known in law enforcement that such persons can be at extreme risk of dying

1 regardless of the measures use to apprehend and restrain them. It is also well known that being
2 under the influence of methamphetamine, a dangerous central nervous system stimulant is a
3 common cause of such violent behavior.
4
5 **Supplemental Opinion Five:**
6 **The officers summoned emergency medical personnel in a very timely manner and**
7 **well before they perceived Mr. Motley to be in serious medical distress.**
8 By reviewing the audio of the radio transmissions and dispatches, the following becomes
9 clear:
10 • Officer Berg radioed that Mr. Motley was in custody (handcuffed) at Time Index
11 14.42.23;
12 • Officer Berg radioed for a Code 3 medical response at Time Index 14.42.57;
13 • AMR Unit 815 was dispatched at Time Index 14.46.16 (4:40 after Officer Berg's
14 request – It is unknown if the AMR and RPD dispatch systems are time
15 synchronized)
16 • Corporal Jacoby radioed for an updated Code 3 medical response for the
17 unresponsive subject at Time Index 14.49.59 (when Officer Largent informed
18 Corporal Jacoby of Mr. Motley's change in condition);
19 • AMR Unit 815 was upgraded to a Code 3 response at Time Index 14.50.31; and
20 • AMR Unit 834 arrived (since they responded as a closer unit) at Time Index
21 15.01.13.
22 It is clear that the officers summoned emergency medical help for Mr. Motley about
23 seven minutes prior to it becoming clear that Mr. Motley needed emergency medical assistance.
24 Also, the available time indexes indicate that the officers used the time waiting for the
25 emergency medical personnel to arrive by carrying Mr. Motley toward the front of the house to
26 expedite access the access to him. Also during this time, Officer Largent constantly monitored
27 Mr. Motley's condition and provided CPR
28
29 **Opinion Six:**
30 **Officers Largent, Zufall, Smyrnos and Corporal Jacoby had not yet immobilized**
31 **Mr. Motley with the leg restraint (hobble) prior to Mr. Motley losing consciousness.**
32 California peace officers are trained that, once they get a violently resisting arrestee
33 *securely and completely* under control, it is at that time that first aid and other safety measures
34 should be taken, e.g., place the subject onto his side. Before that state is achieved, they are
35 trained they may use objectively reasonable force to overcome resistance.
36 Although the officers were able to get Mr. Motley handcuffed, his resistance continued
37 and was so violent that he was lifting Officer Zufall off of the ground as she applied her body
38 weight to his legs. Officer Smyrnos took her place, crossed Mr. Motley's ankles and used his
39 body weight to push Mr. Motley's ankles towards his buttocks, which kept Mr. Motley's hips
40 pressed to the ground. During this time, Officer Largent held onto the back of Mr. Motley's
41 neck and did not place any of his body weight onto Mr. Motley's thorax. This position appears to
42 have been maintained from about 2:45 p.m. until about 2:49 p.m. (Radio Audio Time Index
43 14.45.22 to14.49.59) Over four minutes had passed while Mr. Motley was not in one of the

1    theoretically dangerous positions (i.e., he was neither "hogtied" nor had any of the arresting
2    officers' weight placed onto his thorax – thus not placing him into any of the aforementioned
3    theoretically dangerous positions. This made positional asphyxia or weight-force-
4    compression/restraint asphyxia highly unlikely.

5    Officer Largent demonstrated an awareness of his training by asking for a leg restraint
6    (hobble). Had the hobble arrived prior to Mr. Motley changing color and becoming unconscious,
7    the officers could have used it to immobilize Mr. Motley's legs, which then – and only then –
8    would it have been safe for them to place Mr. Motley on his side.

9    Although Officer Zufall recalled during her deposition that she saw Officer Porter on Mr.
10   Motley's upper back during handcuffing, there is nothing to suggest that she remained there once
11   Mr. Motley was handcuffed. When asked during depositions, Officers Zufall and Largent
12   officers reported having had training that cautioned against leaving suspects in prone positions
13   and/or while applying weight to the suspects' backs for an extended period of time, once the
14   suspect was fully secured. (Zufall Deposition 48:22-50:7; Largent Deposition 106:16-108:4)

15   The officers were working to obtain a leg restraint (hobble), which would have enabled
16   them to safely place Mr. Motley on his side instead of maintaining the prone position. However,
17   Mr. Motley's actions in leading the officers on a chase that placed him deep inside the large
18   rural-like backyard and far away from a street delayed the officers' ability to bring a hobble more
19   quickly. As it was, they worked diligently to obtain one – which they did – and ended up using it
20   to assist in carrying Mr. Motley closer to the street so that medical personnel would be able to
21   get to his side more quickly.
22

23   **Conclusion:**

24   Although the officers were able to get Mr. Motley handcuffed, his resistance continued
25   and was so violent that he was lifting Officer Zufall off of the ground as she applied her body
26   weight to his legs. Officer Smyrnos next crossed Mr. Motley's ankles and used his body weight
27   to push Mr. Motley's ankles towards his buttocks. During this phase of the event, Officer
28   Largent asked for a hobble device so they could place Mr. Motley into a total appendage restraint
29   or a prone maximal restraint in order to overcome Mr. Motley's continued resistance.

30   The officers' actions in apprehending and controlling Mr. Motley were consistent with
31   those of trained and reasonable peace officers in regard to the apprehension, restraint, and proper
32   care of violently resistive suspects – particularly those who do not feel pain or tire, are unusually
33   strong, and engage in bizarre and irrational behaviors. The officers' actions did not place Mr.
34   Motley in a theoretically dangerous position and they did not increase the danger to him through
35   their efforts to safely and completely restrain him. Additionally, they did not have any other
36   options available.

37   California peace officers are trained that, once they get a violently resisting
38   arrestee *securely and completely* under control, it is at that time that first aid and other safety
39   measures should be taken, e.g., place the subject onto his side. Before that state is achieved, they
40   are trained, and common sense dictates, that they fully restrain violently resisting suspects prior
41   providing first aid and summoning emergency medical assistance.
42

43   Attachment: Arrest and Treatment Timeline
44

1  Respectfully Submitted,
2
3
4  JEFFEREY A. MARTIN
5
6
7
8  Date: September 2, 2016
9  San Carlos, California

# EXHIBIT C

**Jeffrey A. Martin**
727 Industrial Rd. Ste. #102
San Carlos, CA 94070
Telephone (650) 595-2452
E-mail: jeff@dsiconsult.com

## EDUCATION

**Juris Doctor – 2007**
Northwestern California University School of Law, Sacramento, California
- State Bar of California, License No. 262839

**Bachelor of Arts, Psychology - 1981**
California State University - East Bay, Hayward, CA

**Associate in Risk Management - 2000**
Insurance Institute of America, Malvern, PA

## EMPLOYMENT

**DSI Consulting, LLC**                                   **2014 - Present**

    **Chief Consultant**
    Provides training and consulting on internal affairs investigations, police practices, and expert witness
    services.

**SELF-EMPLOYED, San Carlos, CA**                        **2009 -Present**

    **Consultant/Trainer/Attorney**
    Provides expert-witness services and adjunct instruction for California P.O.S.T. Institute of Criminal
    Investigations Officer-involved Shootings Investigations Course.

**BERRY WILKINSON LAW GROUP**                            **2009 - 2014**

    **Associate Attorney**
    Provided legal representation for public safety personnel in disciplinary and other administrative matters.

**FORCE SCIENCE INSTITUTE, LTD.**                        **2012 - 2013**

    **Staff Consultant**
    Assisted with operations pertaining to training, research and administrative functions.

**LEXIPOL, LLC.**                                        **2009-2013**

    **Contract "Daily Training Bulleting" Author**
    Authored approximately four to six daily training bulletins per month on various law enforcement topics
    including use of force, pursuits, ethics, officer safety, and other topics related to policy compliance.

**Sergeant, Bureau of Field Operations**         2009 - 2010, 2000 - 2003, 1995 - 1997
**Patrol Division**
Supervised one or more patrol areas and supervised criminal investigations, tactical operations, conducted use-of-force investigations, and community-oriented policing activities. Engaged in other supervisory duties such as writing performance appraisals, coaching, and responding to citizen complaints. Member of the Crisis Intervention Team since April 2001.

**Sergeant, Bureau of Administration**         2005 - 2009
**Training Division**
Supervised the P.O.S.T. Force-Options Simulator (FOS) and Law Enforcement Driving Simulator Programs, which delivered training to the San Jose Police Department and peace officers within Santa Clara County. Delivered and supervised FOS instructor training to other trainers throughout the state of California. Taught and supervised classes in defensive tactics and officer safety. Served as the lead instructor and instructor-trainer for the TASER program for the San Jose Police Department and Basic Academy. Revised pursuit policy and designed, delivered and supervised mandated training for all sworn personnel to meet legislative requirements. Delivered instruction on use-of-force investigations in the Night Detective Academy.

**Sergeant, Bureau of Field Operations**         2003 - 2005
**Patrol Division, Main Lobby and Pre-Processing Center**
Supervised operations in the main lobby of the Witness Center during serious, criminal investigations and the department's temporary holding facility, as regulated by Title 24 of the California Code of Regulations. Also, completed bi-weekly assignments for regular patrol supervision.

**Sergeant, Bureau of Field Operations**         1998 - 2000
**Administrative Unit**
Served as the patrol bureau training coordinator for 800 sworn personnel and supervised sworn and non-sworn employees in the Administrative Unit.

**Sergeant, Bureau of Field Operations**         1997 - 1998
**Airport Division**
Supervised the policing and security functions by sworn personnel at San Jose International Airport. Ensured compliance with FAA and other regulations.

**Police Officer, Bureau of Field Operations**
**Patrol Division**         1984 - 1986, 1988 - 1989, 1994 - 1995
Engaged in proactive enforcement activities, investigated felony and misdemeanor crimes, and participated in community-oriented policing activities.

**Field Training Officer, Bureau of Field Operations**         1992 - 1994
**Patrol Division**
Directly trained and evaluated new officers in basic patrol officer functions, including criminal investigations, patrol tactics and report writing.

**Police Officer, Bureau of Investigations**         1989 - 1992
**Narcotics/Covert Investigations Unit**
Investigated drug and narcotic-related crimes, conducted and/or participated in undercover activities including sting operation support, conducting parole and probation searches, working with informants, obtaining and serving search warrants, and conducting surveillance. Also, served as the firearms instructor for the unit.

**Police Officer, Bureau of Field Operations**                               **1986 - 1988**
**Special Operations Division, Parks Enforcement Unit**
Engaged in proactive enforcement activity throughout the city and its parks, including the investigation of misdemeanor and felony crimes, conducting parole and probation searches, obtaining and executing search warrants, and working with informants. Also, responded to and handled regular patrol calls as needed.

## BAY AREA RAPID TRANSIT (BART) DIST. POLICE DEPARTMENT, San Francisco, CA   1981 - 1984

**Police Officer**
Assignments included both uniformed and plain clothes patrol.

## SOUTH BAY REGIONAL PUBLIC SAFETY TRAINING CONSORTIUM, San Jose, CA   1997 - 2004

**Adjunct Instructor – Multiple Courses and Programs**
Taught liability issues and use-of-force investigations in the Supervisor School, Liability and Officer Safety in the Field Training Officer Course, Liability Issues in FTO Updates, Force-options Simulator Instructor, and Defensive Tactics Instructor in the Basic Academy.

---

## TEACHING/PRESENTATIONS

2016         **Human Factors for the Crime Scene Investigator (Including Eyewitness Dynamics).** Presented at the Santa Clara County Crime Laboratory.

2016         **Eyewitness Dynamics.** Presented at the Bay Area Gang Alliance monthly meeting.

2015 - Present   Officer-involved Shootings Investigations – **"Lawful Force," "Human Factors," "Analyzing Video Evidence," "Eyewitness Dynamics,"** and other topics. Curriculum designer and instructor - 3 presentations to date on behalf of Cutting Edge Training, LLC.

2015         **"Human Factors," and "Eyewitness Dynamics."** Presented to the California Highway Patrol – Critical Incident Response Team.

2014         **"Understanding the Deadly Bluff: When Unarmed Subjects Commit Suicide by Cop."** Presented at the *Suicide Identification, Prevention and Investigation for Law Enforcement & Correctional Officers: Train-the-Trainer Program*, sponsored by the Institute for the Prevention of In-custody Deaths, Las Vegas, NV.

2012 - Present   **Officer-involved Shootings Investigations Course - "Lawful Force" and "Human Factors"** curriculum designer and instructor - 40 presentations. California P.O.S.T. Robert Presley Institute of Criminal Investigation.

2006 – 2009   **TASER X-26 Instructor and Instructor-Trainer.** San Jose Police Department Basic Academy and In-service Training Unit.

2006 – 2009   **California P.O.S.T. LD 20 (Use of Force) Scenario Evaluator**. San Jose Police Basic Academy.

2007         **SB719 Pursuit Policy Update.** Curriculum designer and instructor, San Jose Police Department.

2005 – 2009   **Force Options Simulator; Law Enforcement Driving Simulator; TASER X-26, TASER Update; Officer Safety Update; First Aid; Defensive Tactics; Tactical Field Exercises.** Supervision and delivery in San Jose Police Department In-service Training Unit.

2004 – 2007   **Liability.** San Jose Police Department Communications Training Officer Seminar.

| 2002 – 2004 | **Force Options Simulator**, South Bay Regional Public Safety Training Center. |
|---|---|

2001     **Police Pursuit Driving.** Featured expert regarding pursuit decision making in the training videotape "produced by Performance Dimensions Publishing.

2001     **Pursuit Decision Making,** course developer and instructor for interactive training CD-ROM for The Backup, Inc.

2000 – 2004     **Defensive Tactics,** Basic Academy, South Bay Regional Public Safety Training Consortium.

1999 – 2003     **Pursuit Decision Making,** developed and delivered course curriculum, nine presentations in seven states.

1997 – 2001     **SWAT Weapons Retention, Performance Appraisals, and Field Tactics for Patrol,** various departments.

1997 – 2006     **FTO Liability,** San Jose Police Department Field Training Officer Seminar.

1997 – 2004     **FTO Liability, Officer Safety, and Supervisor Liability** (Including use-of-force investigation and documentation), South Bay Regional Public Safety Training Consortium.

1997, 1998, 2000, and 2003 **In-custody Death Update, Universal Weapon Retention, Evaluating Physical Skills Training, and Multiple-Officer Takedowns, and Dealing with the Mentally Ill,** presented at the *Defensive Tactics Newsletter* Instructors Conferences.

1995 – 1998     **Constitutional Limitations on the Use of Force,** taught to selected patrol teams, San Jose Police Department.

1992     **Redefining the Basics of Patrol Tactics,** taught to selected patrol teams, San Jose Police Department.

1991-1992     **Raid Planning and Entry,** assistant instructor, San Jose Police Department, Narcotics/Covert Investigations Unit.

1990-1992     **Firearms,** San Jose Police Department, Narcotics/Covert Investigations Unit.

1987     **Side-handle baton (PR-24),** developed and delivered curriculum for the San Jose Police Department. This included the initial and in-service training to over 100 sworn department members, as well as writing the Side-handle baton specifications and requirements for the department.

1986     **Modern Pistol Technique,** delivered to the San Jose Police Department Youth Services Detail.

1983     **Side-handle baton (PR-24)** researched and developed program for the BART Police Department. This included the initial and in-service training for all 130 sworn members.

---

## COMMITTEE PARTICIPATION

- 2017    Calif. POST Use-of-Force Training Video Subject Matter Expert.
- 2008 – 2011/2014 California POST SAFE Driving Campaign – Subject Matter Expert Committee
- 2007    San Jose Police Department Lead SB 719 Pursuit Policy Revision
- 2006    Calif. POST SB 719 (pursuit legislation) Subject Matter Expert Committee

- 2006 San Jose Police Department Awards & Commendation Board
- 2004 San Jose Police Department TASER/Use of Force policy update Consultant
- 1999 Calif. POST Supervisors School Redesign Committee
- 1998 San Jose Police Department Duty Manual Update Consultant
- 1998 Calif. Commission on Peace Officers Standards & Training (POST) Field Training Officer School Review Committee
- 1998 San Jose Police Department Crisis Intervention Team Implementation Task Force
- 1998 San Jose Police Department Carbine Program Deployment Committee
- 1997 San Jose Police Department Pursuit Policy Update Committee
- 1995 San Jose Police Department Bureau of Field Operations Training Committee
- 1992 San Jose Police Department Training Committee (Academy Subcommittee)

---

# PUBLICATIONS

## Peer Reviewed

Martin, J.A. (2016, September). Applied Human-Error Theory: A Police TASER-Confusion Shooting Case Study. In *Proceedings of the Human Factors and Ergonomics Society Annual Meeting* (Vol. 60, No. 1, pp. 475-479). SAGE Publications.

Martin, J.A. (2016). Science, Experience and the Law Support Changing Traditional Vehicle-Stop Tactics. *Law Enforcement Executive Forum, 16(1)*, 58-69.

Kaminsky, R.J., Martin, J.A. (2000). An Analysis of Police Officer Satisfaction with Defense and Control Tactics. *Policing: An International Journal of Police Strategies and Management, 23(2)*, 132-153.

## Non-peer Reviewed

Martin, J. (2003, September/October). What's Missing in Police Pursuit Decision Making? *The Police Marksman, 28(5)*, 16-18.

Martin, J. (2003, March/April). Suicide by Cop: What the Responding Officer Needs to Know. *The Police Marksman, 28(2)*, 31-32.

Martin, J. (2002, July). Revising Policy and Procedure Manuals. *Law and Order, 50 (7)*, 114-116.

Martin, J. (2002, May). Making Appraisal Writing Easy. *The Police Chief.*

Martin, J. (2002). Dealing with the Mentally Ill: The Importance of the Subject Control Instructor. *The Defensive Tactics Newsletter, 12(1)*, 1, 3.

Martin, J. (2002). Clarifying the "Cover Fire" Issue. *The Backup, 5(1).*

Martin, J. (2001, September). 3QFC Pursuit Decision Making Model. *Law and Order, 49(9)*, 16-17.

Martin, J. (2001, July). Pursuit Termination: A Lifesaver? *Law and Order, 49(7)*, 30-33.

Martin, J. (2000, November). The Pitfalls of the FTO as Instant Backup. *Law and Order, 48(7)*, 20, 22.

Martin, J. (2000, November). Force 101 – Part IV: *Tennessee v. Garner. The Vanguard, 27(11).*

Martin, J. (2000, October). Force 101 – Part III: *Graham v. Connor. The Vanguard, 27(10)*, 17.

Martin, J. (2000, September). Force 101 – Part II: Rules of Force Conduct. *The Vanguard, 27(9),* 14.

Martin, J. (2000, August). Force 101 – Part I: The "Core Transaction." *The Vanguard, 27(8),* 15-16.

Martin, J. (2000). Getting Over the Hurdle of Your First Article. *The Defensive Tactics Newsletter, 10(1),* 5-8.

Martin, J., Papenfuhs, S. (2000, January/February). The "Sneak Attack" vs. the "Tactical Distance" Approach to Handcuffing. *The Police Marksman, 25(1).*

Martin, J., Williams, G.T. (2000, January). Extracting Suspects from Commercial Aircraft Safely. *Police, 24(1),* 60-63.

Martin, J. (1999). Evaluating the Effectiveness of Subject Control and Defensive Tactics Training. *The Defensive Tactics Newsletter,* 9(1), 1, 10-11.

Martin, J., Williams, G.T. (1998). 1998 California Peace Officers Murdered. *The Journal of California Law Enforcement, 32(4),* 1-11.

Martin, J., Williams, G.T. (1998). 1997 California Officers Murdered Study. *The Journal of California Law Enforcement, 32(3),* 18-28.

Martin, J. (1997, November). Arrest and Control Tactics: A Risk Management Perspective. *Law and Order, 45(11),* 74-76.

Martin, J. (1997). Reducing Suspect Resistance Through "Direct" Handcuffing. *The Defensive Tactics Newsletter, 6(4),* 1, 10-12.

Martin, J. (1997, September/October). Krav Maga: Serious Training for Serious Times. *The Police Marksman, 22(5),* 40-42.

Martin, J. (1997, July/August). The Myth of Control. *The Police Marksman, 22(4),* 54-55.

Martin, J. (1996, August). The Dangers of Dual Force. *Law and Order, 44(8),* 86-88.

Martin, J. (1996). The Wrap: A Definitive Solution Finally Arrives. *The Defensive Tactics Newsletter, 6(2),* 1, 4-7.

Martin, J. (1996, Spring). The Pat Search: Clarifying the Issues for Trainees. *NAFTO News,* 5(1), 18-20.

Martin, J. (1990, September/October). The Secondary Sidearm. *The Police Marksman, 15(5),* 43-44.

Martin, J. (1990, May/June). The Training Attitude. *The Police Marksman, 15(3),* 59-60.

---

## AWARDS

1997    Defensive Tactics Newsletter Leadership Award, presented by Dr. Les Knight, publisher of the Defensive Tactics Newsletter.

---

## PROFESSIONAL MEMBERSHIPS

California State Bar Association
California Peace Officers' Association
International Association of Chiefs of Police – Legal Officers' Section
Human Factors and Ergonomics Society

## SPECIALIZED TRAINING

### Electronic Control Weapons

TASER® Master Instructor - TASER® Training Academy – 2007, 2009, 2011 & 2014

TASER® X-26 Instructor – TASER, International – 2003

Advanced TASER® (M26) Instructor – TASER International – 2001

TASER Instructors Course, Tasertron, Inc. – 1996, 2000

### Arrest/Subject Control and Defensive Tactics

FBI Defensive Tactics Instructor – Federal Bureau of Investigation – 2000

C.L.A.M.P. Instructors Course – Law Enforcement & Security Trainers, Inc. – 1999

G.R.A.S.P. Instructors Course – Law Enforcement & Security Trainers, Inc. – 1999

Arrest & Control Instructor – Los Angeles Police Department – 1998

Master Instructor Handcuffing – ISC Division of Wellness – 1998

Defensive Tactics Instructors Course – Krav Maga Assoc. of America, Law Enforcement Training Division – 1997

Control Points – ISC Division of Wellness – 1997

Police Close Defense Instructor – Williams Defense Systems (now Cutting Edge Training) – 1997

### Edged Weapons

Tactical Folding Knife Instructor – CQC Service Group – 1997

### Firearms

P.O.S.T. Certified Firearms Instructors Course – Napa Valley College Criminal Justice Training Center – 1997

MP5 Submachinegun Operators Course – Heckler & Koch, International Training Division – 1997

Tactical Shotgun – International Law Enforcement Training & Consulting – 1994

Urban Rifle – Thunder Ranch/International Training Consultants - 1993

Defensive Pistol-Level II – Thunder Ranch/International Training Consultants – 1993

Police Shotgun- Level I – Yavapai Firearms Academy – 1988

Intermediate Pistol Course – American Pistol Institute (Gunsite) – 1987

Basic Pistol Course – American Pistol Institute (Gunsite) – 1986

## Impact Weapons

ASP Tactical Baton Instructors Course – Armament Systems & Procedures – 1995, 1997

Side-handle Baton Instructors Update – Gavilan College – 1988

Side-handle Baton Instructors Update – Santa Rosa Criminal Justice Training Center – 1987

Side-handle Baton Instructors Workshop – Martinez Adult School – 1984

P.O.S.T. Certified Side-handle Baton Instructors Course – Martinez Adult School – 1984

## Chemical Agents

Aerosol Defense Spray (O.C.) Instructor – CQB Supply – 2005

## Use of Force

P.O.S.T. Force-options Simulator Instructor – San Jose Police Department – 2002

Confrontational Simulation/Use of Force Instructor – Con Sim International – 1995

## Arrest-related Deaths

Forensic Analyst: Excited Delirium, Sudden In-Custody Deaths Program – I.P.I.C.D. – 2009, 2014

In-custody Death Prevention Instructor – I.P.I.C.D. – 2005

Legal, Medical, and Scientific Constraints on Human Restraints Symposium – I.P.I.C.D. – 2014

## Emergency Vehicle Operations

Law Enforcement Driving Simulator Instructor – San Jose Police Department – 2005

Pursuit Intervention Technique – Oakland Police Department – 2005

Driver Awareness Instructor – San Jose Police Department – 2005

Emergency Vehicle Operation Instructor – San Jose Police Department – 2005

## Crisis Intervention

Suicide by Cop/Suicide Response – San Jose Police Department CIT update – 2002

Crisis Intervention Team Academy – San Jose Police Department – 2001

Crisis Management and Resolution – San Francisco Police Department – 1998

## Human Factors

Fundamentals of Human Factors (SCY-580) - Grand Canyon University – 2016

Human Factors/Ergonomics (ISE 210) – San Jose State University – 2015

Investigating Human Fatigue Factors – National Transportation Safety Board – 2009

Principles of Force Science Certification Course – Force Science Research Center – 2008

## Specialized Investigations

Internal Affairs Investigations – San Jose State University – 2009

Responding to Officer-Involved Shootings – Police Training Services Company – 2008

Officer-Involved Shootings Investigations Course – LAPD, Force Investigations Division – 2008

Narcotic Investigation – California Department of Justice – 1990

## Supervision/Leadership

P.O.S.T. Police Supervision – Gavilan College – 1995

Supervisors In-house Academy – San Jose Police Department – 1995

Sergeants Workshop in Community Oriented Policing – Justice Training Institute – 1994

Situational Leadership, Train the Trainer – Center for Leadership Studies – 1994

---

## CONSULTANT AND EXPERT WITNESS

### Civil Matters - Defense

November 2016     Soler v. County of San Diego, et al., United States District Court - Southern District of California. Areas of Expertise: *"Probable cause to arrest and continue to hold related to the totality of the circumstances supporting a reasonable belief that an arrested subject is the named person on an arrest warrant, including reliance on other official channels for information,"* and *"Diligence in investigating an inmate's claim that he is not the person named on an arrest warrant."* (Report Submitted - Attorney: Stephanie Kish)

August 2016     Anthony Peel v. County of San Mateo, et al., United States District Court - Northern District of California. Areas of Expertise: *"Reasonable Force."* (Retained - Attorney: Jan Ellard)

July 2016     Joseph James Greer v. City of Hayward, et al., United States District Court - Northern District of California. Areas of Expertise: *"Probable cause to arrest," "Reasonable use of force," Reasonable use of TASERs," "Reasonable use of baton as a leverage tool," "Reasonable use of pressure point application," "Reasonable use of restraints - including handcuffs and The WRAP device," "Proper monitoring of physical condition and timely rendering of first aid," "Provision of emergency medical treatment in a timely manner."* (Report Submitted - Attorney: Jeffrey Vucinich)

June 2016     L.M. by and through her guardian ad litem v. City of Redding, et al., United States District Court - Eastern District of California. Areas of Expertise: *"Vehicle flight constituting a threat to the public," "Reasonable use of TASERs," "Reasonable use of the carotid restraint," Reasonable use of personal weapons," "Reasonable use of batons," "Secondary head strikes with Batons," and "Theoretically dangerous positions increasing risk of arrest-related deaths."* (Report Submitted - Attorney: Richard Fisher)

February 2016   Daniel Acedo v. City of Chula Vista, et al., United States District Court – Southern District of California. Areas of Expertise: *"Probable Cause to Arrest," "Warrantless Entry onto Property Based Upon Fresh Pursuit," "Pointing of Firearms While Making Arrest," "Use of Police Dog While Making Arrest,"* **and** *"Conformance with Departmental Policy."* (Report Submitted – Attorney: Karen Rogan)

January 2016   Jovan Jimenez v. County of San Diego, et al., United States District Court – Southern District of California. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Arrest based on Citizens Arrest," "Use of Handcuffs During Detentions," "Reasonable Force to Control Handcuffed Suspects,"* and *"Factors Supporting that Head Strike with an Impact Weapon was Accidental."* (Report Submitted – Attorney: James Chapin)

January 2016   Gary Lawman v. City and County of San Francisco, et al., United States District Court – Central District of California. Areas of Expertise: *"Probable Cause to Arrest," "Booking of Misdemeanant Arrestees," "Explicit Probable Cause to Detain Pursuant to Section 5150 W&I," "Policy Conformance,"* and *"Monell Liability."* (Report Submitted, Deposed and **Testified** – Attorney: James Hannawalt)

August 2015   Michael Nichols et al v. City of Palm Springs, et al., United States District Court - Central District of California. Areas of Expertise: *"Proper Use of Informants," "Determining the Status of Informants,"* and *"Creation of Duty to Protect Informants."* (Submitted Report - Attorney: Michael Tam)

July 2015   Civil: Robert Barron v. City of Redding et al., United States District Court - Eastern District of California. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Reasonable Use of Deadly Force," "Patrol Tactics"* and *"Policy Compliance."* (Submitted report & **deposed** - Attorney: Sean O'Dowd)

March 2015   Civil: Estate of Yanira Serrano v. County of San Mateo, et al., United States District Court - Northern District of California. Areas of Expertise: *"Reasonable Use of Deadly Force," "Force Options," "Patrol Tactics," "Policy Compliance," "Pointing of Firearm," "Monell Liability."* (Submitted report & **deposed** - Attorney: David Levy)

August 2014   Civil: Jose Antonio Aguilar Jaramillo v. City of San Mateo, et al., United States District Court - Northern District of California. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Reasonable Force," "Post-arrest care,"* and *"Policy Compliance."* (Submitted report – Attorney: Jeffrey Vucinich)

December 2013   Civil: United States Automobile Assoc. v. Las Vegas Metropolitan Police Department Consolidated with Dennis Wallace v. Las Vegas Metropolitan Police Department, et al. Nevada District Court, Clark County, Nevada. Areas of Expertise: *"Vehicular Pursuits," "Policy Compliance," "Threat Assessment of Suspect Driving," "Emergency Vehicle Operations."* (Consulted – Attorney: Adam Fulton)

June 2013   Civil: Nicholas Damante v. City of Hayward, et al. Alameda County Superior Court. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Differentiation of Knives Under 653k PC,"* *"Reasonable Force."* (Consulted – Attorney: Jeffrey Vucinich)

February 2013   Civil: A.K.H., a minor by and through her Guardian Ad Litem, Elizabeth Landeros; Maria Cerda Reyes; and Benito Herrera v. City of Tustin et al. United States District Court - Central District of California. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Reasonable Use of Deadly Force," "Human Perception and Reaction Time," "Suicide by Cop," "Timely Rendering of First Aid,"* and *"Policy Compliance."* (Submitted report & **deposed** - Attorney: Robert Kaufman)

December 2011 Civil: Carrillo/Correa v. Las Vegas Metropolitan Police Department, et al. United States District Court - District of Nevada. Areas of Expertise: *"Vehicular Pursuits," "Policy Compliance," "Threat Assessment of Suspect Driving," "Emergency Vehicle Operations"* and *"Perception and Memory."* (Submitted report and **deposed** - Attorney: Sean Lyttle)

October 2011 Civil: Mary & Charles Piskura v. TASER, International, et al. United States District Court – Southern District of Ohio. Areas of Expertise: *"Eyewitness Perception and Memory of Events"* and *"The Biomechanics of Officer-Suspect Interactions."* (Submitted report – Attorney: Andrew Yosowitz)

November 2010 Civil: Kenneth Carrethers v. Bay Area Rapid Transit, et al. San Francisco, CA. United States District Court – Northern District of California. Areas of Expertise: *"Reasonable Suspicion to Detain, Probable Cause to Arrest, and Reasonable Force"* and *"Reasonable Use of Leg Restraint for Defense of a §1983 Action Alleging Unlawful Arrest and Excessive Force."* (Submitted report and **deposed** – Attorney: Dale Allen)

December 2008 Civil: John Garcia v. County of Merced, et al., CA. U.S. District Court - Eastern District of California. Area of Expertise: *"Officers' Training Regarding Proper Search Warrant Affidavit Procedures in a Narcotic Investigation."* (Submitted report – Attorney: Roger Matzkind - Defense)

February 2008 Civil: Randy Sewell v. Dustin James Hutchcraft, et. al. Lane County, OR. Second Judicial District of Oregon. Area of Expertise: *"Off-duty Police Practices in Assault and Battery by Police Plaintiff."* (Consulted – Attorney: Kevin Crawford)

April 2004 Civil: Steven May v. Maaco Auto Body, Modesto, CA. Superior Court of California, Stanislaus County. Area of Expertise: *"Proper Police Procedures and Policies Related to Emergency Vehicle Operation and Pursuits."* (Consultation – Attorney: Dale Thayer - Defense)

May 2003 Civil: Peruzzaro v. San Mateo County Transit District, Redwood City, CA. Superior Court of California, San Mateo County. Area of Expertise: *"Current Training and Proper Procedure Related to Emergency Vehicle Operation, "Code-3" Driving and Safety Measures."* (**Deposed** – Attorney: Albert Wenzell, Jr. - Defense)

June 1999 Civil: Steve Hatzigeorgiou vs. Camelot Park, et al. Modesto, CA. Superior Court of California, Stanislaus County. Area of Expertise: *"Appropriate Off-Duty Conduct by Peace Officers."* (Consultation – Attorney: Michael Amaro - Defense)

Civil – Plaintiff

March 2015 Angel Keith Toscano, Jr., et al. v. City of Fresno, et al., United States District Court - Eastern District of California. Areas of Expertise: *"Probable Cause to Arrest," "Reasonable Force – Patrol Vehicle v. Bicyclist," "Driving with Due Regard During Pursuit of Bicyclist," "Effect of Use of Emergency Lights and Siren," "increasing the Danger to Struck Fleeing Suspect," and "Emergency Vehicle Operations Training."* (Submitted Report – Attorneys: Andrew Jones & Adam Rushing)

October 2013 Steve Armstrong v. El Rancho Market of Chandler, Inc., Superior Court of Arizona – Maricopa County. Areas of Expertise: *"Proper Procedure for Detaining Suspected Shoplifters by Retail Loss-prevention Personnel," "Inadequate Training of Loss-prevention Personnel," and Improper Use of Handcuffs."* (Consulted – Attorney: Robert Trop)

October 2012 Austin Koval v. United States of America. United States District Court – Eastern District of California. Areas of Expertise: *"Reasonable Suspicion to Detain," "Probable Cause to Arrest,"*

11

*"Reasonable Officer's Application of Criminal Statute," "Unreasonable Seizure of Personal Property Without Cause," and "Duty to Intercede."* (Submitted report & **deposed** – Attorney: Robert Trop)

March 2009   Civil:  Steven Morrow v. Park-Gaylord Apartments, Paul Pries, et al. San Jose, CA. Superior Court of California, Santa Clara County.  Area of Expertise:  *"Proper Police Practices in Foot Pursuits."* (Submitted report – Attorney: Peter Timewell)

Criminal – Prosecution

June 2016   People of the State of California v. Gabrielle Lemos and Michelle Lemos, Superior Court, County of Sonoma.  Areas of Expertise: *"Reasonableness of having occupants of stopped vehicles exit" and "Proper procedures for preliminary investigations of potential domestic violence incidents."* (**Testified** - Attorney: Jenica Leonard)

September 2014 People of the State of California v. Brian Rathjen, Superior Court of California, Santa Clara County.  Areas of Expertise: *"Reasonable Force" and "Dealing with Mentally Ill Individuals."* (Consulted – Attorney: Angela Bernhard - Prosecution for Murder and Resisting Arrest with Injury to Peace Officer)

September 2014 People of the State of California v. Christopher Melton, Superior Court of California, Stanislaus County.  Areas of Expertise: *"Reasonable Force" and "Arrest & Control Tactics."* (**Testified** – Attorney: Blythe Harris - Prosecution for Assault Under Color of Authority)

August 2009   People v. Romel Custodio, Marlo Custodio, and Marilou Alvarado, San Jose, CA. Superior Court of California, Santa Clara County. Areas of Expertise: *"Operation and Use of the TASER® Brand Electronic Control Device"* and *"The Use of Force in the Prosecution for Resisting Arrest/Obstructing and Delaying a Peace Officer."* (**Testified** – Attorney: Donald Shearer) STATUS:  Uncompensated expert witness as part of normal police duties.

December 2006 People v. Phouc Ngoc Pham, San Jose, CA.  Superior Court of California, Santa Clara County. Area of Expertise: *"Brandishing a Firearm by Off-Duty Police Defendant."* (Submitted report – Attorney: Raymond Mendoza) STATUS:  Uncompensated expert witness as part of normal police duties.

August 2006   People v. Joe Reyes Guerra, San Jose, CA.  Superior Court of California, Santa Clara County. Areas of Expertise: *"Police Use of Force," "Force Options and Operation"* and *"Proper Application of the TASER® Brand Electronic Control Device."* (**Testified** – Attorney: James Leonard) STATUS:  Uncompensated expert witness as part of normal police duties.

February 2005 People vs. Michael Kan and Craig Daniel Lee, San Jose, CA. Superior Court of California, Santa Clara County.  Areas of Expertise: *"Assault Under Color of Authority," "Officers' Training as to Facts Amounting to Reasonable Suspicion to Detain & Probable Cause to Arrest"* and *"Policy and Practices Regarding Use of Force."* (Submitted report & **testified** – Attorney: Peter Waite)  STATUS:  Uncompensated expert witness as part of normal police duties.

November 2005 People vs. Jose Murillo, Santa Clara, CA.  Area of Expertise:  *"Effect of a Stun Baton."* (Submitted report – Attorney: Benjamin Field - Prosecution)  STATUS:  Uncompensated expert witness as part of normal police duties.

May 2005   People vs. Marvin Evenorlazo Amaya, Santa Clara, CA.  Areas of Expertise: *"Officers' Training as to Facts Amounting to Reasonable Suspicion to Detain"* and *"Policy and Practices Regarding Use of Force."* (**Testified** – Attorney: Angela Bernard) STATUS: Uncompensated expert witness as part of normal police duties.

December 2002 People vs. Lugo Santillan Silva, Santa Clara, CA. Area of Expertise: *"Use of Force/Police Service Dogs as an Instrumentality of Force."* (**Testified** – Attorney: Judith Sklar - Prosecution) STATUS: Uncompensated expert witness as part of normal police duties.

September 2001 People vs. Craig Winton Mosher, Monterey, CA. Superior Court of California, Monterey County. Area of Expertise - *"Assault Under Color."* (Consulted – Attorney: Gary Thelander - Prosecution) STATUS: Uncompensated expert witness

## Criminal – Defense

April 2016 People v. Patrick Feaster, Superior Court - County of Butte. Areas of Expertise: *"Distraction Effects of Stress and its Interaction with Automatic Behavior," "Memory Gaps in Officer-involved Shootings,"* and *"Reasonableness of Drawing of a Sidearm by a Police Officer."* (Report Submitted - Attorney: Paul Goyette)

January 2016 People v. John Demery, Superior Court - County of Riverside. Areas of Expertise: *"Factors that Constitute Proportionate Force," "Human Factors," "Perception of Threat of Death or Serious Bodily Injury by Unarmed Assailant,"* and *"Punches Resulting in Death or Serious Bodily Injury."* (Testified - Attorney: Richard Pinckard)

October 2014 People v. Jeffrey Smock, Superior Court - County of Marin. Areas of Expertise: *"Factors of Reasonable Force in Self Defense by a Civilian."* (Excluded – Attorney: M. Gerald Schwartzbach)

July 2011 State of Nevada v. Aron Carpenter, Las Vegas, NV. Eighth Judicial District of Nevada. Areas of Expertise: *"Pursuit Policy," "Determining Policy Compliance", "Pursuit Dynamics," "Distinguishing Policy from Law,"* and *"Human Perception and Reaction Time."* (**Testified** – Attorney: Bret Whipple)

April 2010 People v. Julio Morales, San Jose, CA. Superior Court of California, Santa Clara County. Areas of Expertise: *"Consensual Encounters, Reasonable Suspicion to Detain," "Probable Cause for Pat Searches," "San Jose Police Department Regulations, San Jose Police Department Performance Appraisal Practices, and Under the Influence (11550 H&S) Investigative Procedures for the Defense of a San Jose Police Officer Charged with Sexual Battery and False Imprisonment."* (**Testified** – Attorney: Craig M. Brown)

## Administrative – Grievant

March 2015 In the Matter of the Appeal of Rodolfo Gomez, Jr., Board of Fire and Police Commissioners of the City of Milwaukee. Area of Expertise: *""Importance of Proper Analysis of Video Evidence in Use-of-Force Investigations."* (Testified – Attorney: Brendan Matthews)

June 2013 Civil Service Hearing: Juan Vara & Kevin Wheeler v. New Orleans Police Department, New Orleans, LA. Areas of Expertise: *"Use of Force," "TASER" and "Human Factors" (Basic vision, light & dark adaptation, lighting and attention).* (Submitted report & **Testified** - Attorneys: Donovan Livacarri & Raymond Burkett, III)

March 2012 Arbitration Hearing: Alfonzo Basurto v. Santa Clara County Sheriff's Department, San Jose, CA. Areas of Expertise: *"Use-of-Force Policy Compliance," "Force Options" and "Arrest and Control Tactics."* (**Testified** – Attorney: William Rapoport - Grievant)

August 2011 Arbitration Hearing: Aron Carpenter v. Las Vegas Metropolitan Police Department, Las Vegas, NV. Areas of Expertise: *"Pursuit Policy and Compliance," "Recognition of Suicidal Behavior,"*

> *"Vehicle Dynamics," "Basic Collision Report Writing,"* and *"Perception, Memory and Reaction Time."* (**Testified** – Attorney: John Harper - Grievant)

March 2011     Arbitration Hearing: City of Grover Beach v. Lopez, Grover Beach. Areas of Expertise: *"Human Perception and Memory," "Operation and Capabilities of the TASER® X26 and TASER Cam®,"* and *"Reasonable Use of the TASER®"* and *"Reasonable Force Per Department Policy."* (**Testified** – Attorney: Alison Berry Wilkinson)

March 2003     Arbitration Hearing: Daysog vs. City of San Jose, San Jose, CA. Areas of Expertise: *"Use of Force/Police Service Dogs as an Instrumentality of Force."* (**Testified** – Attorney: Craig M. Brown - Grievant) STATUS: Uncompensated expert witness subpoenaed by officer.

## Consultation/Review

July 2015     Consultation & Review: Force-Response Analysis of Officer-Involved Shooting: Fridoon Rawshan Nehad. Areas of Expertise: ***"Reasonable Suspicion to Detain," "Probable Cause to Arrest," "Human Perception v. Video Evidence," "Force Options," "Reasonable Use of Deadly Force."*** (Submitted report – San Diego County District Attorney's Office – Attorney: Fiona Khalil)

March 2015     Consultation: Confidential Client (Chief of Police) – Review of reports and examination and interpretation of in-car camera video of arrest to determine reasonableness of force during arrest.

January 2015     Consultation & Training: Confidential Client (Police Internal Affairs Unit) – Examination and interpretation of two body-worn camera videos of two separate incidents, one involving physical non-lethal force (physical force, TASERs, and OC spray) and the other of an officer-involved shooting. Provided training to IA investigators about how to examine and interpret video of force incidents.

March 2000     Interviewed for review of claim regarding a training injury in a defensive tactics course at a basic academy for Keenan & Associates (TPA).

July 1998     Reviewed evidence and documentation for the U.S. Department of Justice Civil Rights Division and rendered an opinion as to reasonableness of force for patterns and practices. Case name is confidential.

## Professional/Peer Review

August 2008     Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP), Department of Homeland Security.

November 2006   Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP), Department of Homeland Security. STATUS: Compensated consultant.

February 2006   Peer Review Panel member for the Commercial Equipment Direct Assistance Program (CEDAP) Department of Homeland Security.

August 2001     Professional Review of Research Report, National Institute of Justice.

March 1999     Professional Review of Research Report, National Institute of Justice

August 1998     Peer Review Panel member for grant proposals, National Institute of Justice

## ADJUDICATION

March 2014      Confidential File No. 033.14284.15294. Neutral board member agreed to by the California Highway Patrol and Appellant in good cause hearing for revocation of a retired peace officer's concealed weapon endorsement pursuant to California Penal Code Sections 25740 and 26305(b) et seq.

# EXHIBIT D



## FEE AGREEMENT

Re the matter of: _____

**CASE REVIEW AND OPINION:**
A Complete review of all materials furnished will be done on a timely basis, and written opinion will be completed if requested. A review of materials provided will be performed at the rate of $200.00 per hour with a minimum of 24 hours ($4,800.00) required in advance of commencement of review. This $4,800.00 fee is nonrefundable and must accompany this signed Fee Agreement acknowledging Jeffrey A. Martin's participation in the case as an expert. Payment to Jeffrey A. Martin is not dependent upon the client-attorney's decision to continue to use the services of Jeffrey A. Martin in this matter. Designating Jeffrey A. Martin as an expert in any case matter without his consent, signing the fee agreement and paying the minimum $4,800.00 fee is prohibited. If the fee arrives before case materials are sent or received, the receipt of the fee is considered an agreement to retain. Jeffrey A. Martin reserves the right to withdraw from assisting in the matter if the client-attorney misrepresents or withholds any information about the case or any relationships constituting potential conflicts. The $4,800.00 minimum billing will be credited toward subsequent invoices.

**TESTIMONY:**
Actual testimony in a proceeding (i.e., trial, deposition, or hearing) will be billed at $400.00 per hour with a four-hour minimum of $1,600.00. Waiting to testify at the venue of the proceeding before actually testifying will be billed at $200.00 hour. If the case settles, is dismissed, or otherwise rescheduled after arrival at the venue of the proceeding, a four-hour minimum of $1,600.00 will be billed. The four-hour minimum of $1,600.00 will be billed if the case settles, is dismissed, or otherwise rescheduled within 24 hours (excluding Saturdays and Sundays) of scheduled testimony.

**READING, CONSULTATION, PREPARATION, RESEARCH & REPORTS\*:** $200.00 per hour.

**CASE/DOCUMENT ORGANIZATION:** $75.00 per hour.

**SITE VISIT:** $1,600.00 if travel time is more than four hours, portal-to-portal. $200.00 per hour otherwise.

**TRAVEL (Does not include travel expenses):** $95 per hour.

**FILING/BILLING/OFFICE SUPPLY FEE (One time fee per case):** $175.00

Airfare will be booked at an unrestricted coach fare.
Mileage will be charged at the current IRS rate.
After 45 days a 10 percent late fee will be charged.
Expenses will be billed as incurred.
Invoices may be issued every 30 days when the case is active.
The hiring firm/organization is responsible for ensuring that all fees are paid in full and in a timely manner.
**All hourly rates will be billed per tenth hour.**
**\*An Expedited-Report fee of $1,000.00 is billed if a report is needed in less than 10 business days.**

**I HAVE READ THIS FEE SCHEDULE IN ITS ENTIRETY AND AGREE TO THE TERMS THEREIN.**

_____           _____
Jeffrey A. Martin                                                        Signature of retaining attorney              Date

                                                                                _____
                                                                                Typed or printed name of retaining attorney