LAW OFFICES OF VICKI I. SARMIENTO
Vicki I. Sarmiento, Esq. (Bar No. 134047)
vsarmiento@vis-law.com
333 North Garfield Avenue
Alhambra, California 91801
Telephone:   (626) 308-1171
Facsimile:   (626) 308-1101

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California  91367
Telephone:   (818) 347-3333
Facsimile:   (818) 347-4118

Attorneys for Plaintiffs L.M., CAROL ADAMS, S.M-B.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.M. by and through her guardian ad litem ASHLEY MCCAIN, individually and as successor in interest to the Estate of STEVEN MOTLEY; CAROL ADAMS, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF REDDING, CHIEF ROBERT F. PAOLETTI, OFFICER JARED HEBERT, OFFICER WES TOWNSLEY, OFFICER BRANDON LARGENT, OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. 2:14-CV-00767 (MCE AC)<br><br>(Consol. Case No. 2:14-cv-01736 TLN CMK)<br><br>**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF CITY OF REDDING AND CHIEF ROBERT PAOLETTI**<br><br>Date:  April 20, 2017<br>Time: 2:00 p.m.<br>Courtroom:  7<br>(Hon. Morrison C. England, Jr.)<br><br>*Filed concurrently herewith*: Plaintiffs' Separate Statement in Response to Defendants' Separate Statement and Additional Facts in Support of Opposition to Motion for Summary Judgment; Declaration of Vicki I. Sarmiento |

## **TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................. 1

II. STATEMENT OF FACTS ............................................................................. 2

III. LEGAL STANDARD ..................................................................................... 5

IV. ARGUMENT .................................................................................................. 7

    A.    Plaintiffs' Monell Claim Is Not Subject To Dismissal ........................... 7

        1.    Unconstitutional Policy, Custom, or Practice - Failure to Train…..... 7

        2.    Ratification…………………………………………………………..10

    B.    Plaintiffs' Claims Against Chief Paoletti Are Not Subject to Dismissal…………………………………………………………………..13

        1.    Official Capacity………………………………………………….13

        2.    Individual Capacity………………………………………………….14

V. CONCLUSION…………………………………………………………….15

# TABLE OF AUTHORITIES

*Adickes v. S.H. Kress & Co*. 398 U.S. 144, 158-59(1970)……………………………..6
*Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)…………………………….10, 11
*City of Canton Ohio v. Harris*, 489 U.S. 378, 389 (1989)………………………..8, 10
*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1088)……………………..10, 11
*Cleary v. News Corp*., 30 F.3d 1255, 1259 (9th Cir. 1994)…………………………..5
*Gomez v. Vernon*, 255 F3d 1118, 1126-27 (9th Cir. 2001)……………………..10, 11
*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)…………………….10, 13
*Hopkins v. Andaya,* 958 F.2d 881, 888 (9th Cir. 1992)……………………………...6
*Lake Nacimiento Ranch Co. v. San Luis Obispo County,* 841 F.2d 872, 875 (9th Cir. 1987)……………………………………………………………………………………6
*Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)...7, 10, 11, 12, 13, 14
*McKenzie v. Milpitas*, 738 F. Supp. 1293, 1301 (N.D. Cal. 1990)…………………..8
*McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986)……………………….10, 11
*Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989)………………..8
*Monell v. Dep't of Soc. Servs. Of N.Y.*, 436 U.S. 658, 691 (1978)…………………..7
*Oklahoma City v. Tuttle*, 471 U.S> 818, 822-24 (1985)……………………………7
*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)……………………………..7
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n.11 (1986)……………………7
*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir 1994)…………………………………..7
*Tennessee v. Garner*, 471 U.S. 1 (1985)……………………………….…………..8
*T.W. Electrical Service, Inc. v. Pacific Electrical Contractor's Association,* 809 F.2d 626, 630-31 (9th Cir. 1987)…………………..………………………………….6


F.R.C.P 56(c)……………………………………………………………………...…5

Plaintiffs, L.M., by and through her guardian ad litem ASHLEY MCCAIN and CAROL ADAMS, and S.M-B., a minor by and through his guardian ad litem DAWN BIANCO, hereby oppose the Motion for Summary Judgment filed by Defendants CITY OF REDDING and CHIEF ROBERT F. PAOLETTI. For the reasons stated below, the motion should be denied in its entirety.

## I. INTRODUCTION

This is a civil rights case arising from the death of Steven Motley on October 5, 2013, who was tased and severely beaten and lost consciousness at the scene as a result of massive injuries[1] inflicted on him by the five individually named defendant officers of the Redding Police Department ("RPD").[2] Mr. Motley never awoke again and died three days later from cardiac arrest having developed severe anoxic brain injury, rhabdomyolysis, acute bronchopneumonia, and multiple organ system failure.

The Plaintiffs are Mr. Motley's five year-old children, L.M. and S.M-B., and his mother CAROL ADAMS. Originally filed separately, the case of L.M. and ADAMS was consolidated with the case of S.M-B. The motion for summary judgment refers to these as the "McCain Complaint" and the "Bianco Complaint," respectively. This brief will do the same for consistency.

Defendants CITY OF REDDING and CHIEF ROBERT F. PAOLETTI have filed their motion for summary judgment only with respect to the *Monell* claims and the claims against CHIEF PAOLETTI, personally and in his official capacity, as

---

[1] The injuries inflicted as documented in autopsy report include cutaneous abrasions and contusions, scalp lacerations, hemorrhage in back muscles, bilateral intercostal muscle hemorrhage, left rib fractures, multiple foci of subarachnoid hemorrhage of brain, small subdural hemorrhage of brain, large scalp contusions, bilateral hemothoraces, pulmonary congestion and edema, fracture of right radius and ulna, fracture of left fibula. (Plt. Sep. Stmt. #31).

[2] Defendant Officers are Wesley Townsley, Brandon Largent, Chris Jacoby, Rebecca Zufall, Peggy Porter, Chris Smyrnos.

alleged in the two separate complaints -- the Fourth and Fifth Claims of the McCain Complaint and the Sixth and Seventh Claims of the Bianco Complaint. The motion should be denied because triable issues of fact exist.

## II. STATEMENT OF FACTS

On October 5, 2013, Officer Jared Hebert ("Hebert") was in pursuit of Mr. Motley on suspicion of driving a stolen vehicle. The incident turned into a foot pursuit after Mr. Motley crashed the vehicle and ran away from officer Hebert. Officer Hebert left his patrol car and ran after Mr. Motley. Mr. Motley circled back around, got into the patrol car, and drove it for a short distance. He exited the patrol car and fled on foot into the backyard areas of a residential neighborhood where he climbed over fences until he ended up in the backyard of the house at 4653 Alta Saga Drive, City of Redding. Officer Townsley pursued Mr. Motley on foot and found him in the above-referenced backyard near the back fence.

After tasing Mr. Motley, he fell to the ground. Officer Townsley recalled no injuries or blood on Mr. Motley at that time. (Plt. Sep. Stmt. #28). Officer Townsley got Mr. Motley into a prone (chest down) position on the ground. He maintained him in that prone position by straddling Mr. Motley's upper body and sitting on his waist area. (Plt. Sep. Stmt. #20). Officer Townsley reported using his body weight to keep Mr. Motley in that position and using a left arm "under-hook" hold. (Plt. Sep. Stmt. #20). Officer Townsley testified that at no time did he feel Mr. Motley overpowering him because Townsley "was able to maintain a dominant position." (Plt. Sep. Stmt. #20). He tried some pain compliance maneuvers like a wrist-lock. Officer Townsley punched Mr. Motley's face several times which seemed to briefly stun Mr. Motley. (Plt. Sep. Stmt. #2). He then applied a carotid neck causing him to lose consciousness. (Plt. Sep. Stmt. #2) To keep Mr. Motley in that prone restraint position, officer Townsley kept his torso on top of Mr. Motley's back and "stayed heavy on him," a martial arts term. (Plt. Sep. Stmt. #2). Officer Townsley subdued Mr. Motley, and he was just laying there moaning in pain; it was under control and Mr. Motley was not resisting. Officer Townsley was on top of

Mr. Motley's back, he had him contained with just one hand, telling him calmly "stop resisting me," and he was calling for backup. (Plt. Sep. Stmt. #2, 20).

As Officer Townsley used his whole body weight to keep Mr. Motley down on the ground, his face was close to the back of Mr. Motley's head. (Plt. Sep. Stmt. #2). The baton strikes were so close to Townsley's head that he flinched and had to sit up on Mr. Motley's back so as not to get hit, but continued to hold him flat on the ground. (Plt. Sep. Stmt. #21). Mr. Motley went from strong resistance to "zero" and "went unconscious" according to officer Townsley. (Plt. Sep. Stmt. #18). Officer Townsley saw Mr. Motley's arm broken as he pulled it back to handcuff it. (Plt. Sep. Stmt. #19).

After Mr. Motley was handcuffed, officer Zufall applied restraint holds such as crossing his legs, bending them back against his buttocks, and applying her body weight. (Plt. Sep. Stmt. #3). Officer Smyrnos arrived after the handcuffs were applied and saw officer Townsley in the front of the house. Smyrnos went to the backyard and found Mr. Motley "detained in handcuffs." Officer Zufall was detaining Mr. Motley's feet. Smyrnos took over from Officer Zufall and continued to apply leg hold. (Plt. Sep. Stmt. #3). He placed Mr. Motley in a figure-four on his legs, bending one foot behind his knee, and then folding the leg up and pressing his weight against the leg. (Plt. Sep. Stmt. #3, 22).

From the time Mr. Motley was handcuffed until officer Jacoby radioed that Mr. Motley was unresponsive, 7 minutes and 40 seconds had elapsed. (Plt. Sep. Stmt. #6). Mr. Motley was restrained prone in several ways with enough pressure to cause death from compressive asphyxia. This included chest compression by body weight and chest compression by figure 4 leg holds. This also included Mr. Motley's face being compressed into the dirt during prone restraint. (Plt. Sep. Stmt. #6). During this period, officer Largent said they were waiting for officer Jacoby to return with leg hobbles, and they noticed a color change in Mr. Motley and his body seemed to relax. (Plt. Sep. Stmt. #6). After Mr. Motley lost consciousness, Officer Largent testified that he did feel a neck pulse. (Plt. Sep. Stmt. #6). Feeling a pulse

in the neck indicates Mr. Motley's heart was still beating after he lost consciousness. It supports the evidence that Mr. Motley was asphyxiated rather than having a primary cardiac arrest event. (Plt. Sep. Stmt. #6).

Plaintiff's expert Ronald O'Halloran confirmed a blood concentration of methamphetamine in Mr. Motley's blood, but it was below the commonly seen levels in which deaths are attributed to direct methamphetamine cardio-toxic effects. (Plt. Sep. Stmt. #26). And the fact that Mr. Motley had a pulse after he lost consciousness indicates something other than the cardiotoxic effect of methamphetamine caused loss of consciousness since the heart was still beating enough to cause a palpable pulse. Rather, the likely cause of loss of consciousness according to Dr. O'Halloran was restraint asphyxia. (Plt. Sep. Stmt. #6, 26). The ultimately fatal asphyxia occurred during a struggle and prone (chest down) restraint procedures with the Redding police officers. (Plt. Sept. Stmt. #6). Mr. Motley was restrained prone in several ways with enough pressure to cause death from compressive asphyxia. This included chest compression by body weight and chest compression by figure four holds. This also included Mr. Motley's face being compressed into the dirt during prone restraint. (Plt. Sep. Stmt. #6).

Mr. Motley never threatened, assaulted or attempted to assault any of the Redding police officers. (Plt. Sep. Stmt. #24).

Mr. Motley sustained multiple injuries at the hands of the defendant officers, including but not limited to, scalp laceration, multiple abrasions throughout his body, most notably on his forehead and midline, and left eyebrow region, scalp hematomas with small subdural hemorrhage, left zygomatic fracture, brain trauma, possible spleen injury, multiple fractures and injuries to face, upper extremities and lower extremities. During his hospitalization he developed rhabdomyolysis and multiple organs system failure from his injuries. A detailed description of his injuries, their cause, and cause of death are detailed in a medical report prepared by Dr. Stephany E. Fiore for the District Attorney's Office, the Autopsy Report and the Decl. of Plaintiffs' expert Richard O'Halloran. (Plt. Sep. Stmt. #31). According to

Plaintiffs' expert, had Mr. Motley not been restrained the way he was on the day of the incident, he would not have died three days later. (Plt. Sep. Stmt. #23). Though cardiac function and respiratory function were restored by medical assistance within an hour of the restraint episode, consciousness was never restored and permanent brain damage was diagnosed at the hospital. Anoxic brain injury caused death through a continuous chain of physiologic malfunctions initiated and caused by the police restraint. (Plt. Sep. Stmt. #23).

The D.A.'s forensic pathologist, Dr. Stephany Fiore, opined that the scalp lacerations were consistent with the use of a linear object like a baton (Plt. Sep. Stmt. #6, 27). She noted that one of the blows caused the baton to shatter, and that the fractures to decedent's right forearm was consistent with a baton blow, or blows (Plt. Sep. Stmt. #6, 27). She stated "the large contusions on the backs of Mr. Motley's left thigh and calf were consistent with blows from a baton." The deep muscle injuries in his back and rib fractures could be from either blows with a baton or stomps or kicks with a heavy booted foot (Plt. Sep. Stmt. #6, 27). Dr. Fiore further opined that the methamphetamine present in his system was at the lower end of toxic level, and had little to do with his cardiac arrest. (Plt. Sep. Stmt. #6, 27).

### III. <u>LEGAL STANDARD</u>

Summary judgment is proper only when there is no genuine issue of material fact, and when viewing the evidence in the light most favorable to the nonmoving party, the movant is clearly entitled to judgment as a matter of law. See F.R.C.P. 56(c); *Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994). The Court must view the evidence presented in this motion in the light most favorable to Plaintiffs.

In judging evidence at the summary judgment stage, "the judge does not weigh conflicting evidence with respect to a disputed material fact…nor does the judgment make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions…these determinations are within the province of the factfinder at trial. Therefore at summary judgment, the judge must view the evidence in the light most favorable to

the nonmoving party. If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judgment must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractor's Association*, 809 F.2d 626, 630-31 (9th Cir. 1987).

Inferences must also be drawn in the light most favorable to the nonmoving party. Where the basic facts are undisputed, summary judgment should be denied if reasonable minds could differ on the inferences to be drawn from those facts. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158–59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987). The plaintiff, to survive the defendant's summary judgment, need only present evidence from which a rational trier of fact might return a verdict in his favor. *T.W. Elec., supra,* at 631.

Specific to Section 1983 cases, the Ninth Circuit has been instructive. Despite an officer's first-hand testimony to the contrary, entirely circumstantial evidence may be sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). As the Ninth Circuit has explained:

> "Deadly force cases pose a particularly difficult problem under [the summary judgment] regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story -- the person shot dead -- is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

## IV. ARGUMENT

### A. Plaintiffs' *Monell* Claim Is Not Subject To Dismissal

To establish Monell liability, Plaintiffs need prove only one of the following: (1) that the City had a policy, practice, or custom that encouraged deputies to ignore the mental state of individuals they come into contact with and use force against them without regard to it; (2) that the City failed to properly train its officers on proper restraint methods; and (3) that the City ratified the unconstitutional actions of the deputies. *Monell v. Dep't. of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

As to defendant City of Redding, the policies of the police department became its policies because the policies set by the department and its Chief 'may be fairly said to represent official City policy' on police matters." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (1991).

#### 1. Unconstitutional Policy, Custom, or Practice – Failure to Train

To show "policy," Plaintiffs need <u>not</u> present facts showing that similar conduct has repeatedly occurred in the past. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n.11 (1986). This standard would require a "strained" reading of Supreme Court precedent. *Id.* "[A] single instance of unconstitutional action by a non-policymaking employee of the [County] . . ." would be sufficient to impute liability to the [County], if "the unconstitutional act was taken pursuant to a municipal policy." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-24 (1985)). Where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants then can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under section 1983. *City of Canton Ohio v. Harris*, 489 U.S. 378, 389 (1989). See also, *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) [an inadequate training program is evidence of policy where the inadequacy amounts to

deliberate indifference to the rights of persons with whom the police regularly come into contact]. "[T]he need to train officers in the constitutional limitations of the use of force is 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights. *McKenzie v. Milpitas*, 738 F. Supp. 1293, 1301 (N.D. Cal. 1990), citing *Tennessee v. Garner*, 471 U.S. 1 (1985). Where a failure to train reflects a "deliberate" or "conscious" choice by the municipality the failure will be properly thought of as an actionable city policy. *Canton,* supra, at 379. In addition, the identified deficiency in training must be closely related to the ultimate injury. *Id.*

Such is the case here. Plaintiffs have set forth sufficient evidence of the defendant officers' unconstitutional actions enough to raise a material issue of fact on the adequacy of the City of Redding police department's training of its officers. This evidence includes the officers' own statements of how they restrained Mr. Motley as an acceptable use of force in accordance with their training. Applying proper restraints is a fundamental law enforcement task that requires specific training to address the potentials for injury and death to the person on whom the restraints are used. Plaintiffs set forth compelling evidence establishing the City's failure to train its officers with respect to the health consequences that could arise from applying body weight to a prone, handcuffed individual. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as positional (or restraint) asphyxia. (Plt. Sep. Stmt. #16). Proper training also covers the multiple effective options available such as avoiding compression of the chest, rolling the subject over on his side, sitting or standing the subject up, proper hobbling methods (which excludes hogtying), sitting the subject in the police unit." (Plt. Sep. Stmt. #16). Properly trained officers know that breathing requires two actions: increasing the size of the chest by expanding the ribs, and contracting the diaphragm, allowing air to fill the lungs. (Plt. Sep. Stmt. #16). When a person is lying face down, performing both of these functions can be more difficult. An

officer kneeling or lying the individual's back, aggravates the situation because the additional weight of the officer must be lifted along with the weight of the person's body. (Plt. Sep. Stmt. #16). The greater the weight or more intense the compression, the harder it becomes to breath. As a result, the suspect struggles more violently. (Plt. Sep. Stmt. #16) Officers are taught that they must assume that any person being restrained presents a risk of sudden and unexpected death. Officers are trained that they must act quickly to return the subject to an upright position. The risk that restraint asphyxia and accidental death will occur is only controlled by using proper restraining techniques.

Here, the officers failed to use the required more reasonable (less forceful) methods when dealing with Mr. Motley and striking him multiple times with batons, breaking bones in the process. When the officers delivered these blows to Mr. Motley's legs, arms, torso and head, this combined with the body weight of several officers on his legs and back escalated the incident into unnecessary and excessive violence. The officers improperly restrained Mr. Motley by keeping him prone with body weight applied, and by holding his legs back toward his buttocks thereby interfering with his ability to breath. (Plt. Sep. Stmt. #16). After Mr. Motley was handcuffed, he should have been brought to a seated position or at least placed on his side. The police officers here violated POST standards and police officer training with respect to restraint and positional asphyxia. (Plt. Sep. Stmt. #16).

The City of Redding failed in their training of their officers. The use of force on Mr. Motley and the manner in which he was restrained and beaten by five Redding police officers shows inadequate training. It would have been obvious to any reasonably trained officer that multiple baton strikes and restrained by application of body weight by five officers on a single subject who is in a prone position without access to weapons was excessive and unreasonable. (Plt. Sep. Stmt. # 15).

At a minimum, triable issues of material fact exist upon which a jury could find deliberate indifference to Mr. Motley's constitutional rights based on the need

for more specific training on restraint applications and the use of force with a baton; and that the inadequacies within the City's general use of force policy were likely to result in the deprivation of Mr. Motley's constitutional rights; and that the City's policy makers were deliberately indifferent to that need. See *Canton,* supra at 388-92.

### 2. **Ratification**

"A policy or custom may be found . . . in the failure of an official 'to take any remedial steps after the violation.'" *Gomez v. Vernon*, 255 F.3d 1118, 1126-27 (9th Cir. 2001), citing *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). The issue of whether ratification occurred in this case is a question for the jury. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *see McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) (custom inferred from failure to reprimand or discharge). The City's failure to discipline officers involved in the incident ratified the deputies' unconstitutional acts and is evidence of approval of the officer's actions. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1088) (plurality); *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991). While a failure to discipline, by itself, is usually insufficient to establish municipal liability, when, as here, it is combined with the fact that the deputies' conduct was so outrageous that a reasonable administrator should have known that he or she should do something about it, a policy can be inferred from the City's failure to reprimand or discharge any deputy in connection with the constitutional violation. *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

The issue of whether ratification occurred in this case is a question for the jury. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). The City of Redding took no steps to change any policy, or train its staff in the proper arrest and control procedures. The City of Redding police department's failure to train and failure to amend its policies in light of this knowledge creates a triable issue of fact as to ratification of the officers' unconstitutional acts and is evidence of approval of the

their actions.  See *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) (plurality); *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *Larez*, supra; *Gomez v. Vernon*, 255 F.3d 1118, 1126-27 (9th Cir. 2001); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986).

Here, the City ratified the conduct of the police officers by ignoring the findings of the D.A.'s forensic pathologist/neuro pathologist, Stephany Fiore, M.D. who concluded that "methamphetamine alone had little to do with this arrest given the amount present". (Plt. Sep. Stmt. 29).  Dr. Fiori opined that other explanations for Mr. Motley's cardiopulmonary arrest may include a carotid sleeper hold; the weight of one or more individuals on Mr. Motley's back while he was in a prone position, particularly in conjunction with the effect of his head trauma; or the act of having Mr. Motley lying prone (hogtied or not), in an unconscious state.  (Plt. Sep. Stmt. 29).   Plaintiff's expert Ronald O'Halloran confirmed that Mr. Motley did not die as a result of excited delirium.

Additionally, the City failed to recognize the egregiousness of the defendant officers' failings with respect to restraint and positional asphyxia of Mr. Motley. The defendant officers violated POST standards in this regard and the Chief did nothing to discipline them or to re-train the department officers.   (Plt. Sep. Stmt. #15).  Instead, after this incident, the department's officers received "additional training for suspects exhibiting signs of "excited delirium" completely missing the point of the violent and out of control beating the defendant officers inflicted on Mr. Motley coupled with their disproportionate restraint holds on a suspect who was already substantially under control by the first officer on scene.   The fact that all of the defendant officers participated in this conduct, without any of them refraining or intervening, demonstrates the inadequacy of the police department training.  (Plt. Sep. Stmt. 15).

And while the D.A.'s office declined to file charges against the officers, it did raise questions about their use of force, particularly their use of baton strikes in an effort to subdue Mr. Motley.  (Plt. Sep. Stmt. #12).   The City's failure to require

retraining of the department's officers in this lethal method of subduing a suspect, or to discipline the defendant officers, is indicative of "acquiescence in the constitutional deprivations" of which the plaintiffs complain. *Larez,* supra, at 647.

The City also accepted the inaccurate characterizations on the death certificate prepared by the Sheriff's coroner. For "manner of death," the coroner wrote "accident" rather than "homicide." "Homicide" is the proper classification for death certificate purposes when it involves "death at the hands of other person(s)." It does not imply necessarily that the death was intentionally caused or that it was a criminal homicide. (Plt. Sep. Stmt. #28). "How the injury occurred" on the death certificate should reflect how the injury occurred that caused the death. "Pursuit crash" has no place on a death certificate since law enforcement's own investigation indicates the crash preceding the police assault of Mr. Motley caused no injuries. (Plt. Sep. Stmt. #28). The large scalp lacerations found on Mr. Motley after the assault would have bled copiously. (Plt. Sep. Stmt. No. 28). No blood was found in the crashed pickup, nor in the police car Mr. Motley drove after the crash. (Plt. Sep. Stmt. #28). No blood was observed on Mr. Motley when first observed by officer Townsley in the residence backyard, nor was blood seen on his hat found close to where he was restrained. (Plt. Sep. Stmt. #28). "Resisted arrest" on the death certificate adds nothing to understanding how injuries Mr. Motley sustained happened. (Plt. Sep. Stmt. #28).

While a failure to discipline, by itself, is insufficient to establish municipal liability, whereas here, such failure is combined with conduct that is so outrageous a reasonable administrator should have known to do something about it, a policy can be inferred from the County's failure to reprimand, retrain, or discharge in connection with the constitutional violation. *See Larez,* supra, at 646; *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("If that episode of such dangerous recklessness obtained so little attention and action by the [county] policymaker, [a] jury [is] entitled to conclude that it was accepted as the way things are done and have been done in [the County]." Here, none of the defendant officers

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

were reprimanded or even re-trained in the use of restraint and compression force. The City of Redding and its policy makers took no steps to ensure that their officers' conduct are being scrutinized in some form.

As opined by Plaintiff's expert Roger Clark, the failure to retrain and lack of discipline of the officers involved demonstrates systemic, organizational, and cultural patterns and practices which tacitly allow excessive and unnecessary force by the rank and file. (Plt. Sept. Stmt. #30). The responsibility for this condition rests with the Redding Police Department chain of command and the Chief of Police. (Plt. Sep. Stmt. #30).

Written policies prohibiting excessive force mean nothing without enforcement. Drawing all inferences in Plaintiffs' favor, summary judgment as to Plaintiffs' Monell claim should be denied.

### B. Plaintiffs' Claims Against Chief Paoletti Are Not Subject to Dismissal
#### 1. Official Capacity.

A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (1991). Chief Paoletti could be found liable in his official capacity if "policy or custom" [or a one-time decision by a governmentally authorized decisionmaker] played a part in the violation of federal law. Chief Paoletti is an official policymaker for the City on police matters. *Id.* Evidence that Chief Paoletti, an authorized policymaker on police matters made, or ratified a decision that deprived plaintiffs of their constitutional rights would suffice for official liability. *Id.*

Here, Chief Paoletti, like the City, ratified the conduct of the police officers by ignoring the findings of Dr. Fiore (Plt. Sep. Stmt. 29); and the D.A.'s office's concerns about the use of force used in this case, particularly their use of baton strikes in an effort to subdue Mr. Motley (Plt. Sep. Stmt. #12). Chief Paoletti's failure to require retraining of his department's officers in this dangerous method of subduing a suspect, or to discipline the defendant officers, is indicative of

"acquiescence in the constitutional deprivations" of which the plaintiffs complain. *Id*. Likewise, Chief Paoletti failed to recognize the egregiousness of the defendant officers' failings with respect to restraint and positional asphyxia of Mr. Motley. The defendant officers violated POST standards in this regard and the Chief did nothing to discipline them or to re-train the department officers. (Plt. Sep. Stmt. #15).

Plaintiffs have submitted sufficient evidence to raise a triable issue of material fact on Chief Paoletti's official capacity liability, and defendants' motion in this regard should be denied.

### 2. **Individual Capacity.**

Chief Paoletti may be liable in his individual capacity if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury;" supervisory liability is imposed against a supervisory official in his individual capacity for his "own culpable action or inaction in the training, supervision, or control of his subordinates;" for his "acquiescence in the constitutional deprivations of which the complaint is made;" or for conduct that showed a "reckless or callous indifference to the rights of others." *Lazar*, supra, at 646.

As in the *Lazar* case, Chief Paoletti, in his individual capacity, was responsible for the constitutional deprivations alleged in the Bianco Complaint and the McCain Complaint because he condoned, ratified, and encouraged the excessive use of force. Also as in the *Lazar* case, Plaintiffs' expert witness, armed with both many years of practical police experience and P.O.S.T. standards opines that the lack of retraining or adequate discipline of the police officers involved is indicative of their collective ratification of what occurred and that it is wrong. (Plt. Sep. Stmt. #30). The Chief neither disciplined them, nor established new procedures for averting the reoccurrence of similar excesses in the future. (Plt. Sep. Stmt. #30). As stated above, it demonstrates systemic, organizational, and cultural patterns and

-14-
PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

practices which tacitly allow excessive and unnecessary force by the rank and file; and the responsibility rests with the Redding Police Department chain of command and the Chief of Police. (Plt. Sep. Stmt. #30).

## V. <u>CONCLUSION</u>

For the reasons stated, it is respectfully requested that this Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: March 16, 2017                    LAW OFFICES OF VICKI I. SARMIENTO
                                                             LAW OFFICES OF DALE K. GALIPO


                                                       By_____*/s/ Vicki I. Sarmiento*_____
                                                            Vicki I. Sarmiento
                                                            Attorneys for Plaintiffs