| | |
|---|---|
| L.M. by and through her Guardian Ad Litem ASHELY MCCAIN, individually and as successor in interest to the Estate of STEVEN MOTLEY; CAROL ADAMS, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF REDDING, CHIEF ROBERT F. PAOLETTI, OFFICER JARED HEBERT, OFFICER WES TOWNSLEY, OFFICER BRANDON LARGENT, OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY; and DOES 1-10, inclusive,<br><br>Defendants. | Lead Case No.: 2:14 CV-00767 MCE-AC<br><br>(Consolidated Case No.: 2:14 CV-01736-TLN-CMK)<br><br>**DECLARATION OF RONALD L. O'HALLORAN, M.D. IN SUPPORT OF OPPOSITION TO DEFENDANTS CITY OF REDDING AND ROBERT F. PAOLETTI'S MOTION FOR SUMMARY JUDGMENT** |
| S.M-B, a minow, by and through his Guardian Ad Litem DAWN BIANCO, individually and as successor in interest to the estate of STEVEN MOTLEY,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF REDDING, a municipal corporation; ROBERT F. PAOLETTI, JARED HEBERT, WES TOWNSLEY, BRANDON LARGENT, BECKY ZUFALL, CHRIS JACOBY; and DOES 1 to25, inclusive,<br><br>Defendants. | |

## DECLARATION OF RONALD O'HALLORAN, M.D.

I, Ronald O'Halloran, M.D., declare and state as follows:

1. I am a forensic pathologist and have been retained as an expert by plaintiffs' counsel in the case of L.M., et al. v. City of Redding, et. al.

2. I am personally familiar with the facts set forth herein and would and could

competently testify thereto if called upon to do so.

3. My curriculum vitae is attached hereto as Exhibit 1.

4. I have reviewed and analyzed the Sheriff- Coroner records including the autopsy report, the coroner's investigation report, the toxicology reports, autopsy photos, original and amended death certificate, medical records from Mercy Hospital and Mercy San Juan Medical Center, Dr. Stephany Fiore forensic pathology consultation report, deposition transcripts of the involved officers, the deposition of Dr. Arnold Josselson, transcripts of interviews with incident witnesses Dane Spence and Katie Garroutte, and Shascom Radio Traffic.

5. In my opinion, Mr. Motley did not die of "excited delirium" aka excited delirium syndrome ("EDS"). Mr. Motley lacked most of the traits described in cases of EDS. He did not exhibit symptoms of delirium before he was restrained and he did not talk as if he was delirious after he was restrained according to police reports. He was not hyperthermic according to medical records. He did not have a primary cardiac arrest by history.

6. To a reasonable degree of medical probability, Mr. Motley died from restraint asphyxia with compression. The asphyxia caused loss of consciousness, hypoxic brain damage and cardiac arrest. The ultimately fatal asphyxia occurred during a struggle and prone (chest down) restraint procedures with the Redding police officers. Mr. Motley was restrained prone in several ways with enough pressure to cause death from compressive asphyxia. This included chest compression by body

weight and chest compression by figure 4 leg holds. This also included Mr. Motley's face being compressed into the dirt during prone restraint.

7. Mr. Motley was compressed for at least four minutes by officer Townsley (235 pounds with gear) sitting and laying on Mr. Motley's back before he was ultimately handcuffed. Before the other officers arrived, Mr. Motley was temporarily rendered unconscious by officer Townsley as he applied a carotid artery neck hold. He was struck numerous times with police batons, including on his head per autopsy findings, which caused numerous injuries including leg and arm fractures. After baton blows, officer Townsley reported Mr. Motley suddenly went from actively struggling to being totally limp.

///

8. From the time Mr. Motley was handcuffed until officer Jacoby radioed that Mr. Motley was unresponsive was 7 minutes and 40 seconds. Mr. Motley was prone most of the time after he was handcuffed and being searched with some side to side movement.

9. Motley's upper body was held down after the search by officer Largent according the officer Smyrnos' report. Largent (250 pounds with gear) said he was holding Mr. Motley's shoulder with his hand but also was holding the back of Mr. Motley's neck after the search. Officer Largent said Mr. Motley was biting dirt and his face was covered with dirt at this time. Concurrently, officer Zufall (162 pounds with

gear) and then Smyrnos (190 pounds with gear) were holding Mr. Motley compressed in a figure 4 leg hold with their weight.

10. It is generally known and accepted in medical literature, research, and observations that after 3-5 minutes of asphyxia the brain can be permanently damaged by anoxia and death can follow because of the lack of oxygen supply to the brain. It is physiologically known that severe physical exertion, such as experienced by Mr. Motley before and during the struggle with police, increases the body's demand for more oxygen. Restriction of breathing with increased oxygen demand can lead to loss of consciousness in less than 3 minutes from hypoxia. Mr. Motley was exerting himself during most of the 13 minute struggle with police and was in restricted breathing situations during almost all of that time.

11. Mr. Motley lost consciousness well before he lost his cardiac pulse. Near the end of the restraint period, officer Smyrnos reported that while he had Mr. Motley in a figure 4 leg hold and officer Largent was holding Mr. Motley's upper body to the ground, he noticed Mr. Motley's breathing appeared to be labored, his pupils were dilated and fixed, and he was not responding to attempts by officers to speak to him. During this period, officer Largent said they were waiting for officer Jacoby to return with leg hobbles, and they noticed a color change in Mr. Motley and his body seemed to relax.

12. After Mr. Motley lost consciousness, Officer Largent testified that he did feel

a neck pulse. Feeling a pulse in the neck indicates Mr. Motley's heart was still beating after he lost consciousness. It supports the evidence that Mr. Motley was asphyxiated rather than having a primary cardiac arrest event. The first EKG obtained by paramedics at the scene was pulseless electrical activity, a finding common in cases of asphyxia.

13. Had Mr. Motley not been restrained the way he was on the day of the incident, he would not have died three days later. Though cardiac function and respiratory function were restored by medical assistance within an hour of the restraint episode, consciousness was never restored and permanent brain damage was diagnosed at the hospital. Anoxic brain injury caused death through a continuous chain of physiologic malfunctions initiated and caused by the police restraint.

14. Mr. Motley's blood concentration of methamphetamine was below the commonly seen levels in which deaths are attributed to direct methamphetamine cardio-toxic effects. And the fact that Mr. Motley had a pulse after he lost consciousness indicates something other than the cardiotoxic effect of methamphetamine caused loss of consciousness since the heart was still beating enough to cause a palpable pulse. The likely cause for the loss of consciousness was restraint asphyxia.

15. The death certificate would more accurately be certified as follows: "Manner of death" should have been "homicide," not an "accident" because the "homicide" classification for death certificate purposes is "death at the hands of other

6
DECLARATION OF RONALD O'HALLORAN, M.D. IN SUPPORT OF OPPOSITION TO DEFENDANTS CITY OF REDDING AND ROBERT F. PAOLETTI'S MOTION FOR SUMMARY JUDGMENT

person(s)." It does not imply necessarily that the death was intentionally caused or that it was a criminal homicide. "How the injury occurred" on the death certificate should reflect how the injury that caused death happened. "Pursuit crash" has no place on a death certificate since law enforcement's own investigation indicates the crash preceding the police assault of Mr. Motley caused no injuries. The large scalp lacerations found on Mr. Motley after the assault would have bled copiously. No blood was found in the crashed pickup, nor in the police car Mr. Motley drove after the crash. No blood was observed on Mr. Motley when first seen by officer Townsley in the residence backyard, nor was blood seen on his hat found close to where he was restrained. "Resisted arrest" on the death certificate adds nothing to understanding how injuries Mr. Motley sustained happened.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct, and that this declaration was executed on March_15_, 2017 at _Henderson___, Nevada.

*Ron O'Halloran*

Ronald O'Halloran, M.D.

# EXHIBIT "1"

# CURRICULUM VITAE
# Ronald L. O'Halloran, M.D.

November, 2016

## ADDRESS AND PHONE:

Home:   2710 Grand Forks Road
        Henderson, NV 89052
        Phone (805) 647-5198

## COLLEGE EDUCATION:

*Gonzaga University*
Spokane, Washington
Psychology and Pre-medicine, BA, 1972
Honors:    Honor Society
           Graduation - Summa Cum Laude

## MEDICAL SCHOOL EDUCATION:

*Oregon Health Sciences University*
Portland, Oregon
*Doctor of Medicine*, 1977
Honors: Sneeden Award for Excellence in Pathology, 1977

## MEDICAL INTERNSHIP AND RESIDENCY TRAINING:

Anatomic Pathology:   *Oregon Health Sciences University*
                      Department of Pathology,
                      Portland, Oregon, 1974 - 1977
                      Student Fellowship in Pathology

                      *U.C.L.A. Hospitals and Clinics*
                      Department of Pathology
                      Los Angeles, California, 1977 - 1979
Forensic Pathology:   *Office of the Chief State Medical Investigator*
                      University of New Mexico
                      Albuquerque, New Mexico, 1979

                      *Oregon State Medical Examiner Office*
                      Portland, Oregon, 1980 -1981

## PROFESSIONAL BOARD CERTIFICATIONS:

American Board of Pathology
Certification in *Anatomic Pathology* - November, 1980

American Board of Pathology
Certification in *Forensic Pathology* - May, 1981

## ASSOCIATIONS:

Former:	Oregon Pathologists Association
	Washington County Medical Society (Oregon)
	Tri-counties Investigators' Association (CA)
	American Medical Association
	California State Coroners Association

Current:	National Association of Medical Examiners
	International Association of Coroners and Medical Examiners

## FORMER POSITIONS:

Deputy Chief Medical Examiner,
    State of Oregon, 1979-1985
Washington County Medical Examiner,
    Oregon, 1983-1985
Instructor in Anatomic and Forensic Pathology,
    University of Oregon Medical School, 1979-85
Clinical Assistant Professor, Department of Pathology,
    Division of Forensic Studies,
    University of Oregon Dental School, 1984-85
Assistant Chief Medical Examiner
    Ventura County, California, 1985-92
Chief Medical Examiner - Coroner
    Ventura County, California, 1993-2012 (retired)
Forensic Pathologist, Department of Medicine,
    Ventura County Medical Center, 1985-2013

## CURRENT POSITIONS:

Forensic Pathology Consultant, 1980-present

## OTHER APPOINTMENTS:

Lecturer - Ventura County Criminal Justice
Training Center, 1986-2012

Lecturer - Basic Coroner Academy, California Board of
Police Standards and Training, 1989-2012
Lecturer - Ventura County Traffic Accident
Investigators School, 1990-2012
Ventura County Child Death Review Team, 1988-2008

MEDICAL LICENSURE:

Oregon, 1979-2015
California, 1978-79, 1985-present (active status)

OTHER AWARDS:

*1996 Manager of the Year*
California State Coroners' Association
*2011 Mentoring/Teaching Award*
Ventura County Management Council

PUBLICATIONS:

1. Atypical Papillary Hyperplasia of the Pancreatic Duct Mimicking Obstructing Pancreatic Carcinoma. New England Journal of Medicine: 301; 531-532, Sept 6, 1979.

2. Deaths during the May, 1980, Eruption of Mount St. Helens. New England Journal of Medicine. 305: 931-936, Oct. 15, 1981.

3. Three Fatalities in a Flash Fire with Variable Dental Charring. American Journal of Forensic Medicine and Pathology. 6(3): 248-249, Sept., 1985.

4. Age and Ossification of the Hyoid Bone: Forensic Implications. Journal of Forensic Sciences. Vol. 32(6): Nov., 1987.

5. Autoerotic Asphyxial Death Following Television Broadcast. Journal of Forensic Sciences. Vol. 33(6): 1493-94, Nov., 1988.

6. Death by Embolization of Prosthetic Aortic Valve. American Journal of Forensic Medicine and Pathology. Vol. 12(I): 80-81, March, 1991.

7. Autoerotic Fatalities with Power Hydraulics. Journal of Forensic Sciences. JFSCA. Vol. 38, (2): 359-364, March, 1993.

8. An Accidental Death Related to Cocaine, Cocaethylene and Caffeine. Presented at the 1993 American Academy of Forensic Sciences Annual Meeting, Boston. Journal of Forensic Sciences, JFSCA, Vol. 38(6): 1513-1515, November, 1993.

9. Restraint Asphyxiation in Excited Delirium. American Journal of Forensic Medicine and Pathology. Vol. 14(4): 289-295. Dec., 1993.

10. The Author's Response. (Letter to the Editor re: Restraint Asphyxia Death Certification) American Journal of Forensic Medicine and Pathology. Vol. 15, (4): page 348, Dec. 1994.

11. Child Abuse Reports in Families with Sudden Infant Death Syndrome. American Journal of Forensic Medicine and Pathology. Vol.19(1):57-62, March, 1998.

12. Age and Sex-Related Variation in Hyoid Bone Morphology. Journal of Forensic Sciences. 1998; Vol. 43(6):1138-1143.

13. Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases. American Journal of Forensic Medicine and Pathology. March 2000; 21(1):39-52.

14. The Authors' Reply. (Letter to the Editor re: Restraint Asphyxia Diagnosis) American Journal of Forensic Medicine and Pathology. Dec. 2000; 21(4): p 420.

15. Reenactment of Circumstances in Deaths Related to Restraint. American Journal of Forensic Medicine and Pathology. Sept. 2004 Vol. 25(3): pp 190-193.

16. Tied Up and Isolated in the Schoolhouse. WK Mohr, J LeBel, RL O'Halloran, C Preustch. The Journal of School Nursing. April 2010 Vol. 26(4): pp 91-101

17. Restraint and Seclusion Use in U.S. School Settings: Recommendations From Allied Treatment Disciplines. J LeBel, MA Nunno, WK Mohr, RL O'Halloran American Journal of Orthopsychiatry. January 2012 Vol. 82(1): pp 75–86.

18. California: Home of the Sheriff-Coroner. Academic Forensic Pathology. 2014 4 (1): 74-79.

## SELECTED LECTURES GIVEN:

1. *Oregon State Medical Examiner Death Investigation Seminars.* 1980-1985. All aspects of forensic death investigation.

1. *"Sudden Death from Natural Causes."* Oregon Health Sciences University Medical School. 1980-1985.

2. *"Sudden Death in Alcoholics."* Oregon Pathologists Association. 1983.

3. *"Postmortem Time of Death Determination; Postmortem Identification; Functions of Medical Examiner/Coroner".* Ventura County Sheriff's Academy. 1986 to present.

4. *"Postmortem Identification."* International Association of Forensic Identification, California Division. 1989 Annual Conference.

5. *"Investigation of Traffic Fatalities."* Ventura County Sheriff Traffic Investigator School. 1990 to present.

6. *"The Dead Body as Evidence."* Pepperdine University School of Law. 1993-1996.

7. *"Investigating Asphyxial Deaths in Custody."* Los Angeles Correctional Medical Service. 1994.

8. *"Positional/Restraint Asphyxial Deaths."* California Coroners Association Annual Training Conference. 1994.

9. *"Investigating Traffic Fatalities."* International Association of Medical Examiners and Coroners Annual Conference. 1995.

10. *"Sudden Infant Death Syndrome vs. Child Abuse."* California SIDS Program Training Seminar. 1995.

11. *"Restraint Asphyxia in Custody: the Ventura County Experience."* National Association of Medical Examiners Annual Conference. 1995.

12. *"The Dead Body as Evidence."* Ventura County Emergency Medical Services Second Annual Conference. May 24, 1996.

13. *"Death by Asphyxia and Restraint."* Ventura County Emergency Medical Services Third Annual Conference. June 5, 1997.

14. Lecturer, California POST certified "Basic Death Investigation" course. Addressing *Time of Death, Postmortem Changes, Postmortem Identification, Asphyxial Deaths, Blunt and Sharp Force Injuries, Traffic Fatalities* and *Gunshot Wounds*. 1987-1999.

15. *"Positional Asphyxia and Restraint Asphyxia"*. Ventura County Police and Sheriff Patrol Commander Meeting. April 23, 1998.

16. *"Asphyxia, Sudden Death and In-Custody Restraint"*. California State Coroner Association Advanced Training Program. Riverside, CA. September 22, 1998.

17. *"Restraint Asphyxia: Asphyxia by Chest Compression during Prone Restraint."* Los Angeles County Medical Examiner CME Death Investigation Conference. May 27, 1999.

18. *"How to Interpret an Autopsy Report."* California Public Defenders Association. Training meeting in Oxnard. November 20, 1999.

19. *"The Crash of Alaska Flight 261 - Medical Examiner Operations and Identification Issues"* Ventura County Emergency Medical Services Sixth Annual Conference. June 2, 2000.

20. *"How and When a Physician Should Sign a Death Certificate."*
    - ☐ VCMC Medicine Staff Conference, September 11, 1997.
    - ☐ St. John's & Los Robles Regional Medical Center's CME Conference, Sept. 26, 2000.

- ☐ VCMC Family Practice Resident Physician Conference, Feb. 21, 2007.

21. *"The Crash of Alaska Flight 261 - Medical Examiner Operations and Identification Issues"*. California Emergency Services Association Annual Conference. South Lake Tahoe, CA. October 18, 2000.

22. *"Manner of Death Determination; Restraint Asphyxia; the Crash of Alaska Flight 261 - Medical Examiner Operations and Identification Issues"*. California State Coroner Association Advanced Training Program. Ventura, CA. September 18-21, 2001.

23. *"How a Medical Examiner Uses Postmortem Toxicology"*. California Association of Toxicologists meeting. Ventura, CA. November 2, 2002.

24. *"Videotaped re-enactment of Deaths during Restraint."* Presented at the National Association of Medical Examiners Annual Meeting. October, 2003.

25. *"Restraint Asphyxia and the Sudden In-Custody Death Syndrome."* California State Coroner Association Advanced Symposium. Riverside, CA. Sept. 2008.

26. *"Restraint Asphyxia and the Sudden Custody Death Syndrome."* Institute for the Prevention of In-Custody Death 4th Annual Meeting. Las Vegas, Nevada. November 2009.

27. *"Restraint Asphyxia Deaths: Contributing Factors, Misconceptions and Preventive Strategies."* Institute for the Prevention of In-Custody Death 9th Annual Meeting. Las Vegas, Nevada. November 2009.