LAW OFFICES OF VICKI I. SARMIENTO
A Professional Corporation
VICKI I. SARMIENTO, SBN 134047
333 North Garfield Avenue
Alhambra, California 91801
Telephone: (626) 308-1171
Facsimile : (626) 308-1101

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

*Attorney for Plaintiffs L.M, Carol Adams and S.M-B*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.M. by and through her Guardian Ad Litem ASHELY MCCAIN, individually and as successor in interest to the Estate of STEVEN MOTLEY; CAROL ADAMS, individually, <br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF REDDING, CHIEF ROBERT F. PAOLETTI, OFFICER JARED HEBERT, OFFICER WES TOWNSLEY, OFFICER BRANDON LARGENT, OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY; and DOES 1-10, inclusive ,<br><br>Defendants.| Lead Case No.: 2:14 CV-00767 MCE-AC<br><br>(Consolidated Case No.: 2:14 CV-01736-TLN-CMK)<br><br>**DECLARATION OF ROGER CLARK IN SUPPORT OF OPPOSITION TO DEFENDANTS CITY OF REDDING AND ROBERT F. PAOLETTI'S MOTION FOR SUMMARY JUDGMENT** |
| S.M-B, a minow, by and through his Guardian Ad Litem DAWN BIANCO, individually and as successor in interest to the estate of STEVEN MOTLEY,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF REDDING, a municipal corporation; ROBERT F. PAOLETTI, JARED HEBERT, WES TOWNSLEY, BRANDON LARGENT, | |

BECKY ZUFALL, CHRIS JACOBY; and
DOES 1 to 25, inclusive,

    Defendants.

# DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST

accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. Since my retirement, I have been accepted by court and testified as an expert on juvenile procedures, juvenile custody, jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, bullet casings and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

8. I was retained to consult in this case regarding the claims set forth in Plaintiffs' Second Amended Complaint. I have read the City of Redding and Robert F. Paoletti's respective Motion for Summary Judgement, and all declarations in support of their motion. I have read the depositions of the involved officers, their interviews to internal affairs, civilian interviews, and have reviewed scene photos and the SHASCOM radio traffic.

9. Based on my review of the depositions of the involved officers, officer interviews, as well as witness interviews, there is disputed evidence that Mr. Motley "resisted violently," or that he "continued to strenuously resist the officers attempting to place him in handcuffs."

10. There is nothing in the record that Mr. Motley sought to assault any officer, that he uttered any threats, that he attempted to enter a residence, that he displayed a weapon, or that he inflicted injury on any of the involved officers.

11. After catching up to Mr. Motley who had fled on foot, Officer Townsely tased him. Officer Townsley then got on top of Mr. Motley's back and started pain compliance techniques, then started punching him in the jaw with both hands on both sides of his jaw to render him unconscious. Mr. Motley was described as stunned and at this point Townsley put him in a carotid restraint causing Mr. Motley to go unconscious. Officer. Townsley took out his handcuffs, but before he could put them on, the other officers arrived and started beating Mr. Motley with batons. Before the

4

DECLARATION OF ROGER CLARK IN SUPPORT OF OPPOSITION TO DEFENDANTS CITY OF REDDING AND ROBERT F. PAOLETTI'S MOTION FOR SUMMARY JUDGMENT

other officers arrived, Officer Townsley had Mr. Motley subdued. According to civilian witnesses, he was just laying there moaning in pain. According to Officer Townsely, the situation was under control and Mr. Motley was not resisting; Townsley was on top of Mr. Motley's back, he had him contained with just one hand, telling him calmly "stop resisting me," and he was calling for backup.

12. According to civilian witness statements, when the four officers arrived on the scene after Townsley already had Mr. Motley subdued, they were running to the scene, yelling "get him, get him" with their batons raised, and then started violently striking Mr. Motley about his arms, ribs, legs, head, and body.

13. The City of Redding failed in their training of their officers. The use of force on Mr. Motley and the manner in which he was restrained and beaten by five defendant officers shows inadequate training. It would have been obvious to any reasonably trained officer that multiple baton strikes and restraint by application of body weight by five officers on a single subject who is in a prone position without access to weapons was excessive and unreasonable. The fact that five defendant officers all participated in this conduct, without any of them refraining or intervening, demonstrates the inadequacy of the police department's training.

14. The officers improperly restrained Mr. Motley by keeping him prone with body weight applied, and by holding his legs back towards his buttocks thereby interfering with his ability to breath. From the time Mr. Motley was handcuffed until

officer Jacoby radioed that Mr. Motley was unresponsive, 7 minutes and 40 seconds had elapsed.

15. The officers violated POST standards and police officer training with respect to restraint and positional asphyxia.

16. There was no retraining or adequate discipline of the police officers involved in this incident which is indicative of ratification of what occurred. he only evidence of re-training is additional training on "excited delirium" but no evidence on how to avoid the restraint applied to individuals in custody.

17. Officers are trained that any use of force on an individual's neck is significant and can result in death. Officer Townsley testified he applied a "carotid restraint" on Mr. Motley.

18. The carotid restraint control hold can reduce officer injuries as well as serious injuries to subjects and potential for in-custody death by providing a force option that does not rely upon electrical load (taser), pain, or blunt force trauma to gain control of the individual. A proper use of the carotid restraint would have rendered Mr. Motley unconscious within seconds and would have precluded any further use of force because he would have been unconscious and totally unable to resist the application of handcuffs.

19. If Mr. Motley continued to struggle, as alleged by the officers, then Mr. Townsley applied a chokehold (and not a carotid restraint hold) which restricts the flow of air into the lungs and caused Mr. Motley to struggle to breathe.

20. Officers are taught that among other obvious injuries, the use of the baton can cause deep bruising and clotting that can eventually reach the heart and/or lungs and cause stroke and/or death.

21. The use of a baton is justified only as a response to aggressive or combative acts. Here, the evidence is in dispute as to whether Mr. Motley was ever combative and most of the description (even by the officers) indicate that Mr. Motley was in a prone position on the ground, with officer Townsley on top of him, while the police officers struck him repeatedly with their batons causing injuries to his arms, ribs, legs, head, body, breaking bones and causing internal and external bleeding.

22. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as positional (or restraint) asphyxia. Proper training also covers the multiple effective options available such as avoiding compression of the chest, rolling the subject over on his side, sitting or standing the subject up, proper hobbling methods (which excludes hogtying), sitting the subject in the police unit. Properly trained officers know that breathing requires two actions: increasing the size of the chest by expanding the ribs, and contracting the diaphragm, allowing air to fill the lungs. When

a person is lying face down, performing both of these functions can be more difficult. An officer kneeling or lying on the individual's back, aggravates the situation because the additional weight of the officer must be lifted along with the weight of the person's body. The greater the weight or more intense the compression, the harder it becomes to breathe. As a result the suspect struggles more violently.

23. Officers are taught that they must assume that any person being restrained presents a risk of sudden and unexpected death. Officers are trained that they must act quickly to return the subject to an upright position. The risk that restraint asphyxia and accidental death will occur is only controlled by using proper restraining techniques.

24. The officers failed to use the required more reasonable (less forceful) methods when dealing with Mr. Motley and struck him not less than 12 times, breaking bones in the process. When the officers delivered 12 baton strikes to Mr. Motley's legs, arms, torso, and head, this combined with body weight on him escalated the incident into unnecessary and excessive violence. Defendants' use of force in this set of facts was exceptionally reckless and movements by Mr. Motley are consistent with efforts to raise himself to breathe.

25. The officers improperly restrained Mr. Motley by keeping him prone with body weight applied, and by holding his legs back toward his buttocks thereby interfering with his ability to breathe.

26. After Mr. Motley was handcuffed, he should have been brought to a seated position or at least placed on his side.

27. The police officers violated POST standards and police officer training with respect to restraint and positional asphyxia.

28. The City of Redding and Chief Paoletti ratified the conduct of the defendant police officers because there was no retraining or adequate discipline of the police officers involved. This demonstrates systemic, organizational, and cultural patterns and practices which tacitly allow excessive and unnecessary force by the rank and file. The responsibility for this condition rests with the Redding Police Department chain of command and the Chief of Police.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct, and that this declaration was executed on March 16, 2017 at Santee, California.

_Roger A. Clark_
Roger A. Clark