# EXHIBIT "A"



# ANDERSON DEPOSITION REPORTING
### Certified Shorthand Reporters

542 Union Street  
Red Bluff, California 96080

Ph: 530.527.7051  
Fax: 530.529.9543

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

L.M. by and through her Guardian ad
Litem ASHLEY MCCAIN, individually and
as successor in interest to the Estate
of STEVEN MOTLEY; CAROL ADAMS,
individually,

        Plaintiffs,

vs.                No. 2:14-cv-00767-MCE-AC
                     (Consolidated Case No:
                     2:14-cv-01736-TLN CMK)

CITY OF REDDING, CHIEF ROBERT F.
PAOLETTI, OFFICER JARED HEBERT, OFFICER
WES TOWNSLEY, OFFICER BRANDON LARGENT,
OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY;
and DOES 1 through 10, inclusive,
        Defendants.
_____/

S.M-B, a minor, by and through his Guardian
ad Litem DAWN BIANCO, individually and
as successor in interest to the estate
of STEVEN MOTLEY,
        Plaintiffs,

vs.

CITY OF REDDING, a municipal corporation;
ROBERT F. PAOLETTI, JARED HEBERT,
WES TOWNSLEY, BRANDON LARGENT,
BECKY ZUFALL, CHRIS JACOBY; and
DOES 1 to 25 inclusive,
        Defendants.
_____/

                DEPOSITION OF WESLEY TOWNSLEY
                  Thursday, June 23, 2016
                    Redding, California

SHEILA ANDERSON, C.S.R.        License No. 12778

1         MR. GALIPO:  Thank you.
2         THE WITNESS:  The problem I run into is, with
3  the heart rate, my heart rate racing and adrenaline
4  racing, your -- your ability to tell time is skewed
5  massively.  I don't know.  It felt like it was five or
6  six minutes.
7  BY MR. GALIPO:
8      Q    Okay.  And you mentioned when backup arrived,
9  that Mr. Motley was essentially chest down.
10     A    Yes, sir.
11     Q    At some point, did it appear that Mr. Motley
12 stopped resisting, just moving forward?
13     A    No, sir.  He -- he actively tried to get away
14 the whole time.
15     Q    Well, at some point, as I understand the
16 reports and statements that I've read, he appeared to go
17 unconscious and become unresponsive.
18     A    I'm sorry.  You mean at the conclusion?
19     Q    Yeah.  At any time.
20     A    Okay.  At the very end, he did.  I don't
21 know -- I'm not sure what caused him to stop, but as
22 soon as he stopped struggling, Corporal Jacoby and me at
23 least said, let's get him in handcuffs, and I got off of
24 him and grabbed his right arm, and we put him in
25 handcuffs.

1    Q    Okay. So would it be correct to say that
2  Mr. Motley was in a chest-down position for some period
3  of time before backup officers arrived?
4    A    Yes.
5    Q    And would it be correct to say you were trying
6  to hold him down in that position?
7    A    Yes, sir.
8    Q    Did you get the impression at times that it
9  felt like he was trying to lift up?
10   A    Yes.
11   Q    And when you felt that, were you trying to use
12 your leverage or body weight to keep him down to the
13 ground?
14   A    Yes, sir.
15   Q    And when it appeared that he stopped
16 resisting -- and I realize we're moving forward, and I'm
17 going to give you a chance to explain it step by step.
18   A    Okay.
19   Q    But when he stopped resisting, was he still in
20 a chest-down position?
21   A    Yes, sir.
22   Q    Okay. And would he have been in a chest-down
23 position from the time that the office -- the backup
24 officers arrived, up to the time he stopped resisting?
25   A    To my recollection, yes. He was in the

1   chest-down position that whole time.
2       Q    Okay.  And you're saying that after he stopped
3   resisting, that's when he was handcuffed?
4       A    Yes, sir.
5       Q    Okay.  And did you see him resisting at all
6   after he was handcuffed?
7       A    No, sir.  I actually left the area immediately
8   after his handcuffs were placed on him.
9       Q    Okay.  Do you recall what he was wearing?
10      A    No.
11      Q    Do you recall where he was when you first saw
12  him?
13      A    He was right by the fence at the back of the
14  yard.
15      Q    Could you see his hands at that time?
16      A    Initially, when I was approaching from behind
17  him, I came from the side of him, and yes, I could see
18  his hands there.  And when I approached him from behind,
19  I couldn't see his hands anymore at that point.
20      Q    Okay.
21      A    So there was a point where I could, yes.
22      Q    When you initially saw his hands, were you
23  trying to determine if he had anything in his hands?
24      A    Yes.
25      Q    And at that point, did he appear to have

```
 1   it some distance away, did you ever see Mr. Motley try
 2   to grab that knife?
 3       A    No.
 4       Q    Did Mr. Motley ever punch you?
 5       A    No, he didn't.
 6       Q    Did you ever see him punch anyone else?
 7       A    No.
 8       Q    Did you yourself have any physical injuries in
 9   this incident?
10       A    I had some bruising that showed up a couple
11   days later, but directly after the incident, I didn't
12   see anything.
13       Q    You didn't have to go to the hospital or
14   anything like that?
15       A    No, sir.
16       Q    Okay.  Had you seen Mr. Motley before?
17       A    Not that I recall.
18       Q    For example, did you know if he had a criminal
19   history or not?
20       A    No.
21       Q    Did you know whether he had ever been to jail,
22   for example?
23       A    No.
24       Q    Was it your understanding that he was driving
25   or at least potentially driving initially a stolen
```

1 your training, that deadly force would have been
2 appropriate?
3    A    Yes.  Initially, when he was getting into
4 Officer Hebert's patrol car, I believed it would have
5 been appropriate to use deadly force at that point.
6    Q    How about -- but you chose not to.
7    A    I chose not to, yes, sir.
8    Q    Okay.  How about when the struggle was going
9 on?  At any point in time, based on your training, did
10 you think it would be appropriate to use deadly force?
11    A    No, I didn't.
12    Q    Is your training on deadly force, that it's
13 force likely to cause death or serious bodily injury?
14    A    Yes.  Well, I believe so.
15    Q    Up to the time of the carotid restraint, any --
16 any other type of force that you used, that you can
17 think of, that we haven't talked about so far?
18    A    I think we've talked about everything.
19    Q    Okay.  The multiple control holds that you
20 referred to earlier, the wrist locks would be one form
21 of control hold; correct?
22    A    Yes, sir.
23    Q    Was there other types of control holds you were
24 using?
25    A    I don't believe I used any other control holds.

1  the backpack?
2       A    No.  Which I found odd.
3       Q    Well, one possibility is he didn't have any
4  contraband in there, isn't it?
5       A    But it is still an encumbrance on him when he's
6  trying to get away from the police.
7       Q    Do you have any knowledge that there was any
8  contraband found in the backpack?
9       A    No.  I had no idea what was in the backpack.
10      Q    Did you have any impression as to whether, you
11 know, there was something in it, whether it was full or
12 empty during this struggle?
13           MR. FISHER:  Objection; calls for speculation.
14           THE WITNESS:  I remember it seemed full.
15 BY MR. GALIPO:
16      Q    Okay.  In relation to him coming back to, after
17 the carotid restraint, do you have any sense of when the
18 other officers got there?  How long after that?
19      A    It was minutes.  I don't know how many.  It was
20 definitely the shorter side of the time that we were
21 fighting.
22      Q    So there's some -- it sounds like there's some
23 period of time that the struggle takes place before the
24 carotid restraint.  Is that fair?
25      A    Yes, sir.

1      Q     And during that time, almost the entire time,
2  with the exception of him attempting to turn towards you
3  as you described, he was chest down?
4      A     I believe so.
5      Q     And then when you put him in the carotid
6  restraint, he was chest down?
7      A     Yes, sir.
8      Q     And then you've already told me, when the other
9  officers arrived, he was also chest down.
10     A     To my recollection, yes.
11     Q     So you would have been able, then, to keep him
12 chest down from the time of the carotid restraint, to
13 the time the other officers arrived?
14     A     Yes.
15     Q     And how were you able -- what did you do to do
16 that?
17     A     The same things I've been explaining.  I was
18 using the underhook in his arm and my body weight to
19 keep him on the ground, keep him flat on the ground.
20     Q     And were you able to do that?
21     A     Yes.  To my recollection, yes.
22     Q     He never, for example, stood up and started
23 running again?
24     A     No, sir.
25     Q     He never threw you off of him?

1     A    No.

2     Q    I think you've answered this already, but I
3  just want a point of clarification.

4          When you were keeping -- or trying to keep his
5  chest flat to the ground, were there times when you felt
6  him trying to lift his chest off the ground?

7     A    Yes.

8     Q    And when he would do that, would you then do
9  something to try to keep him flat?

10    A    Yes.

11    Q    What would you do essentially to keep him flat
12 to the ground?

13    A    Again, I would use the underhook to take one of
14 his legs out, and then -- when I say "legs," it's the
15 four points you need to get up -- and then use my body
16 weight from my arms to drive him back down to the
17 ground.

18    Q    Okay. And then what would you do, once you got
19 him in that position, to hold him in that position?

20    A    I'd keep my torso on top of his back and
21 stay -- what we call, stay heavy on him.

22    Q    Okay.

23    A    Make it hard for him to get up.

24    Q    When you say it's "what we call stay heavy on
25 him," is that just what the police term that's sometimes

could have been because he was tired, but it could have been because he was injured in some way. I don't remember seeing any visual signs of injury, but I wasn't looking for them.

Q   Okay. What I'm meaning is something that was obvious. For example, did you see something that led you to believe that he had a broken arm before you tased him?

A   No, I did not.

Q   Did you see something that led you to believe he had a broken leg before you tased him?

A   No, I didn't.

Q   Did you see any bleeding coming from his face or head before you tased him?

A   Not that I recall, no.

Q   Okay.

A   I was told he was wearing a hat, and I don't even remember a hat, so I don't know.

Q   Okay. Well, obviously, it could have fallen off at some point.

A   Absolutely.

Q   All right. Okay. And at some point, did you become aware of who the officers were that had come to assist you?

A   Yes. I recognized voices. The primary voice I

1   holding a baton, and Officer Largent was. But yes.
2        Q    Okay. Were you essentially -- while the other
3   officers were trying to assist in getting him
4   handcuffed, were you essentially just trying to keep him
5   flat to the ground, as you've already described?
6        A    Yes, sir.
7        Q    Do you know -- do you know who actually
8   handcuffed him?
9        A    I -- I grabbed his right arm. I don't -- I
10  don't remember who handcuffed him.
11       Q    You tried to get his right arm to the -- to an
12  area behind him where it could be handcuffed?
13       A    Yes. Once he stopped fighting, and Corporal
14  Jacoby said let's get him in handcuffs, I got off of him
15  to his right side, I believe, and brought that right arm
16  behind him. I don't remember who had his left arm or
17  who handcuffed him.
18       Q    You indicate in your -- well, strike that.
19            At some point, did you see what appeared to be
20  a broken arm on Mr. Motley?
21       A    Yes, sir.
22       Q    What did you see in that regard?
23       A    When I grabbed his right arm to put it into
24  handcuffs -- I believe it was his right arm -- it was
25  obviously broken.

1    Q    What did you see that made it obvious to you
2 that it was broken?
3    A    When I grabbed it, it was just -- it was like
4 grabbing a rubber arm. That is the best way I can
5 describe it. And there was blood on his arm. That was
6 enough for me to realize that it was probably broken.
7    Q    Okay. At some point, and I think you already
8 mentioned this, you heard Corporal Jacoby say something
9 like "Watch out. He has a knife"?
10   A    I remember him saying something about a knife,
11 yes.
12   Q    And then at least according to your statement,
13 at that point you looked over just to see if the knife
14 was still in the dirt where you had tossed it, and it
15 was.
16   A    Yes.
17   Q    Okay. You just wanted to make sure it wasn't
18 in his possession.
19   A    I wanted to make sure it wasn't close enough
20 for him to use, yes.
21   Q    Okay. And that might have been the time frame
22 that you might have mentioned that you had tossed it
23 there.
24   A    I believe so.
25   Q    Okay. You say at some point you were flinching

1  from the baton strikes near you.
2      A    Yes.
3      Q    What were you trying to describe there?
4      A    Again --
5           MR. FISHER: Let me just object as to vague.
6  I'm not sure if you're asking him about what he recalls
7  or what he wrote.
8           MR. GALIPO: Either/or, however you want --
9  well, let me ask -- I'll break it down.
10 BY MR. GALIPO:
11     Q    First of all, when you reviewed your statement,
12 do you recall a reference to you flinching -- let me get
13 the right words here -- flinching from the baton strikes
14 near you?
15     A    Yes, sir.
16     Q    Okay. And do you kind of recall that part?
17     A    Yes, sir.
18     Q    Can you explain what you were describing?
19     A    Yes. His arms were in -- because of the nature
20 of the position that I was in over his waist with my
21 torso against his torso and my head down, when the baton
22 strikes were issued, they were in proximity to my head.
23 It felt like they were anyways. So when that happened,
24 I sat up.
25     Q    I see. You obviously didn't want to get hit in

1  the head by the baton.
2       A     Correct.
3       Q     Is it your training that hitting someone in the
4  head with a baton could be viewed as potentially deadly
5  force?
6       A     Yes, sir.
7       Q     You also indicate in your statement, that he
8  stopped fighting all of a sudden.
9       A     Yes, sir.
10      Q     Is that your recollection that there was this
11 strong resistance, and then all of a sudden, it went
12 from there to zero?
13      A     Yes. Yes.
14      Q     And was it at that point that he was
15 handcuffed?
16      A     Yes, sir.
17      Q     After he was handcuffed, did you ever see him
18 resisting at all after he was handcuffed?
19      A     No. Again, as soon as I got the handcuffs on,
20 or we got the handcuffs on him, I got up and walked
21 away.
22      Q     Where did you walk to?
23      A     I walked out to the street with Officer Porter,
24 and she helped me clean up.
25      Q     Okay. Is that a female officer?

1  were being communicated that you may not have heard?
2      A    I don't remember any of this traffic. I do
3  remember their request for an ambulance shortly after I
4  walked away.
5      Q    Okay.
6      A    But I don't remember anything after that.
7      Q    Would it be fair to say that at the time you
8  got up, at least based on your observations, Mr. --
9  Mr. Motley was no longer moving?
10     A    He was still moving when I was getting up. He
11 wasn't fighting anymore, that I could see, but he was
12 still moving.
13     Q    What movements, if any, did you observe?
14     A    Just moving body parts. I don't know what he
15 was trying to do, but he was -- he was still moving.
16     Q    I'll ask a few more questions, then we can take
17 a break.
18          When you were holding him down, as you
19 described, using -- it sounds like your chest to his
20 back. Is that fair?
21     A    Yes, sir.
22     Q    Were you also attempting to keep his head down?
23     A    No.
24     Q    Okay. Did you ever see either dirt or anything
25 on his face or lips?

1     A     No.  I'm sure there was dirt on his face and
2  lips.
3     Q     He's basically face down in the dirt?
4     A     Yes.
5     Q     Okay.  Were you essentially holding him down,
6  Mr. Motley, during the time that these baton strikes
7  were going on?
8     A     Initially, until I sat up, yes.
9     Q     Okay.  And when the baton strikes were going on
10 and you were holding him down, did you feel -- at least
11 before you sat up, did you feel you had a pretty good
12 hold on him at that point?
13    A     Yes.
14    Q     And when you sat up, you sat up, in part, not
15 to be struck by the batons?
16    A     Yes.
17    Q     And did you still, though, maintain a position
18 of leverage or advantage to try to hold him down, even
19 though you sat up some?
20    A     To a point.  You lose a lot of control when you
21 sit up, so to a point, yes.
22          MR. GALIPO:  Okay.  I think this is a good time
23 for a break.  Maybe we'll take about ten minutes,
24 because we've been going for quite a while.
25          THE WITNESS:  Thank you.

1           Do you recall that?
2           THE WITNESS:  I don't remember saying that, but
3    I must have said it.
4    BY MR. GALIPO:
5       Q   Okay.  At least in the transcript, would you at
6    least agree that the question and answer I referred to,
7    it is in the transcript?
8       A   Yes, sir.
9       Q   You're just saying, as you sit here today, you
10   don't specifically recall saying that.
11      A   Yes.
12      Q   You're not saying you didn't say that.  You're
13   just saying you don't recall.
14      A   I did say that; correct.
15      Q   You estimated in your second statement, that
16   you say you'd been in over 20 physical altercations.
17   Does that sound correct in your career?
18      A   Sounds correct.
19      Q   You were asked:  At any point -- this is in
20   your statement, page 14 -- at any point in your struggle
21   with Motley, did you feel he was overpowering you?
22          And your response was:  No.  Because I was able
23   to maintain a dominant position.
24          Do you recall that question and answer?
25      A   Yes, I do.

1  did you see any blood to the back of Mr. Motley's head?
2      A    I don't recall seeing blood, no.  I don't -- I
3  don't recall now anyways.  I don't recall seeing it
4  afterwards either, but obviously it was there, so...
5      Q    Okay.  I'm just wondering, you don't recall
6  seeing any before the baton strikes.  Is that true?
7      A    Correct.
8      Q    If I understood your testimony earlier, at some
9  point, Mr. Motley stopped resisting.  Jacoby said to
10 handcuff him, and he was handcuffed, and then you got up
11 and walked away.
12     A    Yes, sir.
13     Q    Okay.  And at least at the time he was
14 handcuffed and when you walked away, would it at least
15 be fair to say you didn't see him resisting during that
16 time?
17     A    Yes.
18     Q    And it sounds like your attention was diverted
19 other places after you walked away.
20     A    Yes, sir.
21     Q    So would it be fair to say, whether he was
22 resisting or not after you walked away, from your own
23 personal observations, you don't know?
24     A    I don't know.  Yes.
25          MR. GALIPO:  Okay.  Do you have any other

CERTIFICATE OF REPORTER

I, SHEILA ANDERSON, a Certified Shorthand Reporter of the State of California, License No. 12778, do hereby certify:

That prior to being examined, the witness

**WESLEY TOWNSLEY,**

was sworn by me to testify the truth, the whole truth and nothing but the truth;

That said deposition was recorded in stenographic shorthand by me, a Certified Shorthand Reporter, at the time and place herein stated, and was thereafter reduced to typewriting under my direction, and that the deposition is a true record of the testimony given by the witness;

That I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

WITNESS MY HAND this 2nd day of July, 2016.

*(signature)*

SHEILA ANDERSON, C.S.R.
License No. 12778