# EXHIBIT "C"



ANDERSON
DEPOSITION REPORTING
Certified Shorthand Reporters

542 Union Street
Red Bluff, California 96080

Ph: 530.527.7051
Fax: 530.529.9543

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

L.M. by and through her Guardian ad
Litem ASHLEY MCCAIN, individually and
as successor in interest to the Estate
of STEVEN MOTLEY; CAROL ADAMS,
individually,

        Plaintiffs,

vs.            No. 2:14-cv-00767-MCE-AC
               (Consolidated Case No:
               2:14-cv-01736-TLN CMK)

CITY OF REDDING, CHIEF ROBERT F.
PAOLETTI, OFFICER JARED HEBERT, OFFICER
WES TOWNSLEY, OFFICER BRANDON LARGENT,
OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY;
and DOES 1 through 10, inclusive,
        Defendants.
_____/
S.M-B, a minor, by and through his Guardian
ad Litem DAWN BIANCO, individually and
as successor in interest to the estate
of STEVEN MOTLEY,
        Plaintiffs,

 vs.

CITY OF REDDING, a municipal corporation;
ROBERT F. PAOLETTI, JARED HEBERT,
WES TOWNSLEY, BRANDON LARGENT,
BECKY ZUFALL, CHRIS JACOBY; and
DOES 1 to 25 inclusive,
        Defendants.
_____/

DEPOSITION OF BRANDON LARGENT
Friday, June 24, 2016
Redding, California

SHEILA ANDERSON, C.S.R.     License No. 12778

1

1 | a photo of it later.

2 |     Q    Okay.  Did you ever see, at any time,

3 | Mr. Motley reaching for a weapon?

4 |     A    He certainly made enough movement throughout

5 | the course of my observations on scene that would be

6 | absolutely consistent with articulating that he would be

7 | reaching and concealing his hands towards his waistband

8 | or another area where a weapon could be concealed.  But

9 | for me to articulate that there was a weapon there --

10 |     Q    What I'm asking, was there any -- ever a weapon

11 | that you saw, for example, either on his person or

12 | nearby him, that he appeared to be reaching for, a

13 | specific weapon that you observed?

14 |     A    No.  No.

15 |     Q    Okay.  Did you ever observe him reaching for

16 | any of the officers' weapons?

17 |     A    No.

18 |     Q    Did you ever see him land a punch on anyone?

19 | And what I mean by that is take a punch and actually

20 | connect.

21 |     A    No.

22 |     Q    Did you ever see him land a kick on anyone?

23 | And what I mean by that is make a kick and actually

24 | connect.

25 |     A    Mule kicks, several mule kicks.

1      Q    And then you say:  I can't tell you if it was

2    exactly three or exactly five.

3           Do you see that?

4      A    I do.

5      Q    And I think we talked about this before.  Is

6    that where you came up with your estimate of five to

7    seven baton strikes total?

8      A    Yes, sir.

9      Q    And there were two initially, and then somewhat

10   of a pause, and then the remaining three to five?

11     A    Yes, sir.

12     Q    Then you say on line 153:  On the last strike

13   that I had struck him, I could clearly see, um, I was

14   focusing directly on that arm, and I could clearly see

15   that there was an injury to his arm with -- whether it

16   was possibly broken or not, I don't know.

17          Do you see that portion of your statement?

18     A    I do.

19     Q    So would it be fair to say, that as of the time

20   of your last baton strike to his right lower arm, you

21   noticed some type of injury to that area?

22     A    Yes, sir.

23     Q    Okay.  And it later, at least, was confirmed,

24   in your mind, as you described, that it was broken.

25     A    Yes, sir.

1  Smyrnos. I take it you're not exactly sure, but it was

2  someone you perceived on the left side, trying to get

3  the left arm?

4      A    Yes.

5      Q    And this would be while you're trying to get

6  the right arm?

7      A    Yes.

8      Q    And then looking at lines 173 and 174, you're

9  referencing one of the officers getting positive control

10 of the left hand.

11     A    Yes.

12     Q    And 175, you believe it was Smyrnos who put the

13 handcuff on the left hand.

14     A    I don't know.

15     Q    You thought it was him, but you weren't sure?

16     A    That's correct.

17     Q    Okay. Looking towards the bottom of the

18 page -- oh. So hold on.

19          Then, I take it, as we discussed, he was

20 handcuffed. I mean he's -- the next thing that happens

21 is he's handcuffed.

22     A    Yes.

23     Q    And looking at lines 186 and 187, you're

24 talking about: We finally get the handcuff on, and then

25 I rolled him over to one side and begin to start

1  searching him.

2      A    Yes.

3      Q    So -- and that's customary, isn't it, if you

4  want to search someone, a good time to do it is after

5  they're handcuffed?

6      A    Yes.

7      Q    And so it seems like, from reading your

8  statement, that almost immediately after he was

9  handcuffed, you rolled him onto his side and started

10 searching him.  Is that fair?

11     A    Yes.

12     Q    Okay.  And then at some point, I think you said

13 on lines 188 and 189, you see the sheath, but you didn't

14 see a knife with the sheath.  Is that correct?

15     A    Well, it doesn't say anything about the knife,

16 but it does say about the knife sheath.

17     Q    Yeah.  I think it was somewhere else.  I think

18 it doesn't say that right there.

19          MR. FISHER:  We'll just note it speaks for

20 itself, Counsel.

21          THE WITNESS:  I'm not trying to be difficult,

22 sir, but you're right.

23 BY MR. GALIPO:

24     Q    That's okay.

25          Now, you then say on lines -- starting on line

1      A     Very -- yes.  Absolutely.

2      Q     Okay.  Then on lines 229 and 230, you reference

3  there's a backpack, and you were suggesting, I think,

4  that someone check out the backpack?

5      A     That's correct.

6      Q     And I think Zufall responded:  Well, we could

7  probably do that later.

8      A     That's correct.

9      Q     And you probably agreed with that.

10     A     That's correct.

11     Q     Starting at lines 237, you're referencing that

12 he was still kicking his legs.

13     A     Yes.

14     Q     And that's when Zufall started sitting on the

15 lower portion of his legs?

16     A     Yes.

17     Q     Looking at the next page, how long do you think

18 it took to search him after he was handcuffed?

19     A     Well, I know I answered that earlier.  I don't

20 know if that can be --

21     Q     I don't know that I asked that question.  To

22 search him?

23     A     Yes, sir.

24     Q     No.  Not -- I think I asked when you started

25 the search after he was handcuffed, and I think you said

1   right away.  Now I'm wondering how long you think it

2   took -- took you to search, you know, pat him down or

3   search him.

4           MR. FISHER:  To conduct the search?  To conduct

5   the search?

6           MR. GALIPO:  Yes.  To conduct the search.

7           THE WITNESS:  Good overall minute and a half to

8   two minutes, very slow, methodical search, checking

9   every pocket, every -- every single bit of his person.

10  BY MR. GALIPO:

11      Q    And then it sounds like after you completed

12  your search, you put him back chest down.  Is that fair?

13      A    No.  No.  No.

14          MR. FISHER:  Is there a portion of the

15  statement, Counsel?

16          MR. GALIPO:  Yes.  I think there is.

17  BY MR. GALIPO:

18      Q    Here.  If you look at lines 248, 249, I think

19  you said that Officer Smyrnos steps in, and we roll him

20  to his stomach.

21      A    Right.  But you -- you asked me when I was done

22  searching him, did I put him on his stomach.  I

23  maintained him on his side after the search was over.

24      Q    Okay.  But then you put him on his stomach,

25  according to your initial statement.

1      A      Yes.

2      Q      Okay.  And that's when you observed Smyrnos

3  placing him in kind of like this academy-style figure

4  four on his legs.

5      A      That's correct.

6      Q      Bending one foot behind his knee, and then

7  folded the leg up, and then was kind of pressing weight

8  against that leg, so he would stop kicking.

9      A      That's correct.

10     Q      And you observed that?

11     A      Yes, I did.

12     Q      And he was on his stomach at that point?

13     A      Yes.

14     Q      And if he was in handcuffs at -- I think we

15  said "Subject in custody" at 14:42.  That would be 2:42.

16  Do you think the search would have been completed by

17  about 2:44?

18             MR. FISHER:  Calls for speculation.

19  BY MR. GALIPO:

20     Q      I mean a couple minutes?  Does that sound about

21  right?

22     A      The search specifically, yes.  That would be

23  fair.

24     Q      Okay.  And he was put back down on his stomach?

25     A      Eventually, yes.

1     Q     And when he was on his stomach, you saw Smyrnos
2     doing what we just described with his legs.  That was
3     after he was turned back on his stomach.
4     A     Yes.
5     Q     And where were you in relation to him at that
6     time?  Was there any need, in your mind, for anyone to
7     hold his upper body when he was turned back on his
8     stomach?
9     A     Nobody was holding his upper body.  I was
10    touching his shoulder.
11    Q     There was no need for it?  He wasn't moving or
12    resisting at that time?
13    A     I don't understand the question.
14    Q     Well, I'm asking -- you've explained all his
15    movement and resisting.
16    A     Yes.
17    Q     So I'm wondering, when -- when Smyrnos was
18    holding his legs, when he was on his stomach --
19    A     Um-hmm.
20    Q     -- did it appear to you that his upper body was
21    resisting?
22    A     He was still tense and rolling around, talking,
23    but --
24    Q     Did you think there was any necessity, once he
25    was turned back on his stomach, for anyone to hold his

1   upper body down?

2       A    No.  Because that would have been me, and I

3   didn't do that.

4       Q    Did you see anybody on his back or upper body

5   as he was turned over on his stomach?

6       A    No.

7       Q    And you didn't think it was necessary based on

8   what you observed?

9       A    No.

10      Q    Is that correct?

11      A    Yes.

12      Q    And then, during this time frame, you were

13  asking for someone to get a hobble?

14      A    That's correct.

15      Q    And Corporal Jacoby went to get a hobble?

16      A    Yes.

17      Q    And you were waiting for him to return?

18      A    That's correct.

19      Q    So weren't you holding the back of his neck to

20  keep his head from moving during this time?

21      A    I don't recall holding the back of his neck.  I

22  think I altered between his shoulder and just the side

23  of his face.  Because he had been trying to bite me

24  earlier and was just talking to him.  I don't -- as far

25  as holding the back of his neck, I don't recall that.

1    Q    Okay.  Let me refer you to lines 253 to 255.

2  You say -- well, before that, you said:  And we -- this

3  is on 252:  We held him in that manner secure while I

4  was awaiting Corporal Jacoby to return.

5          Do you see that sentence?

6    A    That's correct.

7    Q    When you say, "We held him in that manner," who

8  was the "we" you were referring to?

9    A    The sum of us.

10   Q    Okay.  You then say:  At that point in time, we

11 had gained relatively quality control of him.

12         Do you see that sentence?

13   A    I do.

14   Q    He was no longer kicking.  He's on his stomach,

15 and I'm kind of holding the back of his neck because

16 he's still moving his head around.

17         Do you see that sentence?

18   A    I do.

19   Q    Does that refresh your recollection that you

20 were holding the back of his neck?

21   A    Yes.  But it doesn't paint a clear picture of

22 specifically where I was holding him.  I simply had my

23 hand out, which, on the side of his face and the side or

24 back of his neck area, just keeping my hand there away

25 from his mouth, so my hand wouldn't get bitten.  So

1   specific to the neck, it wasn't exactly on the back of

2   his neck, as if I was pressing his neck down.

3       Q    Right.  But you say you're holding the back of

4   his neck because he was still moving his head around.

5            MR. FISHER:  I'll just note an objection.  It

6   says:  I'm kind of holding him.

7            We're kind of splitting hairs and staying on

8   that point.

9            MR. GALIPO:  That's fair.

10  BY MR. GALIPO:

11      Q    You say:  I'm kind of holding the back of his

12  neck because he's still moving his head around.

13      A    Yes.

14      Q    And then you asked him what his name was.

15      A    Yes.

16      Q    You didn't know what his name was; correct?

17      A    No.

18      Q    Then you heard him say something that sounded

19  like "Steven" possibly "Potley"?

20      A    That's correct.

21      Q    And looking at line 260, he's still on his

22  belly.

23      A    That's correct.

24      Q    And you're still awaiting Corporal Jacoby's

25  return.

1    A    Yes.

2    Q    And it's during this time that he's on his

3  belly, and you're awaiting Corporal Jacoby's return,

4  that you notice the significant color change, at least

5  according to your statement.

6         MR. FISHER:  Can we have the...[inaudible.]

7         (Court reporter interrupts.)

8         MR. FISHER:  I'm just asking for the line in

9  the statement that might help us focus.

10 BY MR. GALIPO:

11   Q    Starting on 264:  We're awaiting Corporal

12 Jacoby's return.

13        And starting on 266:  I notice a significant

14 color change.

15   A    Yes.

16   Q    Okay.  And you go on to describe:  Very gray

17 color, very pale gray and blue color took over, washed

18 over his face and neck and his head.

19   A    Yes.

20   Q    All right.  So at least does that refresh your

21 recollection that when you noticed the color change, he

22 was actually on his belly?

23   A    Yes.

24   Q    Okay.  Now, looking at line 272, you're talking

25 about he had a lot of dirt and debris, I guess, on his

1  lips or face area.

2      A    Yes.

3      Q    And I think there was even a time where it

4  looked like he might have been chewing the dirt or

5  something like that.

6      A    No.  He was chewing the dirt.  He was biting

7  mouthfuls.  That was during the time when he was

8  spitting at me and cursing at me, trying to bite me,

9  biting the ground, etcetera.

10     Q    And that's when you say on line 275:  And he

11 would keep his face down.

12     A    Yes.

13     Q    And line 278:  His mouth was full of dirt.

14          MR. BRICKWOOD:  Let me object, Dale.  Doesn't

15 it say "not as if his mouth was full of dirt"?

16          MR. GALIPO:  Oh.  It does.  I apologize.

17          MR. BRICKWOOD:  No problem.

18 BY MR. GALIPO:

19     Q    Did you see -- did you see dirt on his mouth?

20     A    Lips, yes.

21     Q    Okay.  Going to the next page -- so at some

22 point, Jacoby shows back up with a hobble.

23     A    Yes.

24     Q    And you at that point -- and then you see

25 Smyrnos coming off of his legs, according to line 283

1  and 284.

2       A    Yes.

3       Q    And at that point, just paraphrasing, you

4  tell -- because you had already seen him change color.

5       A    Yes.

6       Q    And you thought, now this could be a medical

7  emergency-type situation.

8       A    Yes.

9       Q    And you told Jacoby, you know, words to the

10 effect, I wouldn't worry, you know, about the hobble.

11 In other words, you didn't feel a necessity to put the

12 hobble on at that point.

13      A    Yes.

14      Q    And you mentioned in your statement, that you

15 were thinking this might be excited delirium.

16      A    Yes.

17      Q    Excited delirium, you've had some training on

18 that concept?

19      A    Quite a bit.

20      Q    Okay.  And is it your understanding that

21 excited delirium, at least the theory goes, could cause

22 death?

23      A    Not excited delirium.  Excited delirium is more

24 of a reference to the term about a person being under

25 the influence of a stimulant of some sort, involved in

1  BY MR. GALIPO:

2      Q    Okay.  And when you -- when you went to take

3  his pulse, you checked his carotid initially?

4      A    That's correct.

5      Q    And what were you -- did he have a pulse at

6  that time?

7      A    Yes, he did.

8      Q    Okay.  And how -- how long did you check the

9  pulse for that time?

10     A    Very brief, as I stated already.  My hand was

11  already in that area.  I simply moved my fingers over.

12  I got a quick read, to know that there was a heartbeat.

13  And I believe we start moving in to moving him.

14     Q    Okay.  All right.  Then looking at lines 293 to

15  297, again, you're referencing excited delirium and a

16  conversation with Corporal Jacoby.

17     A    Yes.

18     Q    And you had heard a rescue ambulance being

19  called earlier, but between you and Jacoby or Jacoby

20  wanted to make sure one was on the way Code 3.

21     A    He did.

22     Q    Okay.

23     A    Corporal Jacoby did.

24     Q    And it was at that time, that there was a

25  decision to move Mr. Motley.

1    Q    Other -- and then at some point, you sat him

2  down or put him somewhere in the front of the yard?

3    A    Technically, we were still in the backyard.

4  There was an RV access driveway, best way I can describe

5  it, or some sort of gravel driveway access that ran

6  along the side of the home into the backyard, and we

7  positioned right next to that access drive, in

8  anticipation that the ambulance could drive directly

9  down, right next to where we would be.  So we were still

10  in the backyard.

11    Q    And then you put him on his side?  Looking at

12  lines 316 -- let's see here.

13    A    That's correct.

14    Q    And you rolled him on his side, because that's

15  a -- what's referred to as a rescue posture.

16    A    Yes.

17    Q    And based on your training, putting someone on

18  their side could assist with their ability to breathe?

19    A    Yes.

20    Q    And that's why you put him on his side at that

21  point?

22    A    Yes.

23    Q    And did you try to check his carotid again?

24    A    I did.

25    Q    And what were the -- what did you find in terms

1  of a pulse, if any?

2      A    He still had a pulse.

3      Q    Okay.  You saw some dirt matter that was coming

4  out of his mouth?

5      A    Yes.

6      Q    Did he have dirt inside his mouth?

7      A    As I stated earlier, he had small amounts of

8  dirt debris from chewing on the ground.

9      Q    So that was what you were referring to when you

10 could say there was some of that dirt matter still

11 coming out of his mouth?

12     A    That's correct.

13     Q    Had you seen dirt matter coming out of his

14 mouth before that?

15     A    Yes.

16     Q    And then going to the top of the next page,

17 line 322, you're saying:  Steven, are you with us?

18          Do you see that?

19     A    That's correct.

20     Q    I mean doesn't he essentially appear

21 unconscious at that point, when you're asking him if

22 he's still with you?

23     A    No.  Just to paint a clearer picture, these

24 are -- I said many, many things.  I can't remember every

25 single thing I stated.  But what I am implying is, when

78

1    you're rendering some form of care to somebody, you

2    continually try to talk to them, gain their attention,

3    gain some sort of positive eye contact, tap them on a

4    shoulder, all those types of things that you do.  These

5    were things that I was doing.  Just saying things,

6    "Steven, hey, are you with us?"  Hey -- all these

7    different types of things, just trying to monitor his

8    level of consciousness.

9         Q    So why again were you saying, "Steven, hey, are

10   you with us"?

11        A    For every reason that I just stated.

12        Q    Did he appear not to be with you?

13        A    No.

14        Q    Then you don't feel a pulse anymore?

15        A    That's correct.

16        Q    And you said he goes lifeless or flatlines.

17        A    That's correct.

18        Q    And then you communicated he no longer had a

19   pulse.

20        A    Yes.

21        Q    And you started chest compressions.

22        A    Yes.

23        Q    And you're trained, are you not, that you don't

24   give CPR to someone who's breathing?

25        A    Yes.

1    Q    So obviously, when you started your chest

2  compressions, based on your observations, he was no

3  longer breathing?

4    A    That's correct.

5    Q    And how long of a period of time passed between

6  the fine -- time that you no longer felt the pulse, and

7  the time you started your chest compressions?

8    A    Immediately.

9    Q    At some point, you felt him get a pulse back?

10   A    That's correct.

11   Q    On lines 34 -- 344, 345, and 346, you talk

12  about an exhale sound, a loud, verbal exhale sound.

13   A    Yes.  And I also talked about it above that as

14  well.

15   Q    Okay.  Have you ever heard of the term of

16  "agonal breathing"?

17   A    I have.

18   Q    What does that mean to you, if you remember?

19   A    Well, agonal breathing is more of a state of

20  unconscious motor-function breathing.  Sometimes it's

21  confused with snoring, or it will have a sound of

22  snoring.

23   Q    At some point, the paramedics got there?

24   A    Yes.

25   Q    And do you recall the paramedics saying that he

1                      CERTIFICATE OF REPORTER

2

3          I, SHEILA ANDERSON, a Certified Shorthand

4    Reporter of the State of California, License No. 12778,

5    do hereby certify:

6          That prior to being examined, the witness

7                     **BRANDON LARGENT,**

8    was sworn by me to testify the truth, the whole truth

9    and nothing but the truth;

10         That said deposition was recorded in

11   stenographic shorthand by me, a Certified Shorthand

12   Reporter, at the time and place herein stated, and was

13   thereafter reduced to typewriting under my direction,

14   and that the deposition is a true record of the

15   testimony given by the witness;

16         That I am not of counsel or attorney for any of

17   the parties hereto, or in any way interested in the

18   event of this cause, and that I am not related to any of

19   the parties hereto.

20

21         WITNESS MY HAND this 2nd day of July, 2016.

22

23

24         SHEILA ANDERSON, C.S.R.
           License No. 12778

25

                                                          120