

# EXHIBIT "D"



# ANDERSON
# DEPOSITION REPORTING
### Certified Shorthand Reporters

542 Union Street
Red Bluff, California 96080

Ph: 530.527.7051
Fax: 530.529.9543

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

L.M. by and through her Guardian ad
Litem ASHLEY MCCAIN, individually and
as successor in interest to the Estate
of STEVEN MOTLEY; CAROL ADAMS,
individually,

        Plaintiffs,

vs.

No. 2:14-cv-00767-MCE-AC
(Consolidated Case No:
2:14-cv-01736-TLN CMK)

CITY OF REDDING, CHIEF ROBERT F.
PAOLETTI, OFFICER JARED HEBERT, OFFICER
WES TOWNSLEY, OFFICER BRANDON LARGENT,
OFFICER BECKY ZUFALL, CORPORAL CHRIS JACOBY;
and DOES 1 through 10, inclusive,

        Defendants.

_____/

S.M-B, a minor, by and through his Guardian
ad Litem DAWN BIANCO, individually and
as successor in interest to the estate
of STEVEN MOTLEY,

        Plaintiffs,

vs.

CITY OF REDDING, a municipal corporation;
ROBERT F. PAOLETTI, JARED HEBERT,
WES TOWNSLEY, BRANDON LARGENT,
BECKY ZUFALL, CHRIS JACOBY; and
DOES 1 to 25 inclusive,

        Defendants.

_____/

DEPOSITION OF REBECCA ZUFALL
Friday, June 24, 2016
Redding, California

SHEILA ANDERSON, C.S.R.     License No. 12778

1       A    No.

2       Q    For example, did you ever see Officer Jacoby

3   strike him with a baton?

4       A    No.

5       Q    Did you ever see Officer Largent strike him

6   with a baton?

7       A    No.

8       Q    Did you ever see any blood on Mr. Motley before

9   he was handcuffed?

10      A    No.

11      Q    Did you ever see anything that led you to

12  believe Mr. Motley had a broken arm before he was

13  handcuffed?

14      A    He had an injury to his right arm.

15      Q    When did you first observe that?

16      A    When we were attempting to handcuff him.

17      Q    Okay.  What did you observe in that regard?

18      A    He had an injury to the right wrist.

19      Q    Okay.  And what did it look like?  Can you

20  describe it?  When you say "an injury," I don't know if

21  it's a scratch, a bump, if it looks like the arm might

22  be broken.  What did it look like?

23      A    It looked like his wrist was possibly broken.

24      Q    Okay.  Before Mr. Motley was handcuffed, did

25  you hear him say anything?

1    A    No.

2    Q    Did you ever see Mr. Motley punch anyone,

3  actually land a punch on anyone?

4    A    No.

5    Q    Did you have any injuries related to this

6  incident?

7    A    No.

8    Q    Did you ever hear Mr. Motley verbally threaten

9  to harm anyone?

10   A    No.

11   Q    Did you ever see a weapon in either one of his

12 hands?

13   A    No.

14   Q    Did you ever see him reaching for a weapon

15 specifically?

16   A    He was reaching towards his waistband at one

17 point.  I didn't know if he had a weapon or was going

18 for a weapon.

19   Q    Was that with the right hand or left hand, if

20 you recall?

21   A    He was, I believe, with the right hand on his

22 right side, he was pulling.

23   Q    Okay.  Moving towards his waistband?

24   A    Yes.

25   Q    Was his hand then pulled back out away from

1      Q    Okay.  We'll leave it at that.

2           So you saw -- you saw Officer Porter on

3    Mr. Motley's upper back?

4      A    Yeah, upper.

5      Q    Is that when you first noticed Officer Porter

6    at the scene?

7      A    Yes.

8      Q    And where were you when you noticed Officer

9    Porter on Mr. Motley's upper back?  Were you more by the

10   legs?

11     A    Yes.

12     Q    And did you get on his legs during the time

13   that you saw Officer Porter on his upper back?

14     A    When she arrived, she did not have handcuffs.

15   She removed my handcuffs to place them on him.

16     Q    Okay.  Did you sit down on Mr. Motley's legs

17   before he was handcuffed?

18     A    I don't recall if I -- if I did.

19     Q    Do you recall sitting down on his legs after he

20   was handcuffed?

21     A    Yes.

22     Q    Okay.  Were his legs still moving about after

23   he was handcuffed?

24     A    Yes.

25     Q    Was he still moving to some extent after he was

1  handcuffed?

2      A    Yes.

3      Q    And you were trying to control his legs?

4      A    Yes.

5      Q    And you were trying to control his legs by

6  sitting on his legs?

7      A    Holding his legs with my arms.

8      Q    With both of your arms?  He was chest down at

9  this point; correct?  Because he's handcuffed behind his

10  back.

11      A    He's handcuffed, but he's still moving.

12      Q    But essentially, he's chest down as opposed to

13  laying on his back.

14      A    After he was handcuffed, he was moving his

15  hands to the right, to get under him.

16      Q    Right.  But --

17      A    He was still moving about after he was

18  handcuffed.

19      Q    I understand that.  But what I'm getting at, he

20  was essentially chest down, though, even though his

21  hands were moving, and he was moving.  Is that --

22      A    He was facing down, but flailing side to side.

23      Q    Okay.

24      A    He wasn't just laying face down on the --

25      Q    I understand.  But he was generally chest or

1  face down, but still moving some side to side.

2      A    Yes.

3      Q    Okay.  And when you were holding his legs, were

4  you -- did you have your upper body to the back of his

5  legs?  How were you holding his legs?

6      A    Just grabbing them with my arms, trying to

7  control him.

8      Q    Okay.  And what was your position when you were

9  doing that?

10     A    Face down.

11     Q    Okay.  And was -- when you were -- your

12 chest -- was your chest more to the back of his legs?

13     A    Yes.

14     Q    Okay.  So you were reaching underneath his legs

15 and trying to hold them against your chest?

16     A    To cross them and hold on to him.

17     Q    Okay.  So you were also crossing his legs?

18     A    Yes.

19     Q    Did you cross his legs after he was handcuffed?

20     A    Yes.

21     Q    And when you crossed his legs after he was

22 handcuffed, did you -- were you pushing his legs towards

23 his buttocks?

24     A    Generally, that's what we do to control the

25 legs, so we do not get injured or kicked in the face.

1    Q    I'm really -- I appreciate your answer, but I'm

2    really interested in what you did as opposed to what

3    generally is done.

4    A    Yes.

5    Q    Is that what you did?

6    A    Standard procedure on how to control their

7    legs.

8    Q    Okay.  So you, based on your training, crossed

9    his legs and pushed his legs towards his buttocks?

10   A    Yes.

11   Q    And this was after he was handcuffed?

12   A    Yes.

13   Q    So you were involved in controlling his legs?

14   A    Yes.

15   Q    Who was involved in controlling his upper body

16   at that time?

17   A    I was at the legs.  Officer Porter assisted in

18   handcuffing him.

19   Q    Right.  But as I understand your testimony, you

20   crossed his legs and are pushing them towards his

21   buttocks after he's handcuffed.

22   A    Yes.

23   Q    And you're telling me, after he's handcuffed,

24   he's still moving?

25   A    Yes.

1  saw his color change?

2      A    Couple minutes.

3      Q    About two minutes?

4      A    One to two minutes.

5      Q    Okay.  And during that time, was he essentially

6  face down?

7      A    Well, he was still combative and struggling and

8  moving.

9      Q    Right.  But generally doing it in a chest-down

10 position as opposed to on his back?

11     A    Yes.

12     Q    Did you get the impression he was trying to get

13 up at some point?

14     A    Yes.

15     Q    And were officers trying to keep him down when

16 he was trying to get up?

17     A    I can speak for myself.

18     Q    You were?

19     A    He was trying to stand up as I was on his legs.

20     Q    And you were trying to keep him down?

21     A    Yes.

22     Q    And you were essentially using all your

23 strength to do that?

24     A    Yes, my body weight.

25     Q    Your body weight.  So you were using your body

1  weight on his legs to keep his legs down; is that

2  correct?

3     A    Yes.

4     Q    And you were also, as you indicated, bending

5  his legs back towards his buttocks?

6     A    Yes.

7     Q    You would also be using your weight in that --

8  in that maneuver or method?

9     A    Yes.

10    Q    And are you saying in terms of -- you saw

11 Porter on his back, upper back; correct?

12    A    Yes.

13    Q    And in terms of exactly what the other officers

14 were doing, such as Jacoby or Largent, you're not

15 exactly sure.

16    A    No.

17    Q    Is that correct?

18    A    That's correct.  I'm concentrating on --

19    Q    What you're doing.

20    A    -- what I'm doing.

21    Q    All right.  Were you still holding -- were you

22 still bending his legs back when you saw the change in

23 color?

24    A    No.

25    Q    Okay.  What were you doing when you saw the

1  him?

2      A    Yes.

3      Q    You characterized in your statement, your

4  position around his legs as straddling his legs.  Does

5  that sound accurate?

6      A    At one point, yes.

7      Q    Was there anything that you saw while you were

8  at the scene that you thought would have justified using

9  lethal force against Mr. Motley?

10     A    No.

11          MR. GALIPO:  Do we have the exhibits from the

12 last deposition?

13 BY MR. GALIPO:

14     Q    Let me show you Exhibit 1.  Do you recognize

15 that type of document?

16     A    The dispatch.

17     Q    Right.

18     A    Yes.

19     Q    Do you see that relates to the Motley incident?

20     A    Yes.

21     Q    If you can turn to the next page, I think

22 there's an entry at 14:42, the last 14:42 entry.  See

23 where it says:  Subject in custody?

24     A    Yes.

25     Q    Would that generally be when the person --

# CERTIFICATE OF REPORTER

I, SHEILA ANDERSON, a Certified Shorthand Reporter of the State of California, License No. 12778, do hereby certify:

That prior to being examined, the witness

**REBECCA ZUFALL,**

was sworn by me to testify the truth, the whole truth and nothing but the truth;

That said deposition was recorded in stenographic shorthand by me, a Certified Shorthand Reporter, at the time and place herein stated, and was thereafter reduced to typewriting under my direction, and that the deposition is a true record of the testimony given by the witness;

That I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

WITNESS MY HAND this 2nd day of July, 2016.

SHEILA ANDERSON, C.S.R.
License No. 12778