# EXHIBIT "E"

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
 2                       ---oOo---

 3  L.M. by and through her Guardian         Lead Case No.
    ad Litem ASHLEY MCCAIN, individually     2:14-cv-00767-MCE-AC
 4  and as successor in interest to
    the Estate of STEVEN MOTLEY;             Consolidated Case No.
 5  CAROL ADAMS, individually,               2:14-cv-01736-TLN CMK

 6            Plaintiffs,
    vs.
 7
    CITY OF REDDING, et al.,
 8
              Defendants.
 9  _____/
    S M-B, a minor, by and through his
10  Guardian Ad Litem DAWN BIANCO,
    individually and as successor in
11  interest to the Estate of STEVEN MOTLEY,

12            Plaintiff,
    vs.
13
    CITY OF REDDING, et al.,
14
              Defendants.
15  _____/

16

17                    DEPOSITION OF

18                    PEGGY PORTER

19                  REDDING, CALIFORNIA

20                 FRIDAY, JULY 8, 2016

21

22

23  ATKINSON-BAKER, INC., COURT REPORTERS
    www.depo.com, (800) 288-3376
24  REPORTED BY:  CHERYL K. SMITH, CSR NO. 5257

25  FILE NO.:  AA073E8
```

1     A.    Yes.

2     Q.    And one starts off on August 18th, 2014?

3     A.    Yes.

4     Q.    What was the purpose of that report generally?

5     A.    That one was to document all the photographs in
6 order that I reviewed.

7     Q.    Okay. And then there's a report that starts on
8 August 27, 2014?

9     A.    Yes.

10     Q.    And what was the general purpose of that report?

11     A.    Reviewing Channel 1 radio traffic.

12     Q.    Okay. And then there is a two page document that
13 says at the top Shascom Channel 1 Radio Traffic Real Time of
14 Incident 13 dash 70983; do you have that document handy?

15     A.    Yes.

16     Q.    Did you help prepare that document?

17     A.    I wrote the document.

18     Q.    Okay. Can you just generally explain to me why
19 you wrote the document and what, you know, significance that
20 it had to you in this investigation?

21     A.    It documented what was played over Channel 1 and
22 noting the specific things and chain of events and the times
23 that was said for reference of, you know, where people would
24 be at at certain times.

25     MR. GALIPO:    Okay. Maybe, Gary, if it's okay we

7

1  the deposition, would like a transcript, and I will provide
2  the Reporter his name and address after the deposition.  He
3  represents several of the individual defendants in the
4  case.
5          But I did not hear from Marc Pelta, so we called
6  him to ask whether he intended to be here but we haven't
7  heard anything back, and he's not here.
8          MR. GALIPO:  Okay.  Thank you.  And Miss
9  Sarmiento has agreed to not be present and has agreed that I
10 can take this on behalf of the plaintiffs.
11         MR. BRICKWOOD:  Okay.
12         MR. GALIPO:  Q.  Okay.  So getting back to
13 Exhibit 4.
14     A.   Yes.
15     Q.   When you prepared this documents, were you able to
16 listen to a recording of the dispatch?
17     A.   Yes.
18     Q.   Okay.  And there is two columns on the left-hand
19 side.  One says "Time Elapse," and the other "CAD Time."  Do
20 you see those columns?
21     A.   Yes.
22     Q.   Let's start with the time elapse.  Was that just
23 essentially from the beginning point of the recording, you
24 would just put whatever the elapsed time was depending on
25 the entry that was noted?

1  A. Yes.

2  Q. And the CAD time, what would that relate to?

3  A. The closed incident report, or those comments were
4  cross-referenced that a dispatcher entered and time stamped
5  those.

6  Q. Okay. So for example 1432 would essentially be
7  2:32 in the afternoon?

8  A. Yes.

9  Q. All right. Let me ask you just a few questions
10 about your background. How long have you been a police
11 officer?

12 A. Sixteen years.

13 Q. And what is your current assignment?

14 A. I'm assigned to patrol.

15 Q. Okay. And can you give me an idea during the 16
16 years how many of those you were assigned to patrol?

17 A. Thirteen.

18 Q. On the day of the incident with Mr. Motley, were
19 you in uniform?

20 A. Yes.

21 Q. Did you have a partner that day?

22 A. No.

23 Q. Were you driving any marked vehicles solo?

24 A. Yes.

25 Q. And at some point you heard some information

12

1  And do you know if that's when your vehicle got to
2  the scene as opposed to you actually seeing Mr. Motley?
3     A.   That was broadcasted by Officer Berg, B-E-R-G, who
4  was in his patrol car directly in front of me on Alta Saga
5  as we were driving to the house.
6     Q.   Okay.  Did you and Officer Berg arrive on scene
7  at approximately the same time?
8     A.   Yes.
9     Q.   Okay.  And at some point did you see Mr. Motley?
10    A.   Yes.
11    Q.   And when you first saw Mr. Motley, was he
12 essentially chest down or face down in the backyard?
13    A.   Yes.
14    Q.   And were other officers in close proximity to him?
15    A.   Yes.
16    Q.   What other officers were there when you first saw
17 Mr. Motley?
18    A.   Corporal Jacoby, Officer Largent, Officer
19 Townsley, Officer Zufall.
20    Q.   Okay.  So there would have been four officers
21 there when you first saw Mr. Motley?
22    A.   Yes.
23    Q.   Could you tell whether Mr. Motley was handcuffed
24 or not when you first saw him?
25    A.   He was not handcuffed.

```
 1      Q.   Okay.  Do you have any estimate time-wise as to
 2 how much time past when you first seen Mr. Motley until when
 3 he was handcuffed?
 4      A.   Approximately thirty seconds.
 5      Q.   Okay.  Okay.  At any time were you on
 6 Mr. Motley's back?
 7      A.   No.
 8      Q.   Are you aware from any source other than your
 9 attorney that at least one other officer has either given a
10 statement or deposition testimony that you were on
11 Mr. Motley's back?
12      A.   No.
13      Q.   Did Mr. Motley at all appear to be injured when
14 you first saw him?
15      A.   My initial was just focusing on his left hand, so
16 I didn't make an initial scan of him for injuries.
17      Q.   Okay.  At any time before he was handcuffed did
18 you see any injuries on him?
19      A.   Blood on his forearms.
20      Q.   Okay.  Anywhere else?
21      A.   No.
22      Q.   At any time after he was handcuffed did you see
23 any injuries on him?
24      A.   Just to his wrists.
25      Q.   And what did you see to his wrists?
```

```
 1        A.   His right wrist seemed deformed, maybe a fracture,
 2   and then just the blood on his -- on his hands and forearms.
 3        Q.   Okay.  Was he essentially handcuffed behind his
 4   back?
 5        A.   Yes.
 6        Q.   At any point in time before he was handcuffed
 7   did -- did you hear Mr. Motley say anything?
 8        A.   He was moaning or saying something, but I don't
 9   recall exactly what he was saying.
10        Q.   Okay.  Did you ever see him land a punch on
11   anyone?
12        A.   No.
13        Q.   Did you ever hear Mr. Motley verbally threaten
14   anyone?
15        A.   No.
16        Q.   Did you ever see him land a kick on anyone?  And
17   what I mean by that is not kicking, but actually landing a
18   kick where he -- where he kicked an officer?
19        A.   I didn't see it.
20        Q.   Okay.  It sounds like part of your focus in that
21   first thirty seconds was on his left hand; is that fair?
22        A.   Yes.
23        Q.   And were you trying to see if you could help get
24   him handcuffed?
25        A.   Yes.
```

```
 1  him for weapons?
 2      A.   Maybe thirty seconds.
 3      Q.   Okay.  And after you searched him for weapons,
 4  what did you do next with him, put him back chest down?
 5      A.   I don't recall.
 6      Q.   Did you -- did it appear to you that Mr. Motley
 7  started to calm down after he was handcuffed?
 8      A.   Calm down to the point where he wasn't trying to
 9  get up, but he was still struggling.
10      Q.   Okay.  Because you referenced that.  Did you see
11  that when -- I think when I reviewed your statement I think
12  you mentioned after he was handcuffed he started to calm
13  down?
14      A.   Yes.
15      Q.   Okay.  So are you basically explaining what you
16  were meaning that he wasn't trying to get up anymore but
17  there was some movement?
18      A.   Yes.
19      Q.   Okay.  Prior to being handcuffed, did he appear at
20  times to be trying to get up?
21      A.   No.
22      Q.   Okay.  Now when you say there was some movement,
23  what movement are you referring to?
24      A.   His hands were cuffed behind his back, he was
25  taking his right hand trying to bring it around to his front
```

1  Q. Okay. Did you see Mr. Motley resisting after you
2  searched him?
3  A. I don't recall.
4  Q. Well, do you recall seeing him would this be after
5  he was handcuffed and after you searched him?
6  A. It was brief. I don't recall what he was doing
7  after I searched him and Officer Largent said he would take
8  over because then I left.
9  Q. All right. Before you left, did anybody make
10 mention of getting a hobble?
11 A. I don't remember.
12 Q. Before you left, did you see anybody strike
13 Mr. Motley with a baton?
14 A. No.
15 Q. Did you ever see anybody strike Mr. Motley with a
16 baton?
17 A. Yes.
18 Q. And who did you see do that?
19 A. Officer Zufall.
20 Q. Is her first name Becky?
21 A. Yes.
22 Q. Okay. Was that before or after Mr. Motley was
23 handcuffed?
24 A. Before he was handcuffed.
25 Q. Okay. Do you know if Officer Zufall was ever on

Mr. Motley's legs at any time?

A. Yes.

Q. And is that your recollection that she was?

A. Yes, because she was to my right on his legs when I went to grab the handcuffs out of her cuff pouch.

Q. Okay. Would you essentially have been more on Mr. Motley's left side as he was laying chest down?

A. Yes.

Q. And Officer Zufall more on the legs?

A. Yes.

Q. And do you know who was on Mr. Motley's right side when he was chest down?

A. Either Officer Largent or Officer Townsley, but I don't know which one.

Q. And how about Officer Jacoby, do you know where he was when you were there and Mr. Motley was chest down?

A. He was to my left behind me.

Q. To your left.

How would you -- how was your body positioned relative to Mr. Motley's left side?

MR. BRICKWOOD: You're talking about when she was --

MR. GALIPO: Q. I know you were on his left side, but I'm trying to imagine, in other words, whether you were more or less parallel with him, whether you were

1  told me that were there when you and Officer Berg got there?
2      A.  Yes.
3      Q.  Okay.  I'm going to next page of your report.
4  The first paragraph you reference the strikes by Officer
5  Zufall?
6      A.  Yes.
7      Q.  And you saw two strikes; is that correct?
8      A.  Yes.
9      Q.  Do you recall if she had the baton in one hand or
10  two when she did the strikes?
11      A.  I don't recall.
12      Q.  You indicate that Jacoby was on the ground by
13  Mr. Motley's left side?
14      A.  Yes.
15      Q.  Is that when you first observed -- did this
16  paragraph, what you saw during your first observations up to
17  the time he was handcuffed -- in other words, when did you
18  see Jacoby on the ground next to Mr. Motley's left side?
19      A.  When I first came up, that's my first initial
20  observation.
21      Q.  Okay.  Thank you.
22          And you also saw Largent and Townsley on the
23  suspect's right side?
24      A.  Yes.
25      Q.  And this is the time frame where Jacoby gets up

```
 1        A.    There could or could not be blood, it could be
 2   either way.
 3        Q.    Right.  But in this case you looked for blood in
 4   the car and you didn't see any; is that fair?
 5        A.    Yes.
 6        Q.    And then I think you already told me that you
 7   believed that the hat that was in the backyard was
 8   Mr. Motley's?
 9        A.    Yes.
10        Q.    But when you saw him there chest down to your
11   recollection he was not wearing the hat; is that correct?
12        A.    Yes.
13        Q.    So did you get the impression at some point before
14   walking away that the hat must have come off at some point
15   of Mr. Motley?
16        A.    Yes.
17        Q.    Okay.  Did you think that one way to determine
18   whether the head injury occurred in the traffic collision
19   was to see if there was any blood on that hat?
20        A.    Yes.
21        Q.    And did you see any blood on the hat?
22        A.    I didn't examine the hat, but I didn't see it from
23   the photographs any blood on the hat.
24        Q.    Okay.  Did you send the hat out for any testing to
25   see if there was any blood on it?
```

```
 1        A.    No.
 2        Q.    Did you suggest that to be done?
 3        A.    No.
 4        Q.    When you saw the hat on -- at the scene, did you
 5   see any blood on it that you recall?
 6        A.    I didn't examine the hat at the scene.
 7        Q.    Okay.  But when you looked at the pictures of the
 8   hat, would you at least agree you don't see any blood in the
 9   pictures?
10        A.    To my recollection I don't recall seeing blood on
11   the hat in the pictures.
12        Q.    Okay.  Did you see any blood -- the path that you
13   saw that you believed Mr. Motley ran from where he finally
14   got out of Officer Hebert's vehicle, did you see any blood
15   trail leading to the position where Mr. Motley was on the
16   ground?
17        A.    No.
18        Q.    Is the only blood that you saw on Mr. Motley in
19   the area where he was chest down when you saw him in the
20   backyard?
21        A.    Yes.
22        Q.    Okay.
23        MR. BRICKWOOD:  Dale, let me just say I think she
24   earlier talked about blood on the backpack.
25        MR. GALIPO:  Yes, I'm including that, Gary.
```

```
 1  that fair?
 2      A.  Yes.
 3      Q.  Okay.  And that is one of the reasons that you
 4  were looking for blood in the stolen pickup truck?
 5      A.  Yes.
 6      Q.  Now did you look for blood in the patrol car,
 7  Officer Hebert's patrol car?
 8      A.  Yes.
 9      Q.  Did you see any there?
10      A.  No.
11      Q.  And you understood that Mr. Motley took the patrol
12  car after he crashed the stolen pickup truck; is that
13  correct?
14      A.  Yes.
15      Q.  Okay.  So getting back to Exhibit 2, other than
16  going through each one of these and telling me what the
17  picture showed, I take it that was the purpose of this
18  report.  And rather than going through it, the report would
19  basically explain what you found significant with each
20  photograph?
21      A.  Yes.
22      Q.  Okay.  Just give me a moment to look at it.  I
23  don't know if I will have any questions for you on any of
24  them, but I just want to take a look at some of your
25  notations.
```

1  Q. Okay. So if I'm reading that correctly, that
2  would be the time frame where Mr. Motley was noted to be
3  unresponsive?
4  A. Yes.
5  Q. And it looks like there's a follow-up to see where
6  the -- where the ambulance is and the suggestion to get
7  there as soon as they can?
8  A. Yes.
9  Q. Now do you know where you were when that
10 communication came out that Mr. Motley was unresponsive?
11 Would you have been in the back part, or the front of the
12 house, or do you recall?
13 A. I don't recall where I was.
14 Q. Okay. There's some indication from other
15 officers that he appeared -- was unresponsive when he was
16 chest down in the backyard. Do you have any reason to
17 dispute that?
18 A. I'm sorry, say that one more time.
19 Q. Sure. I took the deposition of some other
20 officers who some of them stated that Mr. Motley appeared to
21 go unresponsive when he was chest down in the backyard. And
22 I'm wondering if you have any reason to dispute that?
23 A. No.
24 Q. So if I'm reading the time frame correctly, would
25 looking at time and custody 10:28 and time unresponsive

1  18:08, that would be slightly less than eight minutes
2  between those two entries; does that sound correct, twenty
3  seconds short of eight minutes?
4      A.   Yes.
5      Q.   And if we look at the CADs it seems somewhat
6  consistent, because we would have 14.42 and 14.50, again
7  fractionally eight minutes?
8      A.   Yes.
9      Q.   Did you at any time after Mr. Motley was
10 handcuffed but before the call came out that he was
11 unresponsive see him sat up?
12     A.   No.
13     Q.   Okay.  Now Exhibit 7 as I understand it is the
14 same as Exhibit 4 but a -- a more clear copy?
15     A.   Yes, with the added noted that I put the times
16 that are on the sound bytes from the CD that has all radio
17 traffic Channel 1, Channel 2, Channel 3, medical, phone
18 calls, SO, is referenced by Exhibit No. 6.
19     Q.   Okay.  Let's talk about Exhibit 6 next, and then
20 we'll look at a few portions of your statement last?
21     A.   Okay.
22     Q.   Can you just generally explain to me what you were
23 trying to do with Exhibit 6?
24     A.   Exhibit 6 just has all the radio traffic, whereas
25 Exhibit 7 or -- has just Channel 1.  So this is just

REPORTER'S CERTIFICATE

I, CHERYL K. SMITH, CSR NO. 5257, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.
§signature requested

Dated this 14th day of July, 2016.

_____
CHERYL K. SMITH, C.S.R. No. 5257