

# STEPHANY E. FIORE, M.D.
CONSULTING FORENSIC PATHOLOGIST

P.O. BOX 1716
WEST SACRAMENTO, CA 95691
TELEPHONE • 916-874-9382
sefioremd@gmail.com

May 30, 2014

Josh Lowery
Chief Deputy District Attorney
Shasta County District Attorney's Office
1355 West Street
Redding, CA 96001

RE: Steven Motley

Dear Mr. Lowery:

Per your request, I have performed an evaluation of documents relating to the death of Steven Motley. The following documents were received and reviewed:

- Autopsy report by Dr. Josselson, Forensic Medical Group, case # C13-0952 (SHA13-008), 7 pages
- Toxicology report by Central Valley Toxicology, report # CVT-13-12416, 1 page
- Sgt. Lozada's report of autopsy dated 10-10-13, 3 pages
- Capt. John Hubbard's investigation report dated 11-6-13, 1 page
- MAIT Supplemental report, # 13-34523, 51 pages
- AMR Shasta patient care, case # 9017082, 19 pages
- Redding Fire Dept report, incident # 2013-9175, 2 pages
- Mercy Medical Center, Redding records (MR#1001006462), dated 10-5-13, 168 pages
- Mercy San Juan Medical Center records (MR# 10058217), dated 10-5 to 10-8-13, 752 pages
- Medical records from Mercy Medical Center in Redding (MR# 366324), dated 11-14-05, 29 pages
- Photographs from scene labeled 522 Darling 10-5-13 (132 photos) & 10-7-13 (115 photos), 155 Porter 10-5-13 (207 photos), 141 Berg 10-5-13 (42 photos), Cheney Scene (211 photos) and Cheney day 2 (168 photos)
- Photographs from hospital labeled 157 Smyrnos 10-5-13 (18 photos) and 13-34523 (S) at Mercy (22 photos)
- Autopsy photographs, 98 unlabeled photos plus 130 photos labeled Lozada
- Email correspondence with Ed Obayashi dated 4-30 and 5-17

In summary, this is a case of a 33 year old male who was driving a vehicle that was reportedly stolen and being chased by the police. He reportedly crashed the vehicle but was able to flee on foot and acting like he had "excited delirium". He eventually had an encounter with as many as four officers, where he was allegedly "tased" once, which knocked him to the dirt ground, and then beaten with batons, possibly placed in a chokehold, and may have had multiple people resting on his back while in a prone position. He is rendered unconscious during this encounter and never regained consciousness. The details of the encounter are scant due to lack of cooperation in the investigation by the police officers involved and minimal information for "witnesses". None of the statements from the officers or witness were provided to me; however, a distilled version of the contents was relayed to be by Ed Obayashi. There is no objective documentation of the events to review.

Review of the medical record produced the following information: AMR received a call at 14:51 and arrived on scene at 15:02, finding the victim lying on his side with no pulse, no blood pressure, and not breathing. He had dirt on his face and hands, possible abrasions on his right knee, trauma to his left knee, an obvious fracture of the right forearm, and a laceration on his scalp. He was described as pale and warm with normal moisture. A pulse was regained after 13 minutes of resuscitative efforts. He was transported to Mercy Medical Center in Redding, arriving at 15:28. There is no additional pertinent information in the report from Redding Fire Department.

Upon arrival to Mercy Redding, he continued to be unresponsive and required mechanical ventilation but his circulation had returned, although, he was tachycardic and hypotensive. His temperature (site unspecified) recorded in the emergency room upon arrival was 36.6°C (97.88°F). He had a large linear full thickness scalp laceration on his head that was described as extending from frontal to occipital area with slow venous oozing. A 'tazor" barb was noted in his right upper arm and he had an open comminuted fracture of his distal right ulna and radius, documented by x-ray. CT scan of the chest showed non-displaced fractures of the left 5, 6, 11, and 12 ribs (location not stated) with minimal adjacent subpleural hemorrhage and no pneumothorax. A facial CT scan showed a "comminuted" left zygomatic fracture; however, this was not described on physical examination. His head CT showed no signs of intracranial trauma or brain edema. Beside FAST exam and CT scans were, otherwise, negative. Urine drug screen was positive for amphetamine, opiates, and THC. The assessment was that he had profound acidosis related to a resuscitated cardiopulmonary arrest, neurologic findings concerning for anoxic brain injury and limb threatening injury to his right forearm resulting in ischemia. For this latter reason, he was transferred to Mercy San Juan Medical Center (MSJMC) in Sacramento for further treatment.

By the time he reached MSJMC, he was profoundly hypotensive, requiring fluids to maintain blood pressure. Their initial assessment described two scalp lacerations in the occipitoparietal area, both previously stabled. There were multiple "abrasions", most notably on his forehead at midline, and to his left eyebrow region. Repeat CT scans showed scalp hematomas with staples and a small subdural hemorrhage but still no brain edema, the left zygomatic fracture, and a possible spleen injury. The rib fractures were described as minimally displaced on the posterior left 11th and 12th ribs and mildly displaced in the anterior "right" 8th and 9th ribs. Neurology was initially consulted and stated there was no clear evidence of anoxic brain injury and thought it was possible there may also be some brain trauma from concussion. Neurosurgery was also consulted. They felt he had anoxic brain injury and was not a surgical candidate. ENT was consulted about the zygomatic fracture. They felt the CT showed a minimally displaced fracture that didn't need surgical intervention. They also stated that the physical examination was inconsistent with the CT scan as the infraorbital rim felt intact and there was minimally bruising in the area. He was taken to the OR for an exploratory laparotomy because of his continued hypotension and no intra-abdominal trauma was found. CT angiogram of the right forearm did not reveal any significant vascular injury. He remained unconscious and hemodynamically unstable throughout his hospitalization and ultimately developed rhabdomyolysis and multiple organ system failure. Neurology was reconsulted on 10-8 to determine brain function. Continuous EEG without sedation showed minimal activity that was interpreted as evidence of severe anoxic brain injury. Following consultation with his mother, the victim was removed from life support and died on 10-8-13 at 14:56, three days after his encounter with the police.

He was autopsied on 10-10-13 at the Yolo County Coroner's office by Dr. Josselson, who works for the Forensic Medical Group. Several people from Shasta County were present to witness the autopsy, including representatives from the Sheriff's Office, Redding Police Department, District Attorney's Office, and Shasta County Grand Jury. The following injuries were documented in the autopsy reports from both Dr. Josselson and Sgt Lozada and in the autopsy photographs:

1. There were two linear scalp lacerations that were closed with surgical staples. One was located above the left ear and oriented from front to back. The other was located across the crown and oriented in an apparent right to left direction. It does not appear that the staples were ever removed, nor was the hair shaved around the wounds; therefore, the depth to the wounds, any associated abrasions, and any associated undermining or directionality cannot be assessed. Internal examination revealed marked scalp hemorrhage associated with these wounds but no underlying skull fractures. There was thin subdural hemorrhage localized towards the back of the head. No photographs were taken of the skull base with the dura still present; therefore the extent of the subdural hemorrhage cannot be fully assessed. The brain sits loosely in the skull and exhibits normal gyral contours with no evidence of brain swelling; brain weight was recorded at 1550 grams, which is within normal limits for this individual. It is difficult to assess due to the amount of blood in the photographs, but there appears to be patchy thin subarachnoid hemorrhage and a small contusion on the tip of the right temporal lobe.

2. Several injuries were noted on his face. There is a large patterned contusion on the mid forehead consisting of a cluster of linear marks oriented from upper right to lower left. There are no photographs with the scale oriented in the same direction as the injury making it difficult to assess their true size, but the individual marks appear to be slightly more than 1 cm in width. There is no scalp hemorrhage or fracture underlying this patterned injury. A couple of small light brown abrasions are also present. These are found on the left side of the face, lateral to the eye and on the cheek, and along the lower lip near the chin. No associated injuries of the left eye, facial skeleton, or labial mucosa are documented or apparent in the photographs.

3. No injuries to the neck were found, either on external or internal examination. There is no photo documentation of a layered anterior neck dissection. No petechial hemorrhages are seen in the photographs of the eyes and no hemorrhages or fractures are documented in the neck block or hyoid bone. A posterior neck dissection was not performed.

4. There is no apparent trauma on the external surfaces of the torso. The only evidence of medical intervention is a stapled laparotomy incision. The back was incised and deep muscle hemorrhages appear to be present along the left side of the spine, over both shoulder blades and along the left lateral chest wall. Internal examination revealed several rib fractures and no visceral injuries. The fractures were located along the lateral aspect of the left thorax involving ribs 6-9 and posterior aspect of left thorax involving ribs 11 and 12. The lateral fractures are associated with small tears in the pleura. Approximately 500 ml of blood was collected from the left thorax and 100 ml of blood from the right. The source of the blood in the left thorax is presumably related to the rib fractures. The source of the blood in the right thorax is unclear.

5. Most of the injuries on the upper extremities involve the right side. The most significant injury is the compound fractures to the distal right ulna and radius. This is associated with a couple of small lacerations. The right hand appears swollen and ecchymotic. Small abrasions are seen on the right thumb and index finger. There is a long linear pairing or cluster of blistered injury on the dorsal surface of the right forearm that appears to have a central zone of contusion possibly associated with small puncture marks. Close up photography of this injury is lacking to accurately determine the nature of this injury. There appears to be a linear light brown abrasion on the posteromedial aspect of the right upper arm. A hospital photograph taken on 10-5 by Smyrnos shows a barb from an electronic control device embedded into to the right upper arm posterior to the beard of a Viking tattoo within a curvilinear design. Autopsy photos of this same area show a small area of ecchymosis. There are not many photographs showing the left upper extremity. Only a couple of small abrasions were seen around the elbow.

6. Most of the injuries on the lower extremities involve the left side. There is a large contusion on the back of the left thigh that is nearly confluent but has a rectangular area of sparing just above the knee. The size of this area of spare cannot be determine as there is no photograph

containing a scale that is focused on this area. The back of the left calf has patchy contusions that also exhibit vague parallel linear marks with central areas of sparing. Again, the width of the areas of sparing cannot be determined due to lack of photographs focused on these areas and containing a scale. In addition, there appears to be an abrasion on the back of the left calf up towards the knee exhibiting horizontal linear striations that are tightly clustered. There is a small laceration on the lateral aspect of the left knee. A photograph of an x-ray of the left knee shows a fracture of the proximal left fibula that may be related to this laceration. Small abrasions are seen on the anterior aspect of each knee. There is a large contusion on the medial aspect of the right thigh. No other injuries are found on the right lower extremity. Deep dissection of the lower extremities was not performed; therefore, the depth of these contusions cannot be fully assessed.

7. There are a few non-traumatic findings worthy of note. The victim is a large individual who appears to be in good physical condition. He is recorded at 76 inches in length and weighed 242 pounds. Based on the photographs he appeared muscular and not obese. His heart was in good condition, weighing 390 gm and showing no coronary artery atherosclerosis. Both of his lungs were heavy (R- 1600 gm; L 1470 gm) and exhibited diffuse congestion and edema on gross examination. Microscopically they showed signs of bronchopneumonia, a consequence of ventilator dependence. His liver was mildly enlarged (2330 gm) with microscopic findings consistent with his history of chronic hepatitis C infection. Microscopic descriptions of the brain (cerebrum and cerebellum) were listed as normal. No slides were received for examination.

The toxicology report for analysis of hospital blood collected on 10-5-13 at 15:40 revealed d-methamphetamine (0.72 mg/L) and d-amphetamine (0.09 mg/L). No ethanol, cannabinoids, or any other common acidid, neutral, or basic drugs were detected.

Finally, the Multidisciplinary Accident Investigation Team with the California Highway Patrol was asked to evaluate the vehicle involved in the victim's crash to look for pre-existing conditions of the vehicle that would have caused or contributed to the accident, to inspect the exterior and interior of the vehicle to determine if any of the injuries found on the victim could be explained by the crash, and to inspect the driver's seating position and occupant restraint system to determine if it was utilized in the crash. The inspection showed no intrusion into the driver's compartment of the vehicle; no damage to the dash, headliner, or visor; no deployment of the airbag; and only minor damage to the vehicle. The MAIT report effectively eliminates the accident as a source of any of the injuries found on the victim.

My interpretation of the findings is as follows:

1. There is no evidence of stimulant-induced excited delirium in this case. Excited delirium is typically associated with an increase in body temperature over 100°F. His temperature recorded in the ER at Mercy Medical Center in Redding was only 36.6°C (97.88°F). While methamphetamine and it's metabolite amphetamine were detected in his blood collected near the time of this ER admission, the amounts present are on the low end of the potentially toxic levels listed on the report from Central Valley Toxicology (0.2-5 mg/L and 0.2 mg/L, respectively). If this individual was accustomed to using this drug on a regular basis, the levels detected are fairly insignificant and could reflect use earlier in the day given the long half-life of this drug. Therefore, it is my opinion that the methamphetamine had little to do with his cardiac arrest and ultimate demise.

2. There is no evidence of neck compression; although, the lack of internal trauma in the neck and lack of petechial hemorrhages does not rule out the use of a carotid sleeper hold.

3. A single barb from an electronic control device (ECD) was document in contact with the victim and was found in his right upper arm. It is unknown where the other barb landed. The linear blistered injury on the right forearm is unusual. It is unknown if this injury has anything to do with

the use of the ECD, but it certainly raises this question. No clothing appears to have been examined and its not even mentioned in the information I have received. Furthermore, I have received no information that the device used in this assault was evaluated. Based on the information I have received, it is unknown what effect the use of this device would have had on the victim. Without additional information, it would be my opinion that it is unlikely the use of this device played any role in his cardiac arrest or demise.

4. The facial injuries appear fairly insignificant, with the exception of the patterned injury on the forehead. The lack of deep scalp hemorrhage and underlying fractures makes this wound an unlikely candidate for being created by a baton. However, it is suspicious for a stomping injury. Evaluation of the tread pattern of the shoes worn by the officers would be helpful. The fracture of the left zygoma (cheek bone) seems minor and even at question, based on the medical records and postmortem examination. It would have been helpful if the skin in the area was reflected and the bone directly examined. Based on the information received, it is my opinion that this injury was unlikely caused by a blow with a baton, but may have been caused by a fist or other less forceful blow. The abrasion on the lower lip could have been cased by adhesive tape used to secure the endotracheal tube. None of these injuries would have caused his cardiac arrest or demise.

5. There are injuries consistent with the use of a baton.
    a. The linear nature of the scalp lacerations is consistent with the use of a linear object like a baton. Lack of an underlying skull fracture raises questions about the amount of force applied to the blows and the directionality of the impacts. Without the benefit of complete exploration of these wounds, these questions cannot be adequately answered. It appears a wooden baton was used in the assault by the police officers and that one of the blows to the victim caused the baton to shatter. During which blow to the body resulted in this shattering is unknown. There is no mention of wood fragments embedded into the scalp wounds within either the medical or autopsy records. It is also unclear if other types of batons were used. My opinion would be that if these were direct blows to the head, they did not occur with enough force to fracture the skull, possibly because the wooden baton was already weakened by other blows and structurally failing. Another option is that they were glancing blows to the head. These blows could have possibly rendered him unconscious, but would not have resulted in his death.

    b. The fractures to the right forearm are consistent with being created by a blow (or blows) with a baton. The forearm was not cleaned, so it was difficult to evaluate the skin. A significant amount of force would have been needed to create these fractures, and possibly lead to the structural weakening of the wooden baton. The swelling and ecchymosis of the right hand is most likely secondary to the distal forearm fractures; although, additional blows to the hand are also possible.

    c. The large contusions on the backs of the left thigh and calf and medial aspect of the right thigh are consistent with blows from a baton. The injuries on the left side show traces of tram-track injury, consistent with the use of a cylindrical object. Deep dissection of the lower extremities would have helped delineate the extent of these wounds, which would have been reflective of the amount of force applied. The proximal end of the left fibula was fractured in association with these injuries indicating that significant force was used. The size of these wounds and their location are also consistent with the victim immobilized in a prone position on the ground.

    d. The deep muscle injuries in his back and the rib fractures could be from either blows with a baton or stomps or kicks with a heavy booted foot. There are no skin injuries to guide me in interpreting the source of these injuries. Again, I have not received any information about the clothing he was wearing during the assault, but given that an ECD barb was

    actually embedded into his skin of his upper arm and remained following removal of his clothing, I would deduce that he was at most wearing a short-sleeved T-shirt. It is my opinion that these injuries mostly likely occurred with the victim lying prone on the ground.

6. The abrasions on the anterior aspects of his knees are consistent with him falling forward onto his knees at some point during the assault. There is no evidence that he was hogtied.

7. The reason the victim never regained consciousness is most likely due to hypoxic/ischemic brain injury even in the absence of gross and microscopic findings. What these findings tell me is that the hypoxic/ischemic assault to his brain was not global or longstanding enough to cause diffuse brain swelling and herniation and global neuronal damage. Different areas of the brain are more susceptible to this type of assault than others. The normal histology listed in the autopsy report could just be reflective of the tissues sampled. Given that he never awoke, it is likely that central regions of the brain were involved and not just the outer cortex. Examination of the slides and a more complete examination of any retained tissue would be needed to further comment on his brain pathology.

8. None of the injuries listed above are sufficient enough to explain his cardiac arrest and ultimate demise. The two blows that caused the linear scalp lacerations and possibly the impact(s) that caused the patterned contusion on his forehead could have rendered him unconscious but are not significant enough on their own to explain his death. It is also my opinion that the methamphetamine alone had little to do with this cardiac arrest given the amount present, his physical condition, and his likely habituation to this drug. I have, however, experienced cases where an individually has suffered a cardiopulmonary arrest following what would appear to be non-lethal head trauma in conjunction with the presence of an arrhythmogenic drug (such as methamphetamine) in his system. These individuals usually also have significant cardiac disease, which was not present in this case. Another explanation would be the use of some sort of restraint tactic by the police officers that lead to the cardiopulmonary arrest. There is no evidence of significant neck compression; however a posterior neck dissection was not performed and the use of a carotid sleeper hold cannot be ruled out. Another factor could be the weight of one or more individuals on his back while he is lying in a prone position, particularly in conjunction with the effects of his head trauma. Finally, just the act of leaving someone lying prone, hogtied or not, in an unconscious state could have been an added factor in the development of a cardiopulmonary arrest.

9. After reviewing the materials presented to me, my opinion about his cause death would be that he suffered a cardiopulmonary arrest during a violent struggle with law enforcement that resulted in blunt force injuries to his head, chest, and extremities and I would list the methamphetamine use as a potential contributing factor. Since I do not have proof of asphyxia and only hearsay, I would leave that in an opinion as a potential contributing factor in his cardiopulmonary arrest based solely on the likely use of such restraint tactics by law enforcement in these types of cases.

I hope this report answers your questions. If you have any additional questions, please feel free to contact me.

Sincerely,

Stephany Fiore, M.D.
Forensic Pathologist and Forensic Neuropathologist