UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.M., et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF REDDING, et al.,<br><br>　　　　Defendants. | No. 2:14-cv-00767-MCE-AC<br><br>(Consolidated Case)<br><br>**MEMORANDUM AND ORDER** |
| S.M-B., et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF REDDING, et al.,<br><br>　　　　Defendants. | |

Through this consolidated action Plaintiffs L.M., a minor by and through her guardian ad litem Ashley McCain; Carol Adams individually; and S.M-B., a minor by and through his guardian ad litem Dawn Bianco, (collectively, "Plaintiffs")[1] seek redress from Defendants City of Redding, Chief Robert F. Paoletti, Corporal Chris Jacoby, Officers

---

[1] Originally filed separately, the case of L.M. and Carol Adams was later consolidated with the case of S.M-B., with the separate complaints being referred to by the parties as the McCain and Bianco complaints. Plaintiffs L.M. and S.M-B. are Decedent's five-year old children. Carol Adams is the Decedent's mother.

1

Jared Hebert, Wes Townsley, Brandon Largent, Becky Zufall, and Does 1-10 (collectively "Defendants") for the death of Steven Motley ("Decedent"). Presently before the Court is Defendants' Motion for Summary Judgment, seeking adjudication of four of the causes of action in this consolidated proceeding.[2] Defs.' Mot., ECF No. 60. Defendants move for summary judgment on grounds Plaintiffs cannot show their injury was caused by an official policy of the City of Redding, and therefore cannot establish municipal liability against the City of Redding for unconstitutional customs or policies under 42 U.S.C. § 1983. Additionally, Defendants assert that Plaintiffs fail to show any act or omission by Chief Paoletti as an individual that caused any deprivation of Plaintiffs' civil rights. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.[3]

## BACKGROUND[4]

On October 5, 2013, Redding Police Officer Jared Hebert observed Decedent driving what Officer Hebert believed was a stolen vehicle. A high speed chase ensued. Ultimately, Decedent crashed the GMC pickup he was operating and attempted to run from the scene. Officer Hebert exited his patrol vehicle and pursued Decedent on foot through a residential neighborhood. While being pursued, Decedent circled back to the unmanned patrol vehicle, got in the driver seat, and drove away. Decedent only drove the police vehicle a short distance before abandoning it and fleeing once again on foot. As Officer Townsley arrived on scene, he saw Decedent fleeing the area and followed on foot.

---

[2] Defendants are seeking adjudication of the fourth and fifth claims of the McCain complaint and the sixth and seventh claims of the Bianco complaint.

[3] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

[4] Unless specifically stated, the following recitation of facts is taken, sometimes verbatim, from Plaintiffs' Opposition. ECF No. 68, at 2-5.

2

After observing Decedent in a residential backyard, Officer Townsley jumped the fence and confronted him. When Decedent attempted to run, Officer Townsley deployed his Taser and was able to stun Decedent momentarily to the ground. Townsley Depo., ECF No. 61-3, at 28:7-29:17. Decedent proceeded to disengage the Taser probes from his arm. Id. As Decedent was preparing to get up, Officer Townsley drove a knee into his back, keeping him on the ground chest-down. Id. at 29:22-30:5. After failing to subdue Decedent through several pain compliance techniques, Officer Townsley testified that he positioned himself on top of the Decedent in a "mounted" position with Decedent facing him, and struck Decedent several times in the jaw. Id. at 34:16-22. After successfully stunning Decedent, Officer Townsley was able to turn him over onto his chest and employ a carotid restraint, which briefly rendered Decedent unconscious. Id. at 34:22-25.

While Decedent was momentarily unconscious, Officer Townsley was able to throw to the side a knife that had been in a sheath, hanging from Decedent's waistband.[5] Id. at 22:20-23:7. However, before Officer Townsley was able to handcuff Decedent, he regained consciousness and continued to resist being detained. Id. at 23:1-4. Officer Townsley testified that during the ensuing struggle he used verbal commands, a Taser, multiple control holds, strikes when the control holds failed, and a carotid restraint, all in an attempt to detain the Decedent. Id. at 14:13-22. Until additional law enforcement officers arrived to assist, Officer Townsley used his whole body weight to keep Decedent face-down on the ground with the officer's hand close to the back of Decedent's head. Id. at 43:11-45:2.

Multiple backup officers then descended on the scene. Upon arrival, Officer Largent struck Decedent's right arm five to seven times with his baton, while Officer

---

[5] Because Decedent had access to a patrol vehicle containing firearms, there was initially concern he had weapons in his possession. There was no radio transmission to that effect, however. Largent Depo., ECF No. 62, at 28:2-30:1. While officers stated they saw a sheath and feared the presence of a weapon, other than Officer Townsley (who had taken the knife from the sheath while Decedent was unconscious), officers stated they never saw Decedent in possession of a weapon during the incident. Id. at 25:18-26:17; Zufall Depo., ECF No. 62-1, at 11:14-24.

Townsley was still "mounted" on top of Decedent's back. Largent Depo., ECF No. 62, at 16:14-17:25. At approximately the same time, Corporal Jacoby struck Decedent twice in the right forearm area with his baton. Jacoby Depo., ECF No. 63, at 10:2-23. At one point, Officer Porter was also on the Decedent's back attempting to restrain him and place him in handcuffs. Zufall Depo., ECF No. 62-1, at 18:1-10.

After finally succeeding in handcuffing Decedent, officers observed that his right arm appeared to be fractured. Townsley Depo., ECF No. 61-3, at 52:23-53:6; Largent Depo., ECF No. 62, at 33:4-34:23. They then used their radio to broadcast that the Decedent had been detained and to request medical help due to his broken arm. Jacoby Depo., ECF No. 63, at 27:10-16. Additionally, a hobble restraint was requested and retrieved in an attempt to further control Decedent. Largent Depo., ECF No. 62, at 46:1-4; Jacoby Depo., ECF No. 63, at 29:8-31:3.

While multiple officers were attempting to restrain Decedent's upper body, additional officers were endeavoring to restrain his lower body. Officer Zufall struggled to control Decedent's legs using her body weight, and when that proved unsuccessful, she struck his legs three or four times with her baton. Id. at 14:6-25. After Decedent was handcuffed, both Officer Zufall and Officer Smyrnos attempted to control Decedent's legs by bending one foot behind a knee and then folding the leg up into a figure four position, pressing Decedent's legs towards his buttocks. Zufall Depo., ECF No. 62-1, at 21:14-22:2.

As Decedent was being subsequently searched, Officers Largent and Zufall observed his face change color. Largent Depo., ECF No. 62, at 43:15-45:14, 68:13-71:24; Zufall Depo., ECF No. 62-1, at 25:4-18. Decedent then went limp and became unresponsive, at which point his legs were released and allowed to extend, and he was moved from the prone position to a side position. Jacoby Depo., ECF No. 63, at 31:22-37:21.

Officer Largent testified that he checked for a pulse on Decedent's carotid while Decedent was still chest down on the ground. Largent Depo., ECF No. 62, at 71:25-

4

75:13. Officer Largent felt a heartbeat and observed that Decedent was still breathing. Id. at 72:16-75:13. The officers requested that an ambulance be dispatched as soon as possible, and proceeded to move Decedent, using a so-called "fireman's carry," closer to where medical personnel could quickly reach him. Id. at 75:18-77:10; Jacoby Depo., ECF No. 63, at 33:21-35:20. Decedent was then placed on his side in a rescue posture and Officer Largent again felt a pulse on Decedent's carotid. Largent Depo., ECF No. 62, at 77:11-78:2. At a point when Officer Largent no longer felt a pulse, he started chest compressions until he was able to regain a pulse, and testified that he heard a loud, verbal exhale sound from the Decedent. Id. at 79:14-80:22. When the paramedics arrived Decedent was not breathing and did not have a pulse. Id. at 80:23-81:4. Decedent was initially transported by ambulance to a local hospital and then later by air ambulance to an out of area hospital.

Three days later, on October 8, 2013, Steven Motley succumbed to his injuries and died without ever regaining consciousness.[6] The cause of death was listed as cardiopulmonary arrest during a violent struggle with police. Decedent's death was further attributed to so-called "excited delirium" given the fact the he was determined to be under the influence of methamphetamine.[7] Josselson Depo., ECF No. 63-1, at 14:8-15:10. A subsequent examination completed by a forensic pathologist retained by the District Attorney's Office during their review of the incident, however, found no evidence of a stimulant-induced excited delirium. Instead, the forensic pathologist opined that the cause of death was a cardiopulmonary arrest during a violent struggle with law

///

///

///

---

[6] During the course of an autopsy, the medical examiner found numerous injuries to the Decedent including two scalp lacerations, large scalp contusions, a small subdural hemorrhage of the brain, a bilateral intercostal muscle hemorrhage, left rib fractures, a fracture of the right radius, a fracture of the right ulna, and a fracture of the left fibula. Josselson Depo., ECF No. 63-1, at Ex. 1.

[7] The autopsy revealed Decedent had methamphetamine in his system at the low end of a potentially toxic level. Josselson Depo., ECF No. 63-1, at 13:8-24.

enforcement that resulted in multiple blunt force traumas.[8] Id. at Ex. 2. The District Attorney's pathologist also stated that asphyxia was potentially a contributing factor. Id. Even the Plaintiffs' expert, contrary to the findings of the initial autopsy report, believed that Decedent likely lost consciousness due to restraint asphyxia, with fatal compression asphyxia thereafter occurring when Decedent was restrained by officers in a prone position with weighted pressure. O'Halloran Decl., ECF No. 68-2, at ¶¶ 6-14.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

///

---

[8] Pursuant to critical incident protocol, both the Shasta County District Attorney's Office and the Shasta County Sheriff's Office independently investigated the incident. Pls.' SSUF, ECF No. 68-1, at ¶¶ 9-12. The District Attorney's Office issued findings that raised questions about the use of force by the officers who used baton strikes in an effort to subdue Decedent, but concluded that, given the chaotic circumstances confronting the officers, there was no basis to second-guess the officers' use of force. Accordingly, the District Attorney's Office declined to file charges. Id. at ¶ 12.

6

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.  Municipal Liability**

A municipality may only be liable where it individually causes a constitutional violation via "execution of a government's policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent them." Monell v. Dept. of Social Services, 436 U.S. 658, 694 (1978); Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002). Municipal liability under Monell can arise three ways:

> (1) [W]hen official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct.

Rodelo v. City of Tulare, No. 1:15-cv-1675-KJM-BAM, 2016 WL 561520, at *3 (E.D. Cal. Feb. 12, 2016). After proving that one of the circumstances exists, a plaintiff must also show that the municipality's action was the cause of the constitutional deprivation. Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). Here, Plaintiffs assert a Monell claim under two separate theories: (1) the municipality's failure to train amounts to deliberate indifference; and (2) ratification of unconstitutional conduct.

**1.     Failure to Train**

A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Connick v. Thompson, 563 U.S. 51, 61 (2011); City of Canton v. Harris, 489 U.S. 378, 388 (1989). Additionally, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton at 390; see also Cloutheir v. County of Contra Costa, 591 F.3d 1232, 1249 (9th Cir. 2010).

Generally, in order to prove deliberate indifference under circumstances like those present here, plaintiffs must demonstrate "a pattern of similar constitutional violations by untrained employees." Connick, 563 U.S. at 62 (citing Board of the County Comm'rs v. Brown, 520 U.S. 397, 409 (1997)). The Supreme Court nonetheless has recognized that even a "single incident" of indifference can, if egregious enough, substitute for the pattern of violations ordinarily necessary to establish municipal liability." Connick, at 63. The Court further explained that the "single-incident" theory represents the Supreme Court's refusal to "foreclose upon the possibility" that when a failure to train is so patently obvious, a single constitutional violation will suffice to give rise to municipal liability under § 1983. Id. at 64. However, the Court took care to note that only "in a narrow range of circumstances" might it be unnecessary to demonstrate a pattern of similar violations. Id. at 63 (quoting Board of the County, 520 U.S. at 409). A violation under such circumstances must be a "highly predictable consequence" of a failure to train. Id. By way of example, "the Court theorized that a city's decision not to train officers about constitutional limits in the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights. Id. (quoting Board of the County, 520 U.S. at 409).

///

In this case, Plaintiffs allege a deficiency of training by the City of Redding Police Department pertaining to the acceptable use of force, specifically the failure to train in the proper application of restraint techniques. Pls.' Opp'n, ECF No. 68, at 8. Plaintiffs assert that applying proper restraints is a fundamental law enforcement task that requires training, especially due to the potential health risks that are associated with improper restraints. Id. Plaintiffs further allege that the restraint techniques used against Decedent were unreasonable due to the numerous baton strikes by multiple officers that resulted in several broken bones, the additional leg restraints by officers, and the risk of asphyxia occasioned by the fact that restraints were employed while Decedent was in a prone position with the weight of multiple officers' pressing upon his body. Id. at 9.

In response, Defendants assert that they meet and exceed so-called POST standards[9] in all areas, including the proper use of force. Defs.' Reply, ECF No. 70 at 2. According to the City, each of the officers involved in the subject incident passed a POST certified police academy prior to beginning their career as police officers, and the City maintains it provides training to its officers in all aspects of law enforcement that meets or exceeds POST standards, including use of force, response to critical incident circumstances, and the provision of reasonable and necessary medical care. See Defs.' Mot., ECF No. 60 at 7. Defendants further assert Plaintiffs misrepresent the record as to how Decedent's restraints were accomplished. See Defs.' Reply at 3, 5.

In this case, disputed facts preclude the entry of summary judgment on Plaintiffs' allegations of a failure to train. These factual issues, which bear on whether the officers in fact received proper training, include but are not limited to: (1) whether the amount of resistance officers faced while attempting to detain Decedent warranted the amount of force utilized and types of restraints employed; (2) whether multiple officers utilized their body weight on Decedent's torso while he was in a prone position; (3) the length of time Decedent was restrained in a prone position and whether and how that may have

---

[9] The Commission on Peace Officer Standards and Training ("POST") sets standards for the basic and continued training of peace officers, and certifies local law-enforcement agencies and their officers as being in compliance with those standards. See Defs.' Ex. B, ECF No. 63-2.

resulted in his subsequent death; (4) the effect of the figure four restraint on Decedent's legs while he was in the prone position; and (5) whether the cause of death was attributable to excited delirium and/or improper restraints.

Given these disputed factual issues, the Court cannot rule out a conclusion that the City's failure to train its officers in proper restraint methods was so obviously deficient that municipal liability could stem from the single constitutional deprivation presently at issue. Therefore, Defendants' Motion is DENIED as to Plaintiffs' Monell claim alleging the City's failure to train.

### 2. Ratification

Failure by a city to discipline a particular officer is insufficient by itself to demonstrate the city's ratification of that officer's conduct. See Haugen v. Brosseau, 351 F.3d 372, 393 (9th. Cir. 2003). There must be something more. In Larez v. City of L.A., 946 F.2d 630 (9th Cir. 1991), for example, the court held there was sufficient evidence to support a jury finding that the chief of police ratified the excessive use of force against the plaintiffs when he unquestioningly accepted the findings of an investigation that had been conducted by the agency responsible for the alleged constitutional violation, despite the fact that said investigation contained gaps and inconsistencies. If sufficient facts have been alleged, ratification becomes a question for the jury. See Christie v. Iopa, 176 F.3d 1231, 1238-9 (9th Cir. 1999); Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995).

In support of their ratification theory, Plaintiffs allege the City did not take steps to change any policy or train its staff in the proper arrest and control procedures after the incident at issue here. Pls.' Opp'n, ECF No. 68, at 10. Plaintiffs point to numerous failings in that regard. Id. They assert the City ignored the finding of the District Attorney's forensic pathologist that asphyxia was potentially a contributing factor, failed to recognize the egregiousness of the violations of POST training with respect to the restraint and positional asphyxia of Decedent, and failed to take disciplinary measures or mandate follow up training for the officers involved in the incident. Id. at 10-13. Plaintiffs

contend that these actions by the City, coupled with conduct that was so outrageous a reasonable administrator should have known action was required, indicate a systemic, organizational, cultural pattern and practice thereby ratifying officers' excessive and unnecessary force. Id.

Defendants assert Plaintiffs' ratification theory is premised on mere allegations of the City's ostensible failure to discipline the officers involved, and is not factually supported. Defs.' Reply, ECF No. 70, at 6. Defendants state that any concerns based upon the findings of the District Attorney's Office are an after-the-fact observation of a single incident and not indicative of any municipal policy. Defs.' MSJ, ECF No. 60, at 11. Further, Defendants point out that additional training on excited delirium was initiated by the police department after the incident with Decedent. Id.

As detailed above, numerous factual disputes surround the issue of whether or not the City may have ratified the officers' actions. Given those disputes, the Court finds that a rational juror could find that the City's failure to train, re-train, or discipline the law enforcement officers after the incident in question could rise to the level of ratification sufficient to support liability by the City for Steven Motley's death. In this Court's estimation, questions of material fact have been raised as to whether steps should have been taken to train, re-train, or discipline officers involved in the altercation with Decedent. Further, the conflicting expert opinions on the causes of death, particularly when coupled with the District Attorney's findings as to the propriety of force associated with the officers' baton strikes, as well as the potential of restraint asphyxia relating to Steven Motley's death, all could lead a reasonable juror to find that by not taking action concerning the training of restraints and baton strikes after the altercation with Decedent, the City was essentially ratifying the officers' use of force. Therefore, Defendants' Motion is DENIED as to Plaintiffs' claim under a Monell theory of ratification.

**B.    Individual Liability**

"Liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates,

for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." Johnson v. City of Vallejo, 99 F. Supp. 3d 1212, 1219 (E.D. Cal. 2015) (quoting Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005)). A suit against a governmental official in his official capacity, on the other hand, is equivalent to a suit against the entity itself and hence is superfluous where, as here, the entity has been sued. Larez v. City of Los Angeles, 946 F.2d at 646.

While respondeat superior liability does not attach to a § 1983 claim, "a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violation [of subordinates] and failed to act to prevent them.'" Preschooler II v. Clark County Sch. Bd. of Trs., 479 F.3d 1175, 1182 (9th Cir. 2007) (quoting Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms." Johnson, 99 F. Supp. at 1219 (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Plaintiffs allege Chief Paoletti, both in his official and individual capacities, was responsible for the constitutional deprivations that befell Decedent because he condoned, ratified, and encouraged the excessive force utilized by the Defendant officers. Pls.' Opp'n, ECF No. 68 at 14. The Court agrees with Defendants, however, that the only real claims against Chief Paoletti are being asserted in his individual capacity, since any official capacity claims are subsumed by the City's inclusion in this lawsuit. With that understanding, the Court only addresses Plaintiffs' claim against Chief Paoletti in his individual capacity.

Defendants assert that Plaintiffs have failed to offer facts establishing that Chief Paoletti knew of any purported pattern of citizen complaints sufficient to establish individual liability, or establishing any violation of Plaintiffs' federal civil rights attributable to Chief Paoletti's individual acts or omissions. Defs.' Mot., ECF No. 60, at 2, 13.

The Court agrees and finds that there has been no evidence brought forth by Plaintiffs indicating that Chief Paoletti had any individual role in this incident that would take his liability beyond that entailed by his official capacity. Accordingly, Defendants' Motion is GRANTED as to Plaintiffs' claim against Chief Paoletti in his individual capacity.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 60, is GRANTED in part and DENIED in part as follows:

1. Summary Judgment is DENIED as to Plaintiffs' Fourth (McCain Complaint) and Sixth (Bianco Complaint) claims under a <u>Monell</u> theory of failure to train.

2. Summary Judgment is DENIED as to Plaintiffs' Fourth (McCain Complaint) and Sixth (Bianco Complaint) claims under a <u>Monell</u> theory of ratification.

3. Summary Judgment is GRANTED as to Plaintiffs' Fifth (McCain Complaint) and Seventh (Bianco Complaint) claims against Redding Chief of Police Robert Paoletti in his individual capacity.

IT IS SO ORDERED.

Dated: November 9, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE